# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| KAREN FINN, DR. JILLIAN FORD, HYLAH DALY, JENNE DULCIO, GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., NEW GEORGIA PROJECT ACTION FUND, LEAGUE OF WOMEN VOTERS OF MARIETTA-COBB, and GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. <br><br> Plaintiffs <br><br> -v- <br><br> COBB COUNTY BOARD OF ELECTIONS AND REGISTRATION and JANINE EVELER, in her official capacity as Director of the Cobb County Board of Elections and Registration, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## **INTRODUCTION**

1.      In response to the rapid diversification of Cobb County and the growing political power of the County's Black and Latinx[1] population, the Cobb County Board of Education (the "Board") and state legislators improperly used race as a predominant factor in drawing the boundaries of districts 2, 3, and 6 ("District 2," "District 3," and "District 6," respectively, and together the "Challenged Districts") in the redistricting plan (the "Redistricting Plan" or the "Plan") for Board elections, recently enacted pursuant to House Bill 1028 ("HB 1028").

2.      The Board's four white members—Randy Scamihorn, David Chastain, David Banks, and Brad Wheeler—forged ahead with a secretive map-drawing process to maintain their tenuous majority over the Board's three Black members—Dr. Jaha Howard, Leroy Tre' Hutchins, and Charisse Davis.  The white Board members' actions regarding the Redistricting Plan fit within their pattern and practice of subjecting the Black Board members and their constituents of color to racially disparate policies enacted along racial lines over the course of the last several years.

---

[1] The term "Latinx" is a gender-neutral term that refers to people of Latin American origin or descent.

3.      Rather than cooperate with their Black counterparts on the Board and the members of Cobb County's legislative delegation, the Board's four white members voted on racial lines and without substantive debate to hire—at great expense to the County—a consulting firm to draw a proposed map.  This process—both the hiring of a third party to draw the redistricting maps and the Board's decision to forego bids from multiple firms—strayed from the Board's past practices.

4.      The Board's white Chairman proposed the Board adopt the map exactly as drawn by the consulting firm hand-picked by the Board's white members.  The Board approved the Chairman's proposed plan along racial lines, over the objections of the Board's Black members, while also rejecting a Black Board member's proposal to retain the 2012-enacted redistricting plan, which, upon information and belief, met the redistricting criteria available to the Board members at the time.  In drawing the Plan, race predominated, with Black and Latinx voters being packed into the three Challenged Districts to dilute their political power.

5.      The Redistricting Plan then proceeded to the Georgia General Assembly, where all county-level school board redistricting plans must be enacted as a matter of state law.  Once there, state legislators singled out the Redistricting Plan—amongst other plans contemporaneously considered from most of Georgia's

159 counties—for atypical treatment.  Specifically, the General Assembly decided to refer the Plan to the House Governmental Affairs Committee.  In contrast, the vast majority of county-level plans were referred to the House Intragovernmental Coordination Committee or the Senate State and Local Governmental Operations Committee.  Ultimately, the General Assembly adopted the Plan over the objections of the majority of Cobb County's state legislative delegation.  Upon information and belief and as set forth further below, the manner in which the General Assembly debated and adopted the Redistricting Plan represented a massive departure from Georgia's long-standing practice for adopting county-level school board redistricting plans.

6.      White Board members and legislative sponsors of the Plan repeatedly claimed that they used race to comply with federal law.

7.      Using race as a predominant factor in redistricting may be justified in certain circumstances, such as ensuring compliance with Section 2 of the Voting Rights Act of 1965 ("VRA").

8.      But, upon information and belief, neither the Board nor any of the state legislators conducted a functional analysis of each Challenged District to support the use of race for purposes of VRA compliance.

9. Instead, Section 2 of the VRA was used as a pretext for the Board and state legislators to improperly separate voters of color from white voters to maintain the white members' slim majority on the Board.

10. Ultimately, the Board and General Assembly enacted a redistricting plan that whitewashed the northern, eastern, and western districts by packing Black and Latinx voters into the Challenged Districts, as a last-ditch effort to limit the power of their emerging political coalition. The Plan is a product of the Board's pattern and practice over the last several years to impose policies that disproportionately and negatively impact students of color and their families.

11. The Board and state legislators' use of race as the predominant factor in drawing the Challenged Districts, without narrowly tailoring that use to comply with a compelling governmental interest, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Redistricting Plan must be enjoined.

## JURISDICTION AND VENUE

12. This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

13.     The Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

14.     The Court has personal jurisdiction over the Defendants, who are all citizens and residents of Georgia and public entities of Georgia.

15.     Venue is proper in this District and Division under 28 U.S.C. §§1391(b) and 90(a) because one or more Defendants officially resides therein.

## **PARTIES**

16.     Plaintiff Karen Finn is a registered voter residing in District 6 as set forth in the Redistricting Plan.  Ms. Finn identifies as a Black/African American woman and is a parent to a student enrolled in public school in Cobb County.

17.     Plaintiff Dr. Jillian Ford is a registered voter residing in District 2 as set forth in the Redistricting Plan. Dr. Ford identifies as Black/African American.  She is a Professor at Kennesaw State University and a leader of Stronger Together, a grassroots community organization of parents, students, educators, advocates, and community members working to end racism in Cobb County schools.

18.     Plaintiff Hylah Daly is a registered voter residing in District 2 as set forth in the Redistricting Plan.  Ms. Hylah Daly identifies as a bi-racial woman and is a recent graduate of Cobb County schools.

19.     Plaintiff Jenne Dulcio is a registered voter residing in District 3 as set forth in the Redistricting Plan.  Ms. Dulcio identifies as a Black/Haitian American woman and is a recent graduate of Cobb County schools.

20.     Plaintiff GALEO Latino Community Development Fund, Inc. ("GALEO") is a non-partisan, nonprofit corporation. GALEO is one of the oldest, largest, and most significant organizations promoting and protecting the civil rights of Georgia's Latinx community.  GALEO is committed to greater civic engagement and leadership development by the Latinx community across Georgia.  GALEO's work includes organizing voter education, civic engagement, voter registration drives, and get out the vote events aimed at energizing and empowering the Latinx community.  GALEO also engages in state and local advocacy aimed at protecting and expanding the right to vote, increasing language access for limited English proficient voters, and ensuring that Latinx voters are not disenfranchised at the voting booth.

21.     GALEO is headquartered in Norcross in Gwinnett County, but a substantial amount of GALEO's civic engagement, voter registration, and get out the vote work takes place in Cobb County.

22.     GALEO has members in at least one or more of the Challenged Districts who identify as Latinx/Hispanic or Black. If the Challenged Districts are

not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

23.    GALEO brings this action on its own behalf and on behalf of its members who are residents of and registered voters in the Challenged Districts and who each have a right to representation on the Cobb County Board of Education that complies with the U.S. Constitution.

24.    Unfair and discriminatory redistricting directly frustrates and impedes GALEO's core mission of protecting the rights of Latinx voters and forces GALEO to divert resources toward directly combatting the ill effects of unlawful redistricting.

25.    Plaintiff New Georgia Project Action Fund ("NGPAF") is a non-profit corporation and nonpartisan civic engagement and democracy group organized and existing under the laws of the State of Georgia.  Since its inception, NGPAF has worked to increase civic engagement and build power among Black and Latinx Georgians as well as other historically marginalized communities.  NGPAF has worked with these communities through nonpartisan voter registration efforts, organizing, and advocacy, statewide, including in Cobb County.  NGPAF assists voters with locating and getting to their polling locations, combats misinformation and disinformation about voting, and hosts town halls as well as voter registration

drives throughout each of Georgia's 159 counties.  Additionally, NGPAF provides public education materials to voters on the redistricting process and advocates for fair and constitutional maps.

26.    NGPAF has one office located in Atlanta, Georgia and operates in Cobb County, among other counties in Georgia.

27.    NGPAF has members in at least one or more of the Challenged Districts who identify as Black and/or Latinx/Hispanic.  If the Challenged Districts are not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

28.    NGPAF brings this action on its own behalf and on behalf of its members who are residents of and registered voters in the Challenged Districts and who each have a right to representation on the Cobb County Board of Education that complies with the U.S. Constitution.

29.     Unfair and discriminatory redistricting directly frustrates and impedes NGPAF's core mission of protecting the rights of voters NGPAF works to engage and forces NGPAF to divert resources toward directly combatting the ill effects of unlawful redistricting.

30.    Plaintiff League of Women Voters of Marietta-Cobb ("LWVMC") is a local League with League of Women Voters of Georgia ("LWVGA") and is a

8

grassroots, nonpartisan, community-based organization existing under the laws of the State of Georgia.

31.     LWVMC and LWVGA are part of the League of Women Voters of the United States (collectively, "the League"), which has state and local leagues in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, and Hong Kong.

32.     LWVMC encourages the informed and active participation of citizens in government and influences public policy through education and advocacy.  The League, including LWVMC, is dedicated to encouraging its members to exercise their right to vote as protected by the Constitution and the Voting Rights Act of 1965. The League impacts public policies, promotes citizen education, and makes democracy work by, among other things, working to remove unnecessary barriers to full participation in the electoral process through voter education and advocacy.

33.     The League fights to protect the rights of all eligible voters and often focuses its work on underrepresented communities to expand access for Black and Latinx voters and other historically marginalized communities who have been left out of the democratic process.  As part of its mission, the League assists voters in navigating the elections process, provides resources for voters to check their registration, determine their voting district and their polling locations, holds issue forums on important issues to the community, and mobilizes voters to engage in

issue advocacy. The League provides public education materials to voters on the redistricting process and advocates for government transparency and public engagement for fair and constitutional maps.

34. The League has members in at least one or more of the Challenged Districts who identify as Black and/or Latinx/Hispanic. If the Challenged Districts are not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

35. The League brings this action on its own behalf and on behalf of its members who are residents of and registered voters in the Challenged Districts and who each have a right to representation on the Cobb County Board of Education that complies with the U.S. Constitution.

36. Unfair and discriminatory redistricting directly frustrates and impedes the League's core mission of defending democracy and empowering voters.

37. Plaintiff Georgia Coalition for the People's Agenda, Inc. ("GCPA") is a Georgia nonprofit corporation that convenes individual members as well as a coalition of more than 30 human rights, civil rights, and justice groups organizations, which collectively advocate for voting rights protections, elimination of barriers to the ballot box, and equal participation in the political process for Georgians of color, among other policy priorities. Since 1998, GCPA has committed time and resources

to protecting voting rights through advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, get out the vote efforts, election protection, census participation, and litigation.  GCPA also conducts voter registration drives, distributes civic education materials to voters and prospective voters, provides voter ID assistance, hosts events aimed at encouraging voter participation among Black and Brown voters and voters in historically underserved communities of color, arranges for rides to the polls for voters, and supports the nonpartisan Georgia Election Protection field program in order to assist voters on the ground near polling sites.

38.    GCPA is headquartered in Atlanta, but it also has field offices in Athens, Albany, Augusta, Macon, Savannah, and LaGrange and it operates in Cobb County regularly.

39.    GCPA has members in at least one or more of the Challenged Districts who identify as Black or Latinx/Hispanic. If the Challenged Districts are not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

40.    GCPA brings this action on its own behalf and on behalf of its members who are registered voters residing in Cobb County and who each have a right to

11

representation on the Cobb County Board of Education that complies with the U.S. Constitution.

41.    Unfair and discriminatory redistricting directly frustrates and impedes GCPA's core mission of protecting the rights of Black voters and other voters of color and forces it to divert resources toward directly combatting the ill effects of unlawful redistricting.

42.    Defendant Cobb County Board of Elections and Registration is the entity charged with overseeing the conduct of Cobb County elections and implementing laws and regulations, including with respect to the Challenged Districts at issue in this litigation.

43.    Defendant Janine Eveler is sued in her official capacity as the Director of the Cobb County Board of Elections and Registration.  Defendant Eveler is Cobb County's chief election officer, responsible for overseeing the conduct of Cobb County elections and implementing laws and regulations, including with respect to the Challenged Districts at issue in this litigation.

## STATEMENT OF FACTS

44.    On March 2, 2022, Governor Brian Kemp signed into law HB 1028, which redistricted the Cobb County Board of Education districts for the next ten years.

45.     Since the white-member majority on the Board shrunk from 6-1 to 4-3 following the 2018 election cycle, the Board has targeted Black and Latinx students and parents as well as the Black members of the Board for disparate treatment.  The white majority's discriminatory actions are in furtherance of their efforts to create a firewall against the rising Black and Latinx political power in the county.

46.     The Redistricting Plan, pursuant to HB 1028, and its use of race as a predominant factor, continues this effort to restrain Black and Latinx political power in Cobb County.  Therefore, before turning to HB 1028 and the Redistricting Plan, some background is warranted.

## I.     <u>Georgia's History of Suppressing the Black Vote</u>

47.     Georgia has a long history of suppressing the voting rights of Black voters and other voters of color.  *See King v. Chapman*, 62 F. Supp. 639, 650 (M.D. Ga. 1945) (discussing the Democratic Party of Georgia's "white primaries"), *aff'd,* 154 F.2d 460 (5th Cir. 1946); *United States v. Raines*, 189 F. Supp. 121, 132 (M.D. Ga. 1960) (discussing Georgia's use of "literacy tests" for voting); *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("Georgia has a history chocked full of racial discrimination at all levels."); *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013) ("Generally, Georgia has a history chock full of racial discrimination at all levels.

This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quotation marks omitted), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015).

48. In fact, Georgia's history of disenfranchising voters of color through racially discriminatory voting laws has been so widespread that district courts have taken judicial notice of such practices. *See, e.g.*, *Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."), *aff'd and remanded*, 515 U.S. 900 (1995); *Brooks*, 848 F. Supp. at 1560 (same).

49. Given this history of discrimination, Georgia was one of the nine states in 1965 required to get clearance from the Department of Justice before changing election rules under the VRA. While Georgia was subject to federal preclearance, the Department of Justice repeatedly objected to many of Georgia's proposed redistricting maps. *See, e.g.*, Letter from David L. Norman, Assistant Attorney General, U.S. Department of Justice, Civil Rights Division, to the Hon. Arthur K. Bolton, Attorney General, State of Georgia (Feb. 11, 1972),

https://www.justice.gov/crt/records/vot/obj_letters/letters/GA/GA-1140.pdf

(objecting to Georgia's first redistricting map following the passage of the VRA);

Letter from William Bradford Reynolds, Assistant Attorney General, U.S.

Department of Justice, Civil Rights Division, to the Hon. Michael Bowers, Attorney

General, State of Georgia (Feb. 11, 1982), https://www.justice.gov/crt/

records/vot/obj_letters/letters/GA/GA-1870.pdf (objecting to Georgia's 1981

congressional redistricting map); Letter from John R. Dunne, Assistant Attorney

General, U.S. Department of Justice, Civil Rights Division, to Mark H. Cohen,

Senior Assistant Attorney General,  State of Georgia (Jan. 21, 1992),

https://www.justice.gov/crt/records/vot/obj_letters/letters/GA/GA-2330.pdf

(objecting to Georgia's 1992 congressional redistricting map); Letter from John R.

Dunne, Assistant Attorney General, U.S. Department of Justice, Civil Rights

Division, to Mark H. Cohen, Senior Assistant Attorney General, State of Georgia

(Mar. 20, 1992), https://www.justice.gov/crt/records/vot/obj_letters/letters/

GA/GA-2360.pdf (objecting to Georgia's second submission of its 1992

congressional redistricting map).

50.    In 2013, however, the Supreme Court in *Shelby County v. Holder*, 570

U.S. 529 (2013), invalidated the coverage provision that identified jurisdictions

subject to the preclearance requirement under the VRA, effectively removing Georgia and other previously covered jurisdictions from its requirements.

51.    HB 1028 is the Board's first redistricting plan to be enacted since the end of the VRA's preclearance requirement that applied for the last five redistricting cycles to states and local jurisdictions with a demonstrated record of racial discrimination in voting, including Georgia and Cobb County.

## II.    Cobb County Rapidly Diversifies, Resulting in the Growing Political Strength of the Black and Latinx Electorate

52.    For the Board's white members and the state legislators who wished to entrench the Board's white majority, the lifting of the preclearance requirement could not have come at a better time, as Cobb County's racial diversification has accelerated substantially since the 2010 census.  According to the U.S. Census Bureau's 2020 redistricting data, Cobb County's white[2] adult population decreased from 60.08% in 2010 to 51.25% in 2020, an 8.83 percentage-point decrease.

53.    By contrast, Cobb County's communities of color all saw population growth during that period.  In 2010, Cobb County's Black population made up 25%

---

[2] The white population as described here are individuals who responded 'No, not Spanish/Hispanic/Latino' and who reported 'white' as their race in the 2020 census questionnaire.

of the County; it now makes up 26.6% of the County.[3]  Cobb County's Latinx population made up 12.3% of the County in 2010; it now makes up 14.5% of the County.  And these trends are likely to continue in the coming years, since Cobb County's youth population skews heavily Black and Latinx.  Between 2010 and 2020, the white children (under 18 years of age) of Cobb County decreased by 7.57 percentage points, from 45.36% of the youth population to 37.80%.  Meanwhile, the Black and Latinx youth population saw an increase of 2.32 percentage points, from 45.83% in 2010 to 48.16% in 2020.

54.     These changing demographics have corresponded with increases in the political strength of Cobb County's communities of color, as the results in the last three national elections demonstrate.  In 2012, President Barack Obama—the preferred candidate of Cobb County's Black and Latinx communities—lost Cobb County by 12 percentage points.  Since then, Cobb County's shifting demographics have impacted Georgia's election results.  In 2016, Hillary Clinton—the Black- and Latinx-preferred candidate—won Cobb County by 2 percentage points, even though she lost Georgia state-wide.  And Joe Biden—the Black- and Latinx-preferred

---

[3] "Black population" as described here are Census respondents who replied that they were any part Black.  "Latinx population" as described here are Census respondents who replied they were of Hispanic or Latino origin.

candidate in 2020—won Cobb County by 14 percentage points.

55.     The political strength of Cobb County's Black and Latinx population has not been limited to presidential elections.  Cobb County's communities of color have boosted their preferred candidates up and down the ballot in recent elections. Stacey Abrams, a Black woman, who narrowly lost Georgia's 2018 gubernatorial election and was the Black- and Latinx-preferred candidate, won Cobb County by 9 percentage points.  Two years later, they also elected the County's first Black County Commissioner, Lisa Cupid, who was the Black and Latinx-preferred candidate.  In that same 2020 election, Cobb County also elected its first Black District Attorney and first Black Sheriff.  And in 2021, majorities in Cobb County helped lift both Reverend Raphael Warnock and Jon Ossoff—the Black- and Latinx-preferred candidates—to victories in the United States Senate runoff elections.

56.     Cobb County's changing demographics have also had a direct impact on the Board's racial makeup in recent years.  Prior to the 2018 election, the 7-member Board was made up of six white members and one Black member, David Morgan.  That changed in 2018 when Board members Dr. Jaha Howard and Charisse Davis, both Black and the preferred candidates of Black and Latinx voters, won their seats and replaced two white Board members.  In 2020, Leroy Tre' Hutchins replaced David Morgan, resulting in the three seats currently held by Black Board

members.   These three Black Board members represent the majority of Cobb County's Black and Latinx population.  The white members' 4-3 majority became even more precarious in 2020, when the preferred candidate of voters of color in District 7—Lindsay Terrebonne—came within approximately 3 points of defeating the preferred candidate of white voters—incumbent Brad Wheeler.

57.    The Board's white members were keenly aware of these demographic changes—and the political impact such changes would have—when they began the 2020 redistricting process.

### III.   The Board's White Majority Reacts to Cobb County's Changing Demographics by Silencing Black Board Members and Their Black and Latinx Constituents

58.    Soon after the white Board members' firm 6-1 majority over non-white Board members diminished following the 2018 election to the slim 4-3 majority in place today, the white members began enacting arbitrary policies based on race that grant white Board members the ability to address key concerns with respect to the Cobb County school system, while silencing and ignoring the concerns of the Black Board members to the detriment of Black and Latinx students and their families. The white majority's discriminatory actions culminated in their approval of the Redistricting Plan in 2021, but began earlier, in 2018.

**A. The Board's White Members Impose Antidemocratic Policies That Prohibit Black Members from Raising Issues Concerning People of Color**

59.    Before Black members threatened the continuation of the Board's longtime white majority, members of the Board were able to freely discuss matters of importance or interest to them at the end of Board meetings.  This long-standing practice allowed for the exchange of ideas among Board members without the need to formally add such items to the Board agenda in advance of the meeting.

60.    Upon their election, the two newest Black Board members, Dr. Jaha Howard and Charisse Davis, used their new position to voice concerns about racism and inequity in Cobb County schools.  Board member Howard, for instance, had used time at the end of meetings to discuss several topics concerning race, including the 400th anniversary of enslaved Africans arriving in America, as well as children and families who had been impacted by Immigration and Customs Enforcement raids.  These topics, which were of personal importance to Board member Howard, were also concerns of his Black and Latinx constituents.

61.    The Board imposed a measure after the 2018 election that ended the longstanding practice of discussing important issues at the end of the agenda, prohibiting Board member Howard and his Black colleagues from speaking freely on the subject of race and on other social justice issues.

62.     In November 2020, the four white Board members voted to increase the number of votes to place an item on a meeting agenda to four.  Prior to Board members Howard and Davis being elected, the Board required three votes to add an item to the agenda.  The white Board members changed that number from three to four votes, permitting the four white Board-member majority to effectively block any agenda item raised by any of the three Black Board members.  What is more, upon information and belief, the white members deprived Black members of prior notice of the proposed rule change or the rationale behind the proposed change.  The measure was approved along racial lines at the same meeting the new rule was introduced.

63.     When asked for his rationale for making this change, current-Board Chairman Chastain responded that his intent was to avoid discussions of "subjects not pertinent to our children," despite the "subjects" previously raised by Black Board members being clearly "pertinent" to Black and Latinx children and parents.

64.     In addition to requiring 4 members to approve agenda items, the new policy also granted the Board Chairman greater authority in determining which items could be discussed and voted on by the Board.

65.     Taken together, the Board's procedural changes requiring four votes to add an item on the meeting's agenda and eliminating speaking time at the end of meetings effectively silenced Black voices on the Board.

66.     The white Board members' decision to limit the Black members' ability to add agenda items, moreover, drew the concern of the school accrediting body, Cognia, who submitted a report in November 2021 questioning how the Board allocated resources, how the Board made financial decisions, how Board members communicate with each other, and how the Board relayed information to the public. While Cognia recently withdrew several of these findings, Cognia retained its initial findings that the Board is fractured, to the detriment of the School Board's ability to effectively serve its students.

67.     Specifically, Cognia said members of the Board should:

a.  Adhere to Board policies to develop a culture of trust and cooperation among Board members, employees, and the stakeholders within the District; and

b.  Review the Code of Ethics to develop, implement, and monitor a plan of accountability to ensure adherence to Board policy and that all Board members execute their established roles and responsibilities effectively and efficiently.

68.     Despite Cognia's directives to the Board to endeavor to cooperate, the white Board members have continued to silence and ignore the Black members, including in connection with their rubber-stamping of the Redistricting Plan without substantive debate or legitimate consideration of alternatives.

### B. The Board's White Members Suppress Efforts to Advance Issues Raised by Students and Parents of Color

69.     The white Board members' discrimination against the Black and Latinx population of Cobb County is not limited to their discriminatory treatment of Black Board members.  In fact, as set forth in this section, the white Board members have engaged in a pattern and practice of ignoring the concerns of Cobb County's Black and Latinx parents and students, shutting them out of critical Board decisions affecting their families.  This includes issues related to the Redistricting Plan.

### i.  The Board's White Members Vote to Dissolve the Committee Tasked With Renaming High School Named After a Confederate Soldier

70.     Joseph E. Wheeler High School is a high school in eastern Cobb County named after a Confederate soldier who after the Civil War served as a congressman from Alabama.  Students of color make up around 74% of Wheeler High School's student body.  In the spring and summer of 2020, thousands of Wheeler High students and other community members petitioned the Board to change the name of the school.

71.    In response, in August 2020 the Board initially voted to form a committee to consider a potential name change to Wheeler High School.  However, after the election in November 2020 and before the committee began meeting, white Board members used its newly enacted speaking restrictions and agenda-setting limitations to vote along racial lines to disband the committee.

72.    Since disbanding the committee, the Board has refused to change the name of the school.  This refusal is despite Cobb's Black and Latinx students' and parents' continued concern about the racist legacy of Joseph E. Wheeler.  For instance, on April 22, 2021, around five months after the Board disbanded the committee, student organizers spoke for 30 minutes in support of the Wheeler name change before the Board.

73.    By leaving Wheeler High School's name, Black students, who make up a majority of the school's student body, are reminded every day of Georgia's racially insidious past, and of the fact that their voices are given less weight by the Board than their white peers.  The educational experience for students has been likened to "living inside a Confederate statue[.]"

### ii.    The Board's White Majority Votes to Ban Critical Race Theory and Lessons Influenced by the 1619 Project

74.    In June 2021, the white Board members again voted along racial lines in favor of a resolution that banned the use of critical race theory ("CRT") and the

1619 Project by teachers, well before the General Assembly considered these topics in January 2022.

75.    At the hearing about the resolution, then-Chairman Randy Scamihorn[4] ignored the concerns of the Black Board members over the move to ban CRT despite lacking a coherent definition and understanding of CRT.  The white majority refused to clarify the meaning of CRT before voting to approve the resolution.

76.    At the hearing the Black Board members also expressed alarm that the resolution would endanger long-standing County programs, such as No Place for Hate.   No Place for Hate, an Anti-Defamation League initiative, had been particularly important to Cobb's Black and Latinx communities because it rallied schools around creating a welcoming community and stopping all forms of bias and bullying.   The threatened programs, as Board member Leroy Tre' Hutchins explained, "support children and make sure that they're academically well in the buildings."   As Board member Tre' Hutchins predicted, the No Place for Hate program was halted altogether shortly after the adoption of the resolution, even though CRT was never defined.

---

[4] During most of the period leading up to the passage of the Redistricting Plan, Randy Scamihorn was the Board's Chairman.   He is therefore referred to as "Chairman Scamihorn" throughout.   The present Chairman, however, is David Chastain.

77.    This resolution, as well as the white Board members' decision to ignore the objections by the Black Board members, is particularly concerning against the backdrop of Cobb County's checkered racial past.   As Board member Davis explained during the meeting where the proposal was considered, Cobb County parents and students of color have long been singled out for "threats . . ., racist assignments, and bigoted comments by students and staff."   Board member Davis then contrasted the swift action by the Board on CRT and the 1619 Project to the muted response the Board gave to parents and staff of color that "[came] to board meetings and contact[ed] us via email to share their stories" of racism.

78.    Plaintiff Dr. Jillian Ford, a Black professor at Kennesaw State University and District 2 constituent, attended the June 2021 school board meeting to provide public comment on how students have been impacted by racism in Cobb County.   In her testimony, Dr. Ford quoted racist remarks directed at Black Cobb County students.   Chairman Randy Scamihorn, however, found Dr. Ford—rather than the incidents of racism—to be "vulgar" and silenced her microphone.   She was then required to leave the meeting.

79.    The anti-CRT resolution drove Jennifer Susko, a well-known white school counselor and active Post 6 constituent, to resign in protest.   In her resignation letter, Susko explained that she could no longer work at a district that prioritized

"dismantl[ing] any effort causing white people discomfort" over ameliorating "the district's longstanding mistreatment of Black families."  Susko also recounted in her letter how white Board members Banks and Scamihorn ignored Black parents and students as they shared "their lived experiences of race-based trauma in [Cobb] schools."

### iii.  The Board's White Majority Refuses Requests From Parents and Students of Color to Discuss Safety Improvements in Response to the COVID-19 Pandemic

80.     Centers for Disease Control and Georgia Department of Health studies show that the COVID-19 pandemic has disproportionately impacted people of color, resulting in higher hospitalization and death for people of color as compared to white people. *See Health Equity Considerations and Racial and Ethnic Minority Groups*, CDC (last updated Jan. 25. 2022), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html; *Covid-19 Status Report*, Georgia's Department of Public Health (last visited May 16, 2022), https://dph.georgia.gov/covid-19-status-report.  As such, Cobb County parents of color have understandably heightened  concerns regarding COVID policy.  Ignoring the wishes of parents of color, the Board has implemented the most lenient COVID-19 protocols of the eight metro Atlanta school districts.  The effect of these policies has been substantial: Cobb County saw a 458% rise in COVID-19 cases in August

27

2021, directly coinciding with the first month of the school year.

81.     Even with this alarming rise in cases and testimonials from Cobb parents, particularly parents of color, the Board's all-white majority has at times refused to discuss the COVID-19 pandemic at Board meetings.

82.     For instance, as COVID-19 cases skyrocketed in August 2021, Black Board member Tre' Hutchins requested the topic of "COVID Protocols" be added to the Board agenda as a discussion item.  After Chairman Scamihorn rejected this request because, according to him, COVID-19 was not an "emergency topic," Board member Howard sought a definition of "emergency."

83.     Rather than respond to or even acknowledge Board member Howard's reasonable question, Chairman Scamihorn admonished the Black Board member for "speaking out of order."  Chairman Scamihorn then belittled his fellow Board member, calling him "very impolite and rude" for attempting to clarify what constituted an "emergency topic."

84.     Chairman Scamihorn also used his authority as Chairman to keep discussion of "COVID protocols" off the meeting agenda, refusing to entertain a vote to see whether four members would approve adding the item to the meeting agenda for discussion.

85.     While parents of color pleaded with the Board to discuss COVID safety

protocols, white Board members have responded with racially offensive statements. Board member Banks, who is white, has called COVID-19 "the China virus," while Chairman Scamihorn has blamed "illegal immigrants" for the County's high COVID positivity rate in justifying ignoring the concerns of Cobb's Black and Latinx parents over the County's lax response to COVID-19.

### iv.   The White Board Members Have Ignored the Concerns of Cobb County Students and Parents About Racism on the Board and in Schools

86.    For years, Cobb County Black and Latinx parents and students have experienced the indignity of the Board's unequal treatment and racialized comments. For instance, white Board member Banks has opined on "black-on-black" racial problems in the south Cobb area as "a cultural thing," saying that "when 70 percent [of south Cobb students] don't have fathers in the house, that's a problem."  He has also blamed "illegal aliens" for Los Angeles's high murder rate.   White Board member Chastain's campaign website fondly called the Civil War the "War for Southern Independence."

87.    Such racially offensive comments and actions are not reserved to the Board.  In one incident, a Cobb County teacher joked to a class about the Ku Klux Klan.  The class had been working through a math problem and the answer consisted, in part, of the letters "K-K-K."   Ignoring the concerns of students of color, the

teacher drew attention to these letters and laughed to the class about them.  Radiya Ajibade, a senior and student body president at Campbell High School, recounted before the Board how "[i]n my four years, there have been concerning comments and instances in regard to race with slurs and blackface from some of my white counterparts."  And in March 2017, a parent of color documented a white student's Facebook posts calling for the return of slavery and the need to "exterminate[] all [N-words]."

88.    The rampant use of such bigoted language is not the end of Cobb County school system's race problems.  In fact, race disparities in school discipline and referrals to law enforcement in Cobb County have persisted for years.  For example, Black students were three times as likely to be referred to law enforcement than white students in the 2017-2018 Cobb County school year.  *See* Rebecca Gaunt, *Cobb Schools Data Shows Black And Disabled Students More Likely To Be Referred To Law Enforcement*, Cobb Cnty. Courier (Sept. 9, 2021), https://cobbcountycourier.com/2021/09/cobb-school-law-enforcement/   (analyzing data from the U.S. Department of Education).

89.    A statistical breakdown of that school year is harrowing.  Of the 515 referrals in Cobb County schools to law enforcement, Black students accounted for

57% of such referrals despite Black students making up 31% of Cobb County's school population.

90.     Despite the well-publicized unequal application of school discipline and law enforcement referrals, and the persistent concerns of students and parents of color of racist incidents in Cobb County schools, the Board has not affirmatively responded or acted to change its policies and practices.

91.     Indeed, the Board's lack of response to unrelenting racially discriminatory acts and statements pushed Cobb County parents and students to take matters into their own hands.  For instance, a coalition of students, mostly from Campbell High School, silently protested during the Board's March 2022 meeting. This student coalition urged the Board to respond to incidents of harassment and bullying and to end racist incidents in their schools.  As of this Complaint, the Board has ignored these students' pleas.

92.     The Board's inaction also spurred Cobb parents and community members to create an advocacy group: Stronger Together.  This organization is "a collection of students, families, educators, and community members advocating for

racial justice in Cobb County School District."[5]  Stronger Together has helped shine a light on the racial inequities in Cobb County, but its impact will continue to be limited if the white Board members remain insulated from the voices of Cobb's residents of color via their racially gerrymandered redistricting plan.

93.     In protest over the Board's continued failure to address the concerns of Cobb's students and parents of color, the three Black Board members walked out of the September 2021 voting session.

## IV.   The Board of Education's and Georgia Legislature's Redistricting Process Excluded Black Members and Departed from Historical Practice

### A. The Board's Redistricting Process

94.     At a Board meeting held on July 15, 2021, Chairman Scamihorn first mentioned to the Board's Black members the possibility that Cobb County's districts would need to be reapportioned and that the Board would be hiring an outside firm to help with drawing the map.

95.     At the meeting, the Black members inquired how the outside firm would be selected, suggesting that a request for proposal be sent out so that the Board could consider several options.  In response, white members noted the possibility of

---

[5] *Stronger Together*, AROMA (Jan. 3, 2022), https://activismatlanta.com/stronger-together#:~:text=Stronger%20Together%20is%20a%20collection,of%20racial%20violence%20within%20CCSD.

working with a firm with whom they already had a pre-existing relationship.  The white members agreed to work cooperatively with the Black members in connection with the redistricting process.

96.    Even with these assurances, none of the Black Board members were contacted concerning redistricting until the next Board meeting, held on August 19, 2021.  At the meeting, Chairman Scamihorn recommended to the Board the retention of Taylor English Duma LLP ("Taylor English"), a law firm, to draw the new districting map.  That was the first time any Black Board members had been presented with the possibility of Taylor English being hired, despite the fact that Taylor English had been approached by white members of the Board several months prior.  To that end, Board member Howard, in a December 2021 Facebook video post, recounted being "surprised" by the vote on Taylor English, as he had no input in the selection.

97.    When asked how many other firms were considered before selecting Taylor English during the August 2021 Board meeting, Chairman Scamihorn admitted that it was the only firm considered by the white Board members.  This, as Black Board member Tre' Hutchins pointed out, strayed from Board precedent, as the Board "always get[s] three bids at a minimum."  Indeed, Board member Tre'

Hutchins explained that this three-bid precedent was followed in March 2021, when the Board was searching for new counsel.

98.    White Board member Banks, who had been on the Board for the last redistricting cycle, confirmed that this new procedure—of utilizing one outside firm without any other bids—was not followed during the last map-drawing process. However, Chairman Scamihorn, without consulting the Black Board members, "saw no need" to look at other firms.

99.    That same day, on August 19, 2021, the white Board members voted to approve the hiring of Taylor English, with all three Black members opposing the measure. The white Board members refused requests from the Black members that a cost analysis be performed before hiring Taylor English.

100.   The white Board members hired Taylor English with full knowledge of a potential conflict of interest. Specifically, the CEO of Taylor English Decisions, the firm's subsidiary and consulting arm, is former state-Representative Earl Ehrhart, a white man who is married to state-Representative Ginny Ehrhart, who had already been identified as the Georgia House member who would be sponsoring the bill that would send the redistricting plan to the General Assembly. Given this conflict, Black Board member Howard, during the August 2021 meeting, raised concerns about whether hiring Taylor English was in the best interest of the County.

Rather than address these concerns, Chairman Scamihorn scolded his fellow Board member for highlighting the conflict—telling Dr. Howard, while raising his voice, to "be careful."

101.   Despite this potential conflict of interest, the white Board members hired Taylor English without seeking bids from other companies, in a departure from its normal practices.

102.   Upon information and belief, over the course of the next several months, the Black Board members were given less access to Taylor English's map-drawing process than white Board members.

103.   The Board first considered the new map drawn by Taylor English at the December 9, 2021 Board Work Session.   Yet, as Superintendent Chris Ragsdale conceded, the new map had only been released to the public and the Black Board members at 8:00 p.m. the night before this meeting—giving the Black members and the public virtually no time review it.   *See* Cobb County, *Board Of Education Work Session* (Dec. 9, 2021), at 2:41:40–2:41:55.[6]   On top of springing these new districts on the Black Board members, the white majority on the Board, according to Board

---

[6] Recordings of Cobb County's Board of Education meetings can be found on the Board's website: *Watch Meetings Online*, COBB SCHOOLS (last visited June 6, 2022), https://www.cobbk12.org/page/8993/watch-meetings-online.

member Howard in his December 2021 Facebook video post, did not engage the Black Board members or the Cobb community at all during the process of drawing the new map.

104.   Despite giving the Black Board members and members of the community less than a day to review the new districts, the Board approved the Taylor English map at the December 9, 2021 Board Work Session, with the vote splitting along racial lines.

105.   Following the December 9, 2021 Work Session, the Board-approved map was submitted to the General Assembly for final approval without, upon information and belief, any involvement or public comment from any constituents, including Black and Latinx communities in the County.

**B. The General Assembly's Redistricting Process**

106.   In Georgia, the General Assembly enacts legislation to approve county school board districts after each decennial census.  Historically, the county school board districts that are proposed by the local school board are rubber-stamped by the General Assembly without meaningful debate, so long as the redistricting proposal has received approval from the majority of the local legislative delegation for that county.  Board member Davis confirmed this process in a February 2022 social-media post.  Under this long-standing practice, the process of drawing new maps is

left to the representatives most familiar with the affected communities.

107.   Since the 2018 elections, the majority of Cobb County's local delegation consists of Black and Latinx-preferred legislators, with state-Representative David Wilkerson, who is Black, serving as chair to the Cobb County legislative delegation.   As such, if the normal processes had been followed, Rep. Wilkerson and Cobb County's other Black and Latinx-preferred legislators would have had significant input in the redistricting process for Cobb County's local elections.

108.   However, during the 2022 redistricting cycle, the white-preferred majority of the General Assembly decided to depart from Georgia's long-held practice of respecting local prerogatives for local redistricting and began considering Cobb County's redistricting decisions on a statewide basis, drastically minimizing the Cobb County local delegation's role in the process.   This dramatic departure is all the more problematic given that it took place in the first redistricting cycle since the 1960s not overseen by the U.S. Justice Department to prevent racial discrimination, after the U.S. Supreme Court in 2013 halted the advance approval requirement known as Section 5 preclearance under the VRA.

109.   The conflict over the white majority's power grab from local delegations came to a head during a meeting of the House Governmental Affairs

Committee held on February 9, 2022.  At that meeting, Rep. Wilkerson voiced opposition to the Cobb County School Board Redistricting Plan after noting that no one had agreed to meet with him to discuss the proposed map.  In response, state-Representative Darlene Taylor, the white Chairwoman of the Committee, ordered that Rep. Wilkerson's microphone be turned off.  When Mr. Wilkerson refused to be silenced in that manner, Chairwoman Taylor called Capitol Police to further discourage Rep. Wilkerson's comments.  Ultimately, Rep. Wilkerson was neither arrested nor escorted from the hearing.

110.   What is more, Rep. Ginny Ehrhart, the sponsor of HB 1028, conceded during a Georgia House Governmental Affairs Committee hearing on HB 1028 that she did not seek input from Cobb County's local delegation.  *See* Georgia House, *Committee on Governmental Affairs* (Feb. 9, 2022), at 0:55:43.0–0:56:06.1, https://vimeo.com/showcase/8988922?video=675573182.  To that end, Rep. Ehrhart admitted that she did not attend a January 6, 2022 meeting by local Cobb delegation members on the new school district maps.  *See id.* at 0:56:43.9–0:56:53.9.  Nor did she seriously consider, according to her testimony, an alternative map drawn by state-Representative Erick Allen, a Black member of Cobb County's delegation.  *See id.* at 0:56:25.00–0:56:41.5.

111.   As Rep. Shea Roberts explained in the same committee hearing, the

decision to bring the new map as a general bill "deviated" from the last redistricting cycle.  *See id.* at 0:50:15.00–0:50:30:00.   During that last cycle, "*every single redistricting bill*" for county school board redistricting maps was "brought as a local bill."  *Id.* (emphasis added).  This 2011 process—in which the legislature passed local redistricting maps with prior consideration and approval by local delegations—included "over 200 bills."  *Id.* at 0:50:32.50–0:50:36.00.

112.   Upon information and belief, the Black and Latinx legislative members had no involvement in the drafting of HB 1028 and were not given any opportunity to provide input on the proposed map.

## V.   Race Predominated in the 2021-2022 Map-Drawing Process

113.   In keeping with the other recent actions led by the white Board members, race was at the forefront of the 2022 redistricting process before the Board. In fact, the Board admitted that the use of race, in furtherance of its purported goal of complying with the VRA, predominated its considerations in approving the Redistricting Plan.

114.   Similarly, legislative sponsors of the Redistricting Plan also admitted that the use of race, in furtherance of its purported goal of complying with the VRA, predominated its considerations in approving the Redistricting Plan.

115.   Upon information and belief, neither the Board nor any of the state legislators conducted a functional analysis of each Challenged District to support the use of race for purposes of VRA compliance.

116.   Accordingly, the Challenged Districts reflect the packing of Black and Latinx voters in a manner not justified by the VRA.

### A. Taylor English Attorney Admits That Race Was Key Consideration in Drawing the Maps

117.   Chairman Scamihorn had identified compliance with the VRA, and the necessary consideration of race for compliance, as a top factor for the "redistricting process" during the July 15, 2021, Board meeting.

118.   At the December 9, 2021 Board meeting, Board members questioned Taylor English attorney Bryan Tyson, the lead map drawer, about the proposed new districts.   Mr. Tyson's comments on legal compliance mirrored Chairman Scamihorn's statements earlier in the meeting that one of his primary goals for the new map was compliance with the VRA, which includes the consideration of race. *See* Cobb County, *Board Of Education Work Session* (Dec. 9, 2021), at 2:43:40– 2:44:10.

119.   According to Mr. Tyson, his "first" and "most important" goal when drawing the map was legal compliance, including with the VRA. *See id.*, at 2:59:14– 3:00:00.  Mr. Tyson then explained to the Board that the VRA required him to draw

"majority-minority districts." *Id*. at 2:59:55–3:00:00. He expanded on this requirement by explaining that, to comply with the VRA, he had to "create districts that are at least 50% of a single race." *Id.* at 3:18:50–3:19:10.

120. Mr. Tyson informed the Board that he drew one single-race "majority-minority district" pursuant to this VRA requirement. *Id*. at 2:59:55–3:00:07. Mr. Tyson stated that he made this decision, in part, by determining that there was "racially polarized voting" in Georgia. *Id*. at 3:00:01–3:00:25. Mr. Tyson also justified his decision to draw at least one "majority-minority district" by pointing to the fact that Cobb County has "a lot of non-white individuals." *Id*. at 3:00:00–3:00:40.

121. During his testimony before the Board, Mr. Tyson did not discuss conducting any functional analysis of Cobb County, generally, or the Challenged Districts, in particular. He also failed to provide the Board with any data or analysis supporting his general finding of "racially polarized voting . . . in Georgia."

122. Upon information and belief, Mr. Tyson did not analyze for his proposed map whether there was racially polarized voting in each of Cobb County's school districts. Further, upon information and belief, Mr. Tyson did not retain an expert to conduct a functional analysis of each Challenged District to support the use of race for purposes of VRA compliance.

123.   After Mr. Tyson explained the steps he took to comply with the VRA, he described the secondary interests he considered when drawing the BOE map, such as keeping "communities of interest together," incumbency protection, and making districts "compact." *Id.* at 3:00:40–3:01:45.

### B. The Legislative Sponsor of the Redistricting Plan Admits That Race Was a Key Consideration in Drawing the Maps

124.   On January 24, 2022, Rep. Ginny Ehrhart, a white legislator, filed a notice of intent to introduce local legislation in accordance with O.C.G.A. § 28-1-14.  On or around January 26, 2022, Rep. Ginny Ehrhart introduced HB 1028, the bill setting forth the Redistricting Plan for Cobb County's Board of Education.

125.   In legislative testimony, Rep. Ehrhart confirmed that race was the predominant factor in drawing the Plan.

126.   On February 7, 2022, Rep. Ehrhart testified before the Georgia House Governmental Affairs Redistricting and Elections Subcommittee that the "first and foremost" concern in drawing Plan's maps was legal compliance, including the VRA.  *See* Georgia House, *House Subcommittee on Governmental Affairs Redistricting and Elections* (Feb. 07, 2022), at 0:26:44:00–0:26:56:00, https://www.youtube.com/watch?v=XNjm5wf7UHI.

127.   Rep. Ehrhart repeated that "legal compliance," was the premier concern in drawing the BOE map to the Georgia House Governmental Affairs

Committee two days later, before the Georgia House floor on February 14, 2022, and to the Senate Committee on State and Local Government Operations on February 16, 2022. *See* Georgia House, *House Committee on Governmental Affairs* (Feb. 9, 2022), at 0:43:37:08–0:44:07:00; Georgia House, *House Chamber Day 16* (Feb. 14, 2022), at 2:53:20–2:54:10, https://vimeo.com/showcase/8988696?video=676365445; Georgia Senate, *Senate Committee on State and Local Government Operations* (Feb. 16, 2022), at 0:03:03:01–0:03:20:00, https://vimeo.com/showcase/9076396?video=676276648.

128.   Such "legal compliance," including compliance with the VRA, necessarily involves the consideration of race.

129.   During the February 7, 2022 subcommittee hearing, Rep. Ehrhart clarified her "legal compliance" statement.  In response to a question from state-Representative Rhonda Burnough, a Black woman, Rep. Ehrhart explained that compliance with Section 2 of the VRA was "the number one consideration in the drawing" of the maps.  Georgia House, *House Subcommittee on Governmental Affairs Redistricting and Elections* (Feb. 07, 2022), at 0:29:42:00–29:54:00.  She also described how Mr. Tyson, the map drawer, informed her that complying with Section 2 of the VRA was "a top consideration."  *Id*. at 0:30:00–0:30:22.

130.   In addition to touting the map drawer's efforts to comply with the VRA, Rep. Ehrhart documented for the subcommittee how the new BOE map "potentially creates three minority opportunity voting districts."  *Id*. at 0:27:00:00–0:27:12:00.  Challenged Districts 2, 3, and 6 are the only majority-minority districts in the Redistricting Plan.

131.   Rep. Ehrhart also championed the BOE map's "three minority opportunity voting districts" to the Georgia House Governmental Affairs Committee two days later, on the Georgia House floor on February 14, 2022, and before the Senate Committee on State and Local Government Operations on February 16, 2022. *See* Georgia House, *House Committee on Governmental Affairs* (Feb. 9, 2022), at 0:44:52.00–0:45:00:00; Georgia House, *House Chamber Day 16* (Feb. 14, 2022), at 2:54:15–2:54:25;  Georgia  Senate,  *Senate  Committee  on  State  and  Local Government Operations* (Feb. 16, 2022), at 0:03:51:01–0:03:57:00.

132.   When pressed to define "minority opportunity voting districts" during the Senate Committee hearing on February 16, 2022, Rep. Ehrhart stated that such districts allow "a minority member to win an election."  *Id*. at 0:08:10:00–0:08:29:00.  To illustrate the point, she stated that "we have minorities representing those areas [districts two, three, and six] now." *Id*. at 0:08:29:00–0:08:33:00.

133.   The resulting three minority opportunity voting districts touted by Rep.

Ehrhart to comply with the VRA stand in contrast to Mr. Tyson's explanation that there need be only one single-race majority-minority district to comply with the VRA.

134.    According to Rep. Ehrhart's February 7, 2022 testimony, this "first and foremost" concern for legal compliance, including the consideration of race as it pertains to the VRA, took precedence over other redistricting principles, such as keeping "communities of interest" together, incumbency protection, and other traditional redistricting principles.  *See* Georgia House, *House Subcommittee on Governmental Affairs Redistricting and Elections* (Feb. 07, 2022), at 0:27:23:00–27:30:00, 0:28:35:00–0:28:51:00; *see also* Georgia House, *House Committee on Governmental Affairs* (Feb. 9, 2022), at 0:45:07:06–0:45:36:00; Georgia House, *House Chamber Day 16* (Feb. 14, 2022), at 2:54:35–2:55:50; Georgia Senate, *Senate Committee on State and Local Government Operations* (Feb. 16, 2022), at 03:51:01–0:04:23:00, 0:05:02:03–0:05:27:00.

135.    Upon information and belief, Rep. Ehrhart did not analyze H.B. 1028 to determine whether there was racially polarized voting in each of Cobb County's school districts.  Further, upon information and belief, Rep. Ehrhart did not retain an expert to conduct a functional analysis of each Challenged District to support the use of race for purposes of VRA compliance.

### C. Black Representatives and Board Members Raise Concerns Over "Packing"

136.   Despite Rep. Ehrhart's and Mr. Tyson's insistence that the new map complied with all legal requirements, Black Representatives and Board members expressed concern throughout the map-drawing process that people of color were being "packed" into Districts 2, 3, and 6.

137.   State-Representative Renitta Shannon, a Black woman, raised such a concern during the February 9, 2022, Georgia House Governmental Affairs Committee hearing.  In questioning Rep. Ehrhart, she expressed alarm that the new map "put more minority voters than what is necessary to comply with the Voting Rights Act" in the so-called "opportunity districts."   Georgia House, *House Committee on Governmental Affairs* (Feb. 9, 2022), at 0:46:38.08.  Given this, Rep. Shannon feared that the new map was engineered to "dilute the Black vote." *Id.*

138.   Later in the hearing, Rep. Shannon repeated her concern that the map was drawn to "dilute the minority voting power in Cobb." *Id.*  In particular, Rep. Shannon highlighted that the new map "split the municipalities of Smyrna as well as Kennesaw." *Id.*  Rep. Ehrhart, however, could not explain "specifically . . . the thinking behind" the split. *Id.* at 0:54:17:01–0:54:35:00.

139.   Board member Tre' Hutchins also expressed concern that the new map was drawn to dilute minority voters.  While testifying at the House Governmental

Affairs Redistricting and Elections Subcommittee hearing on February 7, 2022, he expressed the view that "Black districts [are] being compacted" in the new map. Georgia House, *House Committee on Governmental Affairs Redistricting and Elections Subcommittee* (Feb. 07, 2022), at 0:34:59:00–0:35:07:00.  Specifically, according to Board member Hutchins, "Black and Brown districts [were] being compacted to the southern portion of the county," "especially for those in Post 6." *Id.*  This compacting, in turn, will "disrupt[]" "communities of interest."  *Id.* at 0:34:11:00–0:34:17:00.  As an example of this disruption, he pointed to the splitting of South Cobb High School and Pebblebrook High School into different districts, even though they are only "1.7 miles from" each other and "are long-term rivals" in what makes up the south Cobb community.  *Id.* at 0:33:53:00–0:34:10:00.

### D. The Board and the General Assembly Largely Ignored Other Identified Redistricting Criteria and Instead Focused Predominantly on Race

140.   The Board did not form any committees and did not approve, as an entity, any guidelines with respect to redistricting.

141.   Instead, according to Rep. Ehrhart's testimony, then Chairman Scamihorn requested that Taylor English draw a map complying with the following criteria:

      a.   Maintaining local control;

b. Legal compliance, including with the Federal and Georgia constitutions as well as the Voting Rights Act;

c. Equal representation;

d. The stability of the seven school posts and the school districts;

e. Ensuring that each school district has at least two high schools;

f. Maintaining communities of interest;

g. Keeping high school attendance zones intact;

h. School feeder patterns; and

i. Keeping "eligible" Board members up "for re-election in their same post."

142. These factors, however, differed slightly from the criteria that Mr. Tyson claimed that the Board's Chairman conveyed to him:

a. Legal compliance, including with the Federal and Georgia constitutions as well as the Voting Rights Act;

b. Equalizing population;

c. Having two school districts in each district;

d. Avoiding the unnecessary pairing of incumbents running for re-election; and

    e.  Keeping communities of interests together and making districts as compact as possible.

143.  The General Assembly's Legislative and Congressional Reapportionment Office ("LCRO") also conducts a "technical review" of any redistricting plan submitted to it by a "local governmental entity" for the following:

    a.  Compliance with federal and state constitutional requirements for such plans and the federal Voting Rights Act of 1965;

    b.  Division of current voting precincts in a manner that could compromise voter anonymity;

    c.  Any geographic unassigned areas;

    d.  Maintenance of continuous geographic features; and

    e.  Any other concerns that the LCRO may deem legally significant.

144.  According to the LCRO, other traditional criteria include:

    f.  Compactness;

    g.  Contiguity;

    h.  Respecting political boundaries;

    i.  Communities of interest;

    j.  Preserving the cores of prior districts; and

    k.  Incumbent protection.

And additional criteria include:

    l.  Competitiveness;

    m. Prohibition on using partisan data; and

    n.  Prohibition on favoring a political party, incumbent, or candidate.

145.  The Redistricting Plan adopted by the General Assembly did not adhere to the Board's or Rep. Ehrhart's purported redistricting criteria and conflicted with the redistricting guidelines articulated by the LCRO.

146.  By subordinating other redistricting criteria, the Plan reflects the use of race as the predominant factor.

## VI.  <u>Voting Districts 2, 3 and 6 Violate the Constitution</u>

147.  The Challenged Districts reflect the use of race as the predominant factor, packing Black and Latinx voters in a manner not justified by the VRA.

148.  As shown in the maps directly below, which reflects Black and Latinx voting age population figures by voting district utilizing 2020 census data, the majority of Cobb County's Black and Latinx communities live in the southern half of the County, while most of the County's white population lives in the north.



149. Under the previous decade's maps (see "2012 Map" below), Challenged Districts 2, 3 and 6—the districts currently represented by Black Board members—skewed southeastward, including the south central and southeast portions of the County, as well as portions of District 6 due east of Marietta, the city in the center of Cobb. Correspondingly, the white members' districts—Districts 1, 4, 5, and 7—skewed northwestward, with District 7 also encompassing portions of the County west and southwest of Marietta. Under the current map (see "2022 Map" below), the Challenged Districts are now solely in the southern portion of the County where the majority of Cobb County's Black and Latinx communities live. The

border lines superimposed in blue demonstrate how the Challenged Districts were rotated clockwise so Black and Latinx residents could be packed entirely into south Cobb.  As a result, District 7—where voters of color were on the cusp of electing a candidate of choice in the 2020 election—was moved significantly further north.

**2012 Map**                    **2022 Map**



### a. *District 2*

150.   Race was the predominant factor in drawing Challenged District 2.  In addition to subordinating other redistricting criteria, race was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

151.   Challenged District 2 has a Black voting age population ("BVAP")[7] of 35% and a Latinx VAP ("LVAP") of 21%.  The non-white VAP in District 2 is 65%.[8]

152.   An RPV analysis—an examination that identifies whether and to what degree voting is racially polarized and analyzes based on votes for Black and Latinx-preferred candidates and turnout percentages across elections what percentage VAP is required for Black and Latinx voters to usually elect candidates of choice in that region—shows that Challenged District 2 is drawn with a BVAP and LVAP that are substantially higher than necessary for Black and Latinx voters to elect their candidates of choice.

153.   Upon information and belief, such an analysis was not completed for Challenged District 2 before adopting the district as presented in the Redistricting Plan.

---

[7] "VAP" is also measured in the U.S. Census as respondents 18 years or older.

[8]  "Black VAP," as described here are Census respondents who replied that they were any part Black and 18 years or older.  "Latinx VAP" are Census respondents who replied that they were of Hispanic or Latino origin and 18 years or older.  "Non-white VAP" include all Census respondents 18 years or older except those individuals who responded "No, not Spanish/Hispanic/Latino" and who reported "white" as their race question.  *See supra*, at 16-17 n.2, n.3.

### b. District 3

154.   Race was the predominant factor in drawing Challenged District 3, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

155.   Challenged District 3 has a BVAP of 53% and LVAP of 17%.  The non-white VAP in District 3 is 76%.

156.   An RPV analysis based on racially polarized voting and turnout statistics in the area show that voting District 3 is drawn with a BVAP and LVAP that are substantially higher than necessary for Black and Latinx voters to elect their candidates of choice.

157.   Upon information and belief, such an analysis was not completed for Challenged District 3 before adopting the district as presented in the Redistricting Plan.

### c. District 6

158.   Race was the predominant factor in drawing Challenged District 6, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

159.   Challenged District 6 has a BVAP of 31% and LVAP of 13%.  The non-white VAP in District 6 is 57%.

160.   An RPV analysis shows that Challenged District 6 is drawn with a BVAP and LVAP that are substantially higher than necessary for Black and Latinx voters to elect their candidates of choice.

161.   Upon information and belief, such an analysis was not completed for Challenged District 6 before adopting the district as presented in the Redistricting Plan.

## VII.   The Redistricting Plan Disparately Impacts Black and Latinx Voters

162.   Despite population trends that suggest a growing Black and Latinx population in Cobb, the Board and state legislature's packing of Black and Latinx voters into Challenged Districts 2, 3, and 6 entrenches the majority power of white voters.

163.   Mr. Tyson admitted during a Board Work Session, that the population distribution did not significantly change district-by-district between the 2010 Census and the 2020 Census.  *See* Cobb County, *Board Of Education Work Session* (Dec. 9, 2021), at 2:52:50–2:53:00.  Under the current demographics of Cobb County, had District 7 remained as it had been drawn previously in the western/southwestern part of the County, based on an effectiveness analysis and upon information and belief, District 7's white Board member would have been vulnerable to a Black and Latinx-

preferred challenger.  This would have endangered the white majority's 4-3 hold over the Board.

164.   To avoid this possibility, the white majority's Redistricting Plan did away with District 6's eastward skew and District 7's western and southwestern areas, replacing them with districts that much more closely track the north/south divide of Cobb County's white and Black/Latinx populations.   This was accomplished by rotating each of the Districts clockwise around the hub of Marietta to concentrate the Challenged Districts in the South, without any northward expansions along the spokes of the wheel to the East or West.

165.   This strategy of shifting white voters out of Districts 2, 3, and 6 to solidify a white majority on the Board—particularly by shoring up the white majority in District 7—can be seen by comparing the current map to the 2012 map using the 2020 Census data.

166.   District 3, moreover, was drawn to pack Black voters to the maximum extent possible in the southern part of Cobb and better effectuate the bleaching of District 7.  This packing can also be seen in the legislature's decision to split Kennesaw between Districts 1 and 7 while still effectively preventing Black voters from attaining a majority or near-majority in District 7.  In other words, without packing Black voters into District 3, Defendants could not have successfully split

Kennesaw and simultaneously maintained white control of District 7.

167.  Together, these strategies (i) pack Black and Latinx voters into the 3 southern districts, and (ii) crack Black and Latinx voters between the 4 northern districts, decreasing their concentrations and effectively diluting the voting power of Black and Latinx communities.

168.  By drawing the map in this way, white Georgia legislators sought to maintain a white majority on the Board.

## **CLAIM FOR RELIEF**

**Count One:  Racial Gerrymandering**
**HB 1028's violations of the Fourteenth Amendment to the U.S. Constitution**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983**

169.  The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

170.  The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

171.  Cobb County Board of Education Districts 2, 3, and 6 were drawn using

race as the predominant factor in determining their boundaries as detailed above.

172.   The use of race in the Challenged Districts was not narrowly tailored to advance compliance with Section 2 of the Voting Rights Act or any other compelling government interest, because Black voters and Latinx voters were packed into districts in numbers substantially higher than necessary to elect candidates of choice and without regard for whether racially polarized voting was legally significant in the Challenged Districts.

173.   Because these districts separate individuals on the basis of race in a manner not narrowly tailored to advance a compelling governmental interest, they harm Individual Plaintiffs and Organizational Plaintiffs' members who live in the Challenged Districts and violate the rights guaranteed to them by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

## **PRAYER FOR RELIEF**

174.   WHEREFORE, Plaintiffs respectfully request that the Court:

    a.   Declare that Cobb County Board of Education Districts 2, 3, and 6 in violation of the Fourteenth Amendment to the United States Constitution as racial gerrymanders;

b. Permanently enjoin the Defendants and their agents from holding elections in Districts 2, 3, and 6 as enacted in HB 1028 and any adjoining districts necessary to remedy the constitutional violations;

c. Set a reasonable deadline for State authorities to adopt and enact a new constitutionally compliant redistricting plan for the Cobb County Board of Education that remedies the unconstitutional racial gerrymanders in Districts 2, 3, and 6 while still complying with Section 2 of the VRA;

d. Order, if necessary, an interim redistricting plan for the Cobb County Board of Education seats;

e. Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees incurred in bringing this suit, in accordance with 52 U.S.C. § 10310(e), 42 U.S.C. § 1988, and as otherwise allowed by law;

f. Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court;

g. Grant such other and further relief as the Court may deem just and proper.

59

Dated this 9th day of
June 2022.

Respectfully submitted,

*/s/ Pichaya Poy Winichakul*

Bradley E. Heard (Ga. Bar No. 342209)
Pichaya Poy Winichakul (Ga. Bar No. 246858)
Michael Tafelski (Ga. Bar No. 507007)
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30030
(404) 521-6700
bradley.heard@splcenter.org
poy.winichakul@splcenter.org
michael.tafelski@splcenter.org


Jeff Loperfido*
Christopher Shenton*
SOUTHERN COALITION FOR SOCIAL
JUSTICE
1415 West Highway 54, Suite 101
Durham, NC 27707
(919) 323-3380
jeffloperfido@scsj.org
chrisshenton@scsj.org


Rahul Garabadu (Ga. Bar No. 553777)
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 570738
Atlanta, Georgia 30357
(678) 310-3699
rgarabadu@acluga.org

Jon Greenbaum*
Ezra D. Rosenberg*
Julie M. Houk*
Sofia Fernandez Gold*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
sfgold@lawyerscommittee.org


Douglas I. Koff*
Thomas L. Mott*
Paul Schochet*
Savannah Price*
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000
Douglas.Koff@srz.com
Thomas.Mott@srz.com
Paul.Schochet@srz.com
Savannah.Price@srz.com


*Motion for admission Pro Hac Vice forthcoming*

*Counsel for Plaintiffs Karen Finn, Dr. Jillian Ford, Hylah Daly, Jenne Dulcio, GALEO Latino Community Development Fund, Inc., New Georgia Project Action Fund, League of Women Voters of Marietta-Cobb, and Georgia Coalition For The People's Agenda, Inc.*

61

/s/ Caren E. Short

Caren E. Short* (Ga Bar No. 990443)
LEAGUE OF WOMEN VOTERS
OF THE UNITED STATES
1233 20th Street NW, Suite 500
Washington, DC 20036
202-921-2219
cshort@lwv.org

*Admission to Northern
District of Georgia pending

*Counsel for Plaintiff League of Women Voters
Marietta-Cobb*