# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| KAREN FINN, DR. JILLIAN FORD, HYLAH DALY, JENNE DULCIO, GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., NEW GEORGIA PROJECT ACTION FUND, LEAGUE OF WOMEN VOTERS OF MARIETTA-COBB, and GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., <br><br> Plaintiffs, <br><br> -v- <br><br> COBB COUNTY SCHOOL DISTRICT, COBB COUNTY BOARD OF ELECTIONS AND REGISTRATION, and JANINE EVELER, in her official capacity as Director of the Cobb County Board of Elections and Registration, <br><br> Defendants. | Case No. 1:22-cv-2300-ELR |

## DEFENDANT COBB COUNTY SCHOOL DISTRICT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND MEMORANDUM OF LAW IN SUPPORT

Defendant Cobb County School District (the "District") moves for judgment

on the pleadings pursuant to Rule 12(c). As explained below, Plaintiffs' cause of

action, if any, lies solely and exclusively with the General Assembly who approved

the voting districts that were signed into law by Governor Brian Kemp. Yet Plaintiffs filed this action against the Cobb County Board of Elections and its director Janine Eveler ("Election Defendants") but made scurrilous allegations about the District's board members. The District was thus required to move to intervene so that it could defend itself against the racial accusations hurled by Plaintiffs. Because Plaintiffs' allegations do not support claims against any of the defendants in this case, including the Election Defendants, judgment should be entered as a matter of law.

## INTRODUCTION AND PROCEDURAL HISTORY

This case arises from a purely political dispute between the three Democratic and four Republican members of the Cobb County Board of Education ("the Board of Education") and the redistricting of the seven Board districts following the 2020 census.[1] Redistricting is a quintessential political process. Plaintiffs, who consist of alleged "non-partisan" organizations that in reality promote partisan Democratic causes, and individuals they recruited who are also partisan Democrats, are upset that the effect of the redistricting process did not align with their preferred partisan outcome: a Democratic takeover of the Board of Education. Lacking the political power to effect change, Plaintiffs resort to hurling incendiary accusations of racism

---

[1] The Board of Education is the governing body of the District. *See* O.C.G.A. § 20-2-50.

at the Board of Education and the District in a calculated attempt to override the redistricting map voted on and approved by the General Assembly and signed by Governor Brian Kemp. This nakedly political suit should fail.

In the Amended Complaint, Plaintiffs ask this Court to declare that three of the voting districts are unconstitutional and to require redistricting by the "State authorities" or "if necessary," order "an interim redistricting plan." (Doc. 43, pp. 36-37.) Throughout the Amended Complaint and within the relief sought, Plaintiffs expressly acknowledge that it is the State of Georgia, through the General Assembly, which enacts the voting districts "as a matter of state law." (Id., ¶ 5) (alleging that "the manner in which the General Assembly debated and adopted the Redistricting Plan represented a massive departure from Georgia's long-standing practice for adopting county-level school board redistricting plans.") Curiously, though, Plaintiffs did not include the State of Georgia as a defendant nor the District whose members they accuse of racial gerrymandering. Instead, they sued the Election Defendants whose only role is to conduct elections using maps enacted by the General Assembly.[2] Plaintiffs' tactic thus required the District to move to intervene to address Plaintiffs' allegations, which the Court granted as unopposed, after which the District filed its answer to the Amended Complaint.

---

[2] The Election Defendants' motion to dismiss on that ground remains pending. (Doc. 43.)

(Docs. 54, 60 and 64.) As discussed below, however, Plaintiffs have not stated plausible grounds for the relief they seek under 42 U.S.C. § 1983.

Initially, there is no legal or factual support for the Plaintiffs' central contention that the Board of Education can be held liable merely for recommending a redistricting map to the General Assembly when only the General Assembly has the power to enact redistricting maps. This is boilerplate law, and the Plaintiffs offer no basis upon which this Court can ignore this basic principle.

The Plaintiffs' next liability theory is equally frivolous. To this end, Plaintiffs attempt to attribute the alleged racial motive of the Board of Education to the General Assembly under a "cat's paw" theory, whereby the alleged discriminatory motives of one person or entity are attributed to another, which does not apply to legislators. Plaintiffs' argument fails for two reasons. First, none of their allegations suggest any racial motivation by the Board of Education. Every circumstance alleged in the Amended Complaint are run of the mill political disputes over which Republicans and Democrats clash every day. Distilled to their essence, Plaintiffs attempt to paint every partisan disagreement as having a racial motive, when they are simply political disputes. Second, and even more importantly, the Supreme Court and every court that has confronted the issue, has made clear that whatever motives underlie a local government's recommendation

cannot be attributed to the ultimate legislative body enacting the applicable law. Here, this basic principle means that Plaintiffs cannot use a *cat's paw* theory to attribute the alleged discriminatory motives of the sponsor of the bill encompassing the redistricting map approved by the Board of Education to other legislators who voted in favor of the bill.

Finally, even if this Court disregards the glaring omission that the Plaintiffs failed to name the State as a party for the clearly strategic purpose of furthering their partisan goal in filing this frivolous litigation, Plaintiffs have not alleged nor can one infer in the slightest that racial motives infected the redistricting decision of the General Assembly and the signing of the act by Governor Kemp.

For these and additional reasons set forth below, the District is entitled to judgment on the pleadings as a matter of law.

## STATEMENT OF THE CASE

**A.     Plaintiffs Rely Upon Common Political Disagreements Among the Board of Education Members Preceding the Redistricting Process.**

In attempt to plead evidence of racial motives, Plaintiffs' allegations recite numerous political disagreements among Republican and Democratic Board members dating from the 2018 and 2020 elections that resulted in a 4-3 Republican majority Board. Specifically, the Plaintiffs cite only to political issues where they dislike the outcome, including the COVID-19 policies of the Board of Education

and the Superintendent, the Board of Education's vote along partisan lines to ban the teaching of Critical Race Theory, and the debate and eventual vote along partisan lines to not change the longtime name of a Cobb County School. (Am. Comp. ¶¶ 70-85.) Based solely on the racial makeup of the Democrats on the Board of Education at that time, and utterly ignoring the clear partisan basis for the dispute, Plaintiffs strain to inject race as the sole reason for these voting actions.[3]

## B.    The Board of Education Recommends a New District Map to the General Assembly.

In a July 15, 2021 Board work session, Chairman Randy Scamihorn informed the Board of Education that redistricting was needed because of anticipated population changes in the forthcoming release of the 2020 census data. (Doc. 43, ¶ 94; Answer ¶ 94.) The Board of Education then hired attorney Bryan Tyson ("Tyson") at Taylor English Duma LLP ("Taylor English") to assist with the redistricting process. (Doc. 43, ¶¶ 96, 99.) Democratic and Republican Board members were given access to Taylor English's map-drawing process. (*Id.* ¶ 102.)

---

[3] The purely partisan divide has continued even though one of the Black Democrat members has been succeeded by a white Democrat. Most recently, the same partisan divide occurred again when a new Chairman was selected and the contract of Superintendent Chris Ragsdale was extended. If the new white Democrat was Black, Plaintiffs would be citing to these instances as race discrimination as well. (1/5/23 Board Meeting, https://www.cobbk12.org/page/8993/watch-meetings-online#, at 25:44-26:24 (electing Brad Wheeler as new Chairman); 2/16/2023 Board Meeting, https://www.cobbk12.org/page/8993/watch-meetings-online#, 45:50-51:52 (4-2-1 vote in favor of extending Superintendent Chris Ragsdale's contract).)

Each Board member was invited to meet with Mr. Tyson alone to discuss their views and preferences for redistricting maps, including the opportunity to prepare their own maps for the Board of Education's consideration. (12/9/21 Work Session, https://www.cobbk12.org/page/8993/watch-meetings-online, at 2:54:28.)[4] Importantly, each and every Board member—from both political parties—did so. (*Id.*)

Board Chairman Scamihorn conveyed to Mr. Tyson the Board of Education's criteria, including compliance with the Federal and Georgia constitutions and the Voting Rights Act. (*Id.* at 2:54:42; 2:59:15-3:01:41.) Ultimately, after extensive consultation with Mr. Tyson, three Board of Education members submitted proposed redistricting maps for the agenda for the December 9, 2021 work session. (*Id.* at 2:54:55-2:55:15.) Two of those were submitted by Democrat Board members Charisse Davis and Leroy "Tre" Hutchins, respectively. (*Id.*)  Mr. Tyson and Taylor English developed those maps based on the criteria, input, and goals provided by Ms. Davis and Mr. Hutchins. (12/9/21 Work Session at 2:56:08-2:57:18; 2:57:45-2:59:13.) The third map was labeled the "Chair's Map," which Mr. Tyson drew based on the criteria Chairman Scamihorn conveyed

---

[4] The video is located by clicking the "Next Page" link at the bottom of the "Related Videos" menu until reaching the 12/9/21 Work Session link. It is properly before the Court on this motion because it is central to Plaintiffs' claims and is undisputed. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

at the beginning of the process.  (*Id.* at 2:59:15-3:01:41.)

At the meeting, Tyson stated that the new map was drawn with legal compliance as the first and most important goal. (*Id.* ¶ 118-19.) Chairman Scamihorn similarly stated that legal compliance, including with the Voting Rights Act ("VRA"), was the first goal of the new map. After Tyson's presentation, Ms. Davis proposed that the existing district map be retained rather than recommend a redistricted map.[5] (*Id.* at 3:24:25.) Her proposal failed by a 3-4 vote along partisan lines.  (*Id.* at 3:25:12) The "Chair's Map" was approved the same day in a party-line vote. (Doc. 43, ¶ 104.) Afterward, the District submitted the map to the General Assembly for consideration.

## C.     The General Assembly Enacts the New Map

In Georgia, the General Assembly enacts legislation to establish each county's school board districts after each decennial census. (Doc. 43, ¶ 106.) Plaintiffs allege that, despite the purported significance of the Board of Education's recommendation, the Cobb County delegation in the Georgia Assembly (which since 2018 has a one vote majority of Democrats—the

---

[5] As Ms. Davis stated and Attorney Tyson confirmed, the then-existing districts were legally defensible. (*Id.* at 2:52:35-2:53-52.) But it is undisputed that Cobb County had experienced significant demographic changes and population shifts since the 2010 census. It is reasonable to anticipate that trend will continue. Accordingly, and as explained by Chairman Scamihorn, it was beneficial to draw a new map that both reflects those changes and could absorb anticipated future shifts.  (*Id.* at 2:46:48-2:47:25.)

delegation is composed of an equal number of Republican and Democrat State Senators and one more Democratic State House member than there are State House Republicans) should have had significant input on whether the recommended map was adopted in the redistricting process. (*Id.* ¶¶ 106-07.)

Representative Ginny Ehrhart, a Republican, introduced HB 1028, the bill setting forth the redistricting plan recommended by the Board of Education. (*Id.* ¶ 124.) During the bill's consideration in the various committees, Representative Ehrhart testified that legal compliance was the foremost concern used to draw the redistricting plan. (*Id.* ¶¶ 126-27, 129-134.) The General Assembly passed HB 1028, and Governor Brian Kemp signed it into law on March 2, 2022. (*Id.* at ¶¶ 44, 147.)

Despite this legitimate political process, Plaintiffs make the threadbare conclusion that race was used as the predominant factor to determine the boundaries of the challenged districts in the Board of Education's recommended map because legal compliance with the U.S. Constitution, Georgia Constitution, and the VRA were cited among the criteria for the recommended map and that their Equal Protection rights were thus violated. (*Id.* ¶ 180-82.) Specifically, Plaintiffs allege that Districts 2, 3, and 6 (the "challenged districts") violate the Constitution by "packing" Black and Latinx voters in a "manner not justified by

the VRA." (Doc. 43, ¶ 156.)

## ARGUMENT AND CITATION OF AUTHORITY

### A.    Standard for granting a motion for judgment on the pleadings.

"Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998). "A motion for judgment on the pleadings is subject to the same standard as is a Rule 12(b)(6) motion to dismiss." *Provident Mut. Life Ins. Co. of Phila. v. City of Atlanta*, 864 F. Supp. 1274, 1278 (N.D. Ga. 1994); *see also Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002).

To survive a motion to dismiss, a complaint must contain enough factual allegations to "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and state a claim for relief "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To do this, a plaintiff must plead more than "naked assertion[s]" without "further factual enhancement." *Id.* Thus, in reviewing the sufficiency of a complaint, a court should ignore allegations that are no more than opinions or mere legal conclusions. *South Fla. Water Mgmt. Dist. v. Montalvo,* 84 F.3d 402, 409 n.10 (11th Cir. 1996).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, and "unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

Importantly, allegations that are "merely consistent with" a violation of the law "stop[] short of the line between possibility and plausibility." *See Twombly*, 550 U.S. at 557. Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level." *Id.* at 555.

**B.      The District Cannot Be Liable Under § 1983 Because the Board of Education was Not the Final Decisionmaker With Respect to the Redistricting Map.**

Plaintiff's fundamental contention that the Board of Education can be held liable for the actions of the General Assembly is utterly frivolous. It has no basis whatsoever in law or fact. For that to be the case the Board of Education would have to have been making decisions for the General Assembly which is an absurd proposition. It is firmly established under Section 1983 law that a governmental entity such as the District cannot be liable vicariously for acts of individuals; instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "The policy or custom requirement of *Monell* applies to § 1983 claims for declaratory or injunctive relief no less than claims for damages." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 31 (2010)).

"Ultimately, the plaintiff must show that the [government's] 'policies were the moving force behind the constitutional violation.'" *Baxter v. Roberts*, 54 F.4th 1241, 1270 (11th Cir. 2022) (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). "A defendant's actions cannot be the moving force behind a violation where the actions of another, independent decisionmaker breaks the chain of causation." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1235–36 (11th Cir. 2022).

Plaintiffs' allegations fall far short of these exacting standards for asserting liability upon the District.

In an attempt to transform a political dispute into a viable claim, Plaintiffs attribute lawmaking and map-drawing powers to the Board of Education that it simply does not possess. As discussed, it is undisputed that the District's district maps are established by an act of the Georgia legislature signed by the Governor.

The Georgia legislature may take the Board of Education's recommended district map into account and has historically sought significant input from the local Cobb County delegation as well, but it is not required by law to do so. Nonetheless, the Board of Education's recommended map is fully considered by each legislator in the appropriate committees, and if those committees approve, each legislator must consider the redistricting map before a final vote. Even if the Board of Education acted with an unlawful racial motive in preparing its recommended map (which it did not), this unlawful motive may not be imputed to the only political body with the actual power to put the redistricted maps into effect: the Georgia General Assembly.

In contrast to the unsupported theory asserted by the Plaintiffs that the Board of Education is liable for the actions of the General Assembly and approval by the Governor, it is axiomatic that a plaintiff alleging racial gerrymandering must plausibly allege that the relevant actor acted with discriminatory intent and must not simply make grandiose conclusions. *See Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018). To plausibly state a claim of discriminatory intent in violation of the Equal Protection Clause, Plaintiffs must meet the threshold of enough factual allegations to rise above the speculative level that race was the predominant factor motivating the decision to place a significant number of voters within or without a particular

district. *See Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788 (2017).

### 1. The Board of Education was not the party that enacted the redrawn districts.

Instead, Plaintiffs' allegations of racial gerrymandering focus primarily upon *the Board of Education's* decision in the redistricting process. The controlling law and undisputed facts here show the Board of Education's actions are irrelevant to the only legal and factual issue, which is the Georgia legislature's motive. In other words, neither the members of the Board of Education nor the District has the lawmaking power to enact a legally binding redistricting map. Rather, it is well-established in Georgia law that the local board may merely *recommend* a map to the Georgia legislature, which then independently reviews the recommendation for enactment. This process was succinctly explained by the Eleventh Circuit Court of Appeals over 20 years ago:

> Objections to local legislation typically are not pursued; nonetheless, this does not render plenary authority to the local delegations with respect to the enactment of local legislation, as Voters argue. The local delegations only make recommendations to the House and Senate standing committees, which then propose local legislation to the entire body. Local legislation is not officially enacted until it is voted on by a majority of the full House and Senate and signed by the Governor. Thus, the General Assembly, which has undisputedly been apportioned in accordance with the "one person, one vote" requirement, engages in the governmental function of lawmaking, not the local delegations.

*DeJulio v. Georgia*, 290 F.3d 1291, 1296 (11th Cir. 2002). Indeed, Georgia's

constitution confirms that *only* the General Assembly has the authority to enact new district voting maps in preempting "[a]ction affecting the composition, form, procedure for election or appointment, compensation, and expenses and allowances in the nature of compensation of the county governing authority." Ga. Const., Art. IX, § 2, ¶ I (c)(2).

Simply stated, because the District made only a recommendation to the General Assembly as to the redistricting map, Plaintiffs have not alleged (let alone plausibly so) that a "custom or policy" of the District was the "moving force" behind a constitutional violation for liability to attach under Section 1983. *See Chabad Chayil*, 48 F.4th at 1235-36 ("A defendant's actions cannot be the moving force behind a violation where the actions of another, independent decisionmaker breaks the chain of causation.") Here, the State was "another, independent decisionmaker" that prevents the District from being liable under Section 1983.

### 2. Plaintiffs have not sued the State and cannot attribute the Board of Education's alleged motives to the General Assembly.

Recognizing that the District cannot be held liable under § 1983 for merely recommending a redistricting map, Plaintiffs here essentially assert a "cat's paw" theory of liability against the District, which is a familiar term in employment cases. As the Supreme Court has recently explained, "[a] 'cat's paw' is a 'dupe' who is 'used by another to accomplish his purposes.' A plaintiff in a *'cat's paw'*

case typically seeks to hold the plaintiff's employer liable for 'the animus of a supervisor who was not charged with making the ultimate [adverse] employment decision.'" *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (internal citations omitted). Here, again, the Plaintiffs' arguments are frivolous and fail for two fundamental reasons.

First, there is no relevant evidence alleged in the Amended Complaint from which one can infer that the Board of Education acted with any racial intent. Even if this Court wrongly applied a *cat's paw* theory, there are no facts pled of any racial motive underlying the map recommended by the Board of Education. Plaintiffs ask the Court to make unwarranted factual deductions from their allegations that cite only *political* disagreements between the Democratic and Republican members of the Board of Education over agenda setting policy, *e.g.,* whether COVID-19 could be discussed as an emergency topic at a Board meeting, the renaming of Wheeler High School, and the Board of Education's decision to forbid the teaching of critical race theory and the 1619 Project in schools–as "evidence" of the Board of Education's racially discriminatory intent. In reality, none of these occurrences can, in and of themselves, plausibly be inferred to suggest racial motives. As the Supreme Court noted in *Twombly*, allegations that are "merely consistent" with a violation of the law "stop short of the line between

possibility and plausibility." 550 U.S. at 557. Here, even construing these allegations as somehow suggesting a racial motive asks this Court to suspend common sense and reach the unwarranted conclusion that these acts do not plausibly reflect the disagreements of Democratic and Republican members, who happen to be of different races, at the time of these debates. Indisputably, looking at the actual factual allegations in the Amended Complaint, and disregarding threadbare recitals, speculation, naked assertions and the spin and political hype reflected in virtually every paragraph of the Amended Complaint, these disagreements were purely political, and there is no meaningful factual allegation that the Board of Education's decisions had anything to do with race.

Indeed, Plaintiffs here advance a theory of racial motives that is wrong and destructive. Casting political actions and ideological disputes in racial terms may be fair game in the political world, but it has no place in a court of law. Each instance cited by the Plaintiffs are typical of partisan disputes played out every day in the political arena. Without meaningful factual allegations of racial motives, which are nowhere to be found in Plaintiffs' Amended Complaint, it is nothing more than crass political rhetoric to ascribe racial motives to disputes that also are easily explained by deeply held ideological and political disagreements.

Moreover, even if the Court found in this Amended Complaint some *indicia*

of racial motives behind the Board of Education's recommendation of a map, Plaintiffs' theory that the General Assembly's motives can be attributed to the Board of Education's alleged motives has expressly been rejected time and time again. Specifically, the Supreme Court expressly addressed the application of the *"cat's paw"* theory in the legislative context, and succinctly dismissed it as a viable liability theory, stating:

> The "cat's paw" theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is ***insulting*** to suggest that they are mere dupes or tools.

*Brnovich*, 141 S. Ct. at 2350. (emphasis added).

Here, the Court's holding squarely forecloses the Plaintiffs' only theory that the Board of Education is liable for the General Assembly's action. Thus, Plaintiffs' suggestion that the Georgia legislature could be used as the local school board's *"cat's paw"* in attempting to state a claim sufficient to impute liability to the District is, to use the Court's words, "insulting" to Georgia's democratic process. As the Supreme Court has reiterated, "[u]nder our form of government, legislators have a duty to exercise judgment and represent their constituents." *Brnovich*, 141 S. Ct. at 2350. And legislatures are presumed to act in good faith.

*See Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). Thus, "[i]n assessing the sufficiency of a challenge to a districting plan," a court "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Brnovich*, 138 S. Ct. at 2324.

Ultimately, while the Plaintiffs attempt to obscure the correct legal analysis by hurling a torrent of distorted conclusions premised upon unsupported racial inuendo, they cannot deny that the redistricting statute passed by the General Assembly requires *independent* action which negates any motive the Board of Education may have had. The Board of Education's recommendation was just that: a recommendation. It did not engage in lawmaking on its own, and there is no allegation in the Amended Complaint that disputes this fact. The Georgia legislature proposed the Board of Education's map to the entire body, where it was subject to meaningful review by each legislator and was not officially enacted until a majority of the House and State Senate voted in favor of it, and the Governor decided to sign the bill into law. *See DeJulio v. Georgia*, 290 F.3d 1291, 1296 (11th Cir. 2002).

For these reasons, Plaintiffs' claim fails. Any use of race as a predominant factor could only be done by the Georgia legislature, not the Board of Education.

### 3. Plaintiffs plead no plausible facts that the actions of the entire General Assembly and the signing of the Act by Governor Kemp were motivated by race.

Plaintiffs, faced with the knowledge that redistricting is the sole province of the state legislature, included some strained allegations that the Georgia legislature must have used race as a predominant factor in drawing the new districts. In doing so, Plaintiffs still ask this Court to hold the District liable for the motives of the General Assembly. As discussed above, there is no theory of liability against the District to support such a finding. If the Plaintiffs truly believe a case can be made for racial discrimination by the State, they should have sued the State. Indeed, the Plaintiffs could have sued the State but obviously chose not to do so. Given the experience of the attorneys representing the Plaintiffs, this was not merely an oversight. The only reason that plausibly can be attributed to this strategic decision to omit the State as a party is that this lawsuit is nothing more than a vehicle to further a partisan political purpose by trying to taint the motives of the Republican majority of the Board of Education with unfounded allegations of racial discrimination.

In any event, examination of the Amended Complaint's allegations about the General Assembly's process in adopting the redistricting map for the Cobb School Board leaves no basis to find that Plaintiffs have met the threshold of meaningful

factual allegations that the General Assembly's motives were racially motivated. In the Amended Complaint, Plaintiffs cite testimony from Representative Ginny Ehrhart, sponsor of the bill, in committee hearings where she made the innocuous observation that "legal compliance" was a primary concern in drawing the HB 1028 maps and discussed the redistricting map's creation of "minority opportunity voting districts". (Doc. 43, ¶¶ 124-129.) Plaintiffs also allege that Representative Ehrhart did not meet with Cobb County's local legislative delegation to seek input on the new redistricting map, which they allege deviated from the previous practices of the Georgia legislature. (*Id*., ¶¶ 110-12.)

Regarding the "legal compliance" comment, it requires a completely strained and unwarranted conclusion to ignore that Representative Ehrhart simply was stating the obvious. It goes without saying that a redistricting map that does not prioritize legal compliance, including with the U.S. Constitution, the Georgia Constitution, and the VRA, will not be a valid map. Under no plausible circumstances could Plaintiffs do anything more than speculate that Representative Ehrhart acted with discriminatory intent or that race was a predominant factor.

Likewise, Representative Ehrhart's observation that the redistricting map "potentially creates three minority opportunity voting districts" is equally innocuous and cannot be rationally construed as sufficient evidence of an unlawful

motive. (Doc. 43, ¶¶ 130-31.) She explained that such districts were those that allowed "a minority member to win an election." (*Id.* ¶ 132.) Again, it takes a completely unwarranted and strained interpretation of these comments to ignore that Representative Ehrhart was simply explaining plausible political outcomes of the redistricting map and noted that the same "minority opportunity voting districts" were currently represented by minority members. In sum, her comments and actions were entirely appropriate and do not evidence in the slightest, any wrongful motivation.

Importantly, regardless of how Representative Ehrhart's actions and comments are construed, they ultimately cannot be considered relevant factual allegations in measuring whether the Amended Complaint sufficiently taints the General Assembly's motives for their decision or Governor Kemp's motive in signing the legislation. In focusing upon Representative Ehrhart's comments, Plaintiffs simply offer another variation of the *cat's paw* argument that *Brnovich* rejected. Plaintiffs in essence allege that the Board of Education, allegedly acting with racially invidious intent, used Representative Ehrhart as its *cat's paw* to promote its allegedly unconstitutional redistricting map and to shepherd HB 1028 through the legislature. But "the legislators who vote to adopt a bill are not the agents of the bill's sponsors or proponents." *Brnovich*, 141 S. Ct. at 2350. It also

follows that the Georgia legislators who voted to pass HB 1028 were not agents of the Board of Education, Rep. Ehrhart or anyone else. Instead, each legislator exercised his or her duty to represent their constituents. And Plaintiffs allege no facts showing that any legislator failed to act in good faith or used race as a predominant factor for their decision to vote in favor of HB 1028. *See Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018).

Plaintiffs' other complaint is that the Georgia legislature did not defer to the local delegation (which has a Democratic majority and likely would have favored a map that enhanced their electoral prospects to gain a majority of the Board of Education). However, in *DeJulio v. Georgia*, the Eleventh Circuit discussed the role of local delegations in the Georgia legislative process and noted that Georgia law does not "codify or require the discretionary deference to local courtesy when either the House or the Senate addresses legislation." 290 F.3d at 1296. Rather, "members of the General Assembly can contest local legislation of which they disapprove by removing it from the consent calendar and requiring the whole body to vote upon it." *Id.*

Obviously, this was not a decision by the Board of Education or the District, and Plaintiffs offer no relevant factual allegations that the Georgia legislature's decision to not extend this courtesy has any bearing on whether race was a

predominant factor in the redistricting process.

Thus, Plaintiffs similarly fail to allege any plausible facts or legal claim that the Georgia legislature considered race as a predominant factor in the redistricting process, and, as a result, their suit should be dismissed.

## CONCLUSION

To summarize, Plaintiffs have attempted to circumvent suing the State of Georgia by bringing this action against the Election Defendants who had no role in enacting the voting districts that they find objectionable. Adding to this scheme, Plaintiffs based their claims of racial motivations by the District's board members while attempting to prevent the District from defending itself in the vain hope that this Court might redraw the voting maps to their political liking. Plaintiffs' relief, if any, is in the political process or at best in a lawsuit against the General Assembly who enacted the voting districts into law. For some reason, Plaintiffs have chosen not to sue the State despite having been expressly invited to do so through the Election Defendants' motion to dismiss. Because the State would be the only party from whom relief could be obtained, judgment should be entered in favor of the District as well as the Election Defendants.

WHEREFORE, the District is entitled to judgment on the pleadings.

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**

*/s/ Philip W. Savrin*
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com
William H. Buechner, Jr.
Georgia Bar No. 086392
bbuechner@fmglaw.com
P. Michael Freed
Georgia Bar No. 061128
michael.freed@fmglaw.com
Scott Eric Anderson
Georgia Bar No. 105077
Scott.Anderson@fmglaw.com

*Counsel for Cobb County School District*

## <u>LOCAL RULE 7.1 CERTIFICATION</u>

The undersigned does hereby certify that this memorandum of law has been

prepared with Times New Roman 14-point font in compliance with Local Rule 5.1.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Philip W. Savrin*
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing to the Clerk of Court using the Court's E-file system, which will automatically send electronic mail notification of such filing to the following counsel of record:

Bradley E. Heard
Pichaya Poy Winichakul
Michael Tafelski
SOUTHERN POVERTY
LAW CENTER
150 E. Ponce de Leon Ave.
Suite 340
Decatur, Georgia 30030

Jeff Loperfido
Christopher Shenton
SOUTHERN COALITION FOR
SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, NC 27707

Rahul Garabadu
Cory Isaacson,
Caitlin May
ACLU FOUNDATION
OF GEORGIA, INC.
P.O. Box 570738
Atlanta, Georgia 30357

Jon Greenbaum
Ezra D. Rosenberg
Julie M. Houk
Sofia Fernandez Gold
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street
Suite 900
Washington, DC 20005

Douglas I. Koff
Thomas L. Mott
Paul Schochet
Savannah Price
Matthew J. Sunday
SCHULTE ROTH &
ZABEL LLP
919 Third Avenue
New York, New York 10022

Caren E. Short
LEAGUE OF WOMEN VOTERS
OF THE UNITED STATES
1233 20th Street NW
Suite 500
Washington, DC 20036

Daniel W. White
HAYNIE, LITCHFIELD
& WHITE, PC
222 Washington Avenue
Marietta, GA 30060

This 31st day of March 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Philip W. Savrin*
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com

*Counsel for Cobb County School District*

100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)