## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

KAREN FINN, et al.,           *
                              *
         Plaintiffs,          *
                              *
    v.                        *        1:22-CV-02300-ELR
                              *
COBB COUNTY BOARD OF          *
ELECTIONS AND REGISTRATION,   *
et al.,                       *
                              *
         Defendants.          *
                              *

_____

**O R D E R**

_____

There are several matters pending before the Court.  The Court sets out its

reasoning and conclusions below.

## I.    Factual Background[1]

This case stems from the 2022 redrawing of the seven (7) districts from which

members of the Cobb County School District Board of Education (the "Board") are

elected.  See generally Am. Compl. [Doc. 37].  Plaintiffs Karen Finn; Dr. Jullian

Ford; Hylah Daly; Jenne Dulcio; Galeo Latino Community Development Fund, Inc.;

---

[1] For purposes of the present motions only, the Court accepts the facts alleged in the Amended
Complaint as true and construes them in the light most favorable to Plaintiffs as the non-movants.
See Perez v. Wells Fargo N.A., 774 F.3d 1329, 1335 (11th Cir. 2014) (applying this standard to a
motion for judgment on the pleadings); Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003)
(applying this standard to a motion to dismiss).

New Georgia Project Action Fund; League of Women Voters of Marietta-Cobb; and Georgia Coalition for the People's Agenda, Inc. allege that the 2022 Board voting district map (the "Map") violates their rights pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it is the product of illegal racial gerrymandering.  See id.  Specifically, Plaintiffs contend that the Map was drawn with race as a predominating factor, both to preserve a narrow 4-3 majority of white members on the Board and to "create a firewall against the rising Black and Latinx political power" in Cobb County by packing Black and Latinx voters into three (3) of the seven (7) voting districts.  Id. ¶¶ 4, 45–46.

### A.    The Parties

Plaintiffs are both individuals and organizations.  Plaintiffs Finn, Ford, Daly, and Dulcio (together, the "Individual Plaintiffs") are registered Cobb County voters who self-identify as Black, African American, biracial, or Haitian American.  Id. ¶¶ 16–19.  Plaintiffs Galeo, New Georgia, League of Women Voters of Marietta-Cobb, and Georgia Coalition (together, the "Organizational Plaintiffs") are nonprofit groups that work to protect and promote the voting rights of historically marginalized communities, including those of Black and Latinx voters.  Id. ¶¶ 20–41.  Defendants the Cobb County Board of Elections and Registration and its director, Janine Eveler, in her official capacity (together, the "Election Defendants") are responsible for overseeing Cobb County elections and implementing election

laws and regulations, including the Map at issue.[2]  See Am. Compl. ¶¶ 42–43, 147–48, 150–52; see also O.C.G.A. §§ 21-2-40(b), 21-2-70.  After Plaintiffs filed this case, the Cobb County School District (the "District") intervened as a Defendant. [Docs. 52, 60].

The District—through its governing body, the Board—played a role in the redistricting process that led to the creation of the Map at issue.  See Am. Compl. ¶¶ 1–4, 94–96.  Specifically, this redistricting process began when, in 2018, the chairman of the Board (as part of his apparent official duties) hired an attorney from a consulting firm to draw the Map and later presented the Map to the other Board members for their approval.  See id.  The three (3) Black Board members objected to the Map and voted not to approve it, instead proposing that the Board retain "the 2012-enacted redistricting plan, which, upon [Plaintiffs'] information and belief, met the redistricting criteria available to the Board members at the time."  Id. ¶ 4.  The four (4) white Board members voted to approve the Map "exactly as drawn by the consulting firm" the Board's chairman had hired and submitted the same to the Georgia General Assembly for legislative approval.  Id. ¶¶ 4–5.  According to Plaintiffs, the Map "is a product of the Board's pattern and practice over the last

---

[2] During a hearing the Court held on June 20, 2023, Election Defendants represented that Ms. Eveler retired from her position as Director of the Cobb County Board of Elections and Registration, but added that a new Director has not yet been appointed.  The Court instructs Election Defendants to substitute the appropriate Director in place of Ms. Eveler in this case as soon as that individual is appointed in accordance with Rule 25(d).  See FED. R. CIV. P. 25(d).

several years to impose policies that disproportionately and negatively impact students of color and their families." Id. ¶ 10.

**B.    Enaction of the Map**

After the Board voted 4-3 (along racial lines) on December 9, 2021, to submit the Map to the General Assembly, it was passed as part of House Bill 1028 ("HB 1028"). Id. ¶¶ 44–47.   Subsequently, on March 2, 2022, Georgia Governor Brian Kemp signed HB 1028 into law, thereby redistricting voting districts for the Board elections the next ten (10) years.  Id. ¶ 44.  The authority to enforce HB 1028, including during the 2024 primary and general elections, passed to Election Defendants pursuant to Georgia law.  Id. ¶¶ 147–51.  Plaintiffs allege that "[b]y enforcing HB 1028, [Election Defendants] are subjecting Cobb [County] residents to a racially redistricted [M]ap" and "Plaintiffs' injuries flow directly from [this] conduct." Id. ¶ 158.

**C.    The Challenged Districts**

According to Plaintiffs, the Map was drawn using race as the predominant factor for the purpose of suppressing the "growing political power of [Cobb] County's Black and Latinx population" following the "rapid diversification" of the county's population.  Id. ¶ 1.  "Using race as a predominant factor in redistricting may be justified in certain circumstances, such as ensuring compliance with Section 2 of the Voting Rights Act of 1965 ('VRA')[,]" but Plaintiffs claim that "neither the

Board nor any of the state legislators conducted a functional analysis of each challenged District to support the [Map's] use of race" as legitimate and not pretextual. Id. ¶¶ 7–9. Instead, Plaintiffs claim the Map was designed to pack Black and Latinx voters into three (3) of the seven (7) voting districts for the District's Board seats (the "Challenged Districts"), thereby preserving the white majority voting population in the Board's four (4) other districts. Id. ¶¶ 4, 45–46.

Plaintiffs include the below figure in the Amended Complaint to illustrate Cobb County's "Black and Latinx voting age population figures by voting district" based on 2020 census data. See id. ¶ 157. The deeper hue a voting district is shaded in the below figure, the greater the percentage of that district's voting age population is Black and Latinx. Id.



See id.  As shown in the figure above, "the majority of Cobb County's Black and Latinx communities live in the southern half of the [c]ounty, while most of the [c]ounty's white population lives in the north."  Id.  Pursuant to the voting district map for Board seats in Cobb County that was used from 2012 to 2022, "the districts currently represented by Black Board members[] skewed southeastward," while "the white members' districts . . . skewed northwestward[.]"  Id. ¶ 158.  Plaintiffs include the below figures in the Amended Complaint to illustrate how the current Map differs from that used between 2012 and 2022.  See id.  They contend that "the border

lines superimposed in blue demonstrate how the Challenged Districts were rotated clockwise so Black and Latinx residents could be packed into" the Challenged Districts (Districts 2, 3, and 6).  Id.

**2012 Map**                                **2022 Map**



See id.

## II.   Procedural History

Plaintiffs initiated this action against Election Defendants on June 9, 2022, bringing a single claim pursuant to 42 U.S.C. § 1983 for purported violations of the Fourteenth Amendment's Equal Protection Clause based on racial gerrymandering. See Compl. ¶¶ 169–73 [Doc. 1].  As relief, Plaintiffs request that this Court: (a) declare that the Challenged Districts violate the Fourteenth Amendment as racial gerrymanders, (b) permanently enjoin Defendants and their agents from holding

elections in the Challenged Districts as enacted in HB 1028 and any adjoining districts necessary to remedy the constitutional violations, (c) set a deadline for state authorities to adopt and enact a new redistricting plan for the Board elections that complies with the United States Constitution and the VRA and remedies the unconstitutional racial gerrymanders in the Challenged Districts, (d) order an interim redistricting plan for the 2024 Board elections if necessary, and (e) award fees and costs to Plaintiffs.  See Am. Compl. ¶ 183.

On July 29, 2022, the Election Defendants filed a "Motion to Dismiss or to Join Necessary Parties."  [Doc. 30].  Plaintiffs moved for an extension of time to submit their response to the motion to dismiss through August 19, 2022, which the Court granted in an Order dated August 12, 2022.  [See Docs. 34, 35].  On August 19, 2022, Plaintiffs filed their Amended Complaint.  See Am. Compl.  That same day, the Parties submitted a "Consent Motion Regarding Defendants' Answer or Response to Plaintiffs' Amended Complaint," by which they requested that the Court (1) allow Election Defendants twenty-one (21) days to answer or otherwise respond to the Amended Complaint and (2) deny as moot the motion to dismiss the original Complaint.  [See Doc. 38 at 3].  The Court granted the consent motion on August 19, 2022.  [Doc. 39].  Subsequently, on September 9, 2022, Election Defendants submitted their instant "Motion to Dismiss Plaintiffs' Amended Complaint."  [Doc. 43].  Plaintiffs oppose that motion.  [See Doc. 44].

Pursuant to an extension of time granted by the Court, the Parties submitted their Joint Preliminary Report and Discovery Plan on October 11, 2022. [See Docs. 40, 42, 48]. The Court issued a Scheduling Order on October 13, 2022, and assigned this case to an eight (8)-month discovery track. [Doc. 49]. On December 19, 2022, Plaintiffs filed a "Motion to Commence Discovery and Revise Scheduling Order," by which they requested an order pronouncing that discovery had opened and re-setting the eight (8)-month discovery period to run from the date of any such order. [See Doc. 51]. The Court granted Plaintiffs' motion by an Order dated January 5, 2023, and issued an Amended Scheduling Order that same day. [See Docs. 56, 57].

On December 19, 2022, the District filed a "Motion to Intervene" and asked to be joined in this action "as a defendant to protect its interest in the subject matter of the case" pursuant to Federal Rule of Civil Procedure 24. [Doc. 52 at 2]. Election Defendants responded by indicating their "consent and support" of the District's motion based on their asserted belief that "[the] District is an indispensable parties [sic] . . . and should be allowed to intervene[.]" [Doc. 55 at 1]. On December 30, 2022, Plaintiffs filed a response providing their "consent to intervention by the . . . District, with the understanding that the discovery period ha[d already] commenced." [Doc. 54 at 2]. In this regard, Plaintiffs noted their desire to "move this case forward towards a timely resolution." [See id. at 2 & n.2]. On January 30, 2023, with the consent of all Parties, the Court granted the District's motion to

intervene as a Defendant and Ordered it to answer or otherwise respond to Plaintiffs' Amended Complaint within seven (7) days.  [Doc. 60].  The District subsequently Answered the Amended Complaint on February 6, 2023.  See District Answer [Doc. 64].  Thereafter, on March 31, 2023, the District filed its pending "Motion for Judgment on the Pleadings."  [Doc. 83].  Plaintiffs oppose that motion.  [Doc. 93].

By an Order dated April 11, 2023, the Court scheduled a hearing on Election Defendants' motion to dismiss and the District's motion for judgment on the pleadings for June 22, 2023.  [Doc. 87].  With the benefit of oral argument and having been fully briefed, these motions are ripe for the Court's review.  The Court addresses each motion in turn.

### III.   The Election Defendants' Motion to Dismiss [Doc. 43]

In their motion to dismiss, Election Defendants advance two (2) arguments: first, that Plaintiffs lack Article III standing to bring the instant claim against them, and second, that Plaintiffs failed to join indispensable parties as required by Federal Rule of Civil Procedure 19.  [See generally Doc. 43-1].  The Court addresses each of these arguments in turn.

### A.   Article III Standing

#### 1.   Legal standard

Federal Rule of Civil Procedure 12(b)(1) permits a party to seek dismissal of a complaint for lack of subject matter jurisdiction.  See FED. R. CIV. P. 12(b)(1).

"When a defendant challenges a plaintiff[']s standing by bringing a Rule 12(b)(1) motion, the plaintiff bears the burden to establish that jurisdiction exists."  McCabe v. Daimler Ag, Civil Action No. 1:12-CV-02494-MHC, 2015 WL 11199196, at *2 (N.D. Ga. Aug. 19, 2015).

A defendant may challenge a district court's subject matter jurisdiction through two (2) different types of attacks: facial attacks and factual attacks.  See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008).  A facial attack on the complaint requires the court "merely to look and see if the plaintiff sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [the] complaint are taken as true for the purposes of the motion." See id. at 1233 (internal quotation omitted).  "When defending against a facial attack, the plaintiff has 'safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised,' and 'the court must consider the allegations in the plaintiff's complaint as true.'"  See id. (quoting McElmurray v. Consol. Gov't of Augusta–Richmond Cnty., 501 F.3d 1244, 1250 (11th Cir. 2007)).

"By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony."  See id. (internal citation omitted).  When assessing a factual attack, the trial court

> may proceed as it never could under 12(b)(6) or FED. R. CIV. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's

> jurisdiction—its very power to hear the case—there is substantial authority [in] that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

See Morrison v. Amway Corp., 323 F.3d 920, 925 (11th Cir. 2003) (internal quotation omitted).

### 2.   Discussion

In their motion to dismiss, Election Defendants lodge a facial attack on the Amended Complaint. [See Doc. 43-1 at 8–12]. In essence, Election Defendants contend that Plaintiffs lack standing because the purported constitutional violation undergirding Plaintiffs' § 1983 claim is only traceable to the "parties who created the challenged [Map,]" that is, the District, the Board members, and the General Assembly (the political body that enacted the Map when it passed HB 1028). [See id. at 11–12]. Thus, without these individuals and entities in this case, Election Defendants contend that the Court cannot redress the alleged wrongs on which Plaintiffs base their claim. [See id.] In response, Plaintiffs maintain that "the standing analysis does not turn on whether [Election] Defendants played a role in the creation of the [M]ap" because (1) "Plaintiffs need only show that [Election] Defendants participate in enforcing a challenged law to meet the traceability prong of Article III standing" and (2) "[t]he crux of Plaintiffs' action is to stop the implementation and enforcement of this racial gerrymander" such that "an injunction

against [Election] Defendants preventing the enforcement of HB 1028 would redress Plaintiffs' injuries." [Doc. 44 at 4–5] (internal citations omitted).

To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Tsao v. Captiva MVP Rest. Partners, LLC, 986 F.3d 1332, 1337 (11th Cir. 2021) (citing Lujan v. Defs. Of Wildlife, 504 U.S. 555, 560–61 (1992)). The Parties do not dispute that Plaintiffs satisfy the first element by alleging an injury-in-fact. [See generally Docs. 43-1 at 8–12; 44; 47]. However, as noted, they dispute both traceability and redressability. [See Docs. 43-1 at 12; 44 at 4–5]. Traceability requires that "the injury must have been caused by [the d]efendant's actions." Black Voters Matter Fund v. Raffensperger, 478 F. Supp. 3d 1278, 1298 (N.D. Ga. 2020), aff'd sub nom. Black Voters Matter Fund v. Sec. of State for Ga., 11 F.4th 1227 (11th Cir. 2021). Redressability requires that the "[p]laintiffs' injury, or threat of injury, must likely be redressed by" an order from this Court. Id. "The question of whether the [p]laintiffs ultimately will prevail on the merits of their asserted claims is not the question before the Court in assessing standing." Id. (internal citations omitted).

In the Amended Complaint, Plaintiffs allege that Election Defendants participate in enforcing the challenged Map pursuant to their statutory duties. See Am. Compl. ¶¶ 42–43. In particular, Plaintiffs allege that Election Defendants are

responsible for overseeing Cobb County elections as well as implementing election laws and regulations—including the Map at issue—pursuant to O.C.G.A. §§ 21-2-40(b) and 21-2-70.   See Am. Compl. ¶¶ 42–43, 147–55.   As the former statute provides:

> The General Assembly may by local Act create a board of elections and registration in any county of this state *and empower the board with the powers and duties of the election superintendent relating to the conduct of primaries and elections* and with the powers and duties of the board of registrars relating to the registration of voters and absentee-balloting procedures.

O.C.G.A. § 21-2-40(b) (emphasis added).   Additionally, the latter statute requires that "superintendents" (at the time this suit was filed, Ms. Eveler, in her official capacity as Director of the Cobb County Board of Elections and Registration) "receive and act upon all petitions . . . for the division, redivision, alteration, change, or consolidation of precincts[.]"   O.C.G.A. § 21-2-70.   And "[a] state official is subject to suit in [her] official capacity when [her] office imbues [her] with the responsibility to enforce the law or laws at issue in the suit."   Rose v. Raffensperger, 511 F. Supp. 3d 1340, 1357 (N.D. Ga. 2021) (citing Grizzle v. Kemp, 634 F.3d 1314, 1316 (11th Cir. 2011) and Ex Parte Young, 209 U.S. 123, 161 (1908)).

As this district has held, Georgia's election code delegates authority to county boards of elections in various aspects, and where a plaintiff's claim stems from the performance of those official duties, the traceability prong of the standing analysis is satisfied.   See Black Voters Matter Fund, 478 F. Supp. 3d at 1306 n.18.   For

example, in <u>Black Voters Matter Fund v. Raffensperger</u>, another judge of this district found that the plaintiffs' claimed injury related to postage for absentee ballots was fairly traceable to the DeKalb County Board of Registration & Elections, its members, and the director of elections it employed because those defendants were "in charge of the day-to-day operations of running elections in DeKalb County" and "[t]he Georgia election code tasks the local election superintendents, which would include the [aforementioned d]efendants, with the preparation and delivery of absentee ballots." <u>See</u> 478 F. Supp. 3d at 1306 n.18.  In line with this reasoning, the Court finds that Plaintiffs have "demonstrated a causal connection, even if arguably indirectly, between" Election Defendants' "challenged conduct" of enforcing the Map "and the asserted injury to Plaintiffs' constitutional rights[,]" which is all the law requires at the motion to dismiss stage. <u>Id.</u> at 1306 (citing <u>Focus on the Fam. v. Pinellas Suncoast Transit Auth.</u>, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action[.]")).  Therefore, the Court finds Plaintiffs allege an injury that is fairly traceable to Election Defendants.  <u>See</u> Am. Compl. ¶¶ 42–43; <u>Black Voters Matter Fund</u>, 478 F. Supp. 3d at 1306 & n.18.

As for the third prong of standing, Election Defendants urge the Court to find that Plaintiffs' claimed injuries flow from "the independent actions of the parties who created the challenged [Map]" and that redressability is therefore lacking.  [<u>See</u>

Doc. 43-1 at 12]. In response, Plaintiffs maintain that the "crux of [their] action is to stop the implementation and enforcement of" the Map, and thus, "an injunction against Defendants preventing the enforcement of HB 1028 would redress Plaintiffs' injuries." [Doc. 44 at 5] (citing Am. Compl. ¶¶ 11, 22, 27, 34, 39, 183). The Court agrees with Plaintiffs. As the Eleventh Circuit has explained, "[t]o have Article III standing, a plaintiff need not demonstrate anything 'more than [] a substantial likelihood' of redressability." Wilding v. DNC Servs. Corp., 941 F.3d 1116, 1126–27 (11th Cir. 2019) (quoting Duke Power Co. v. Carolina Env'tl Study Grp., Inc., 438 U.S. 59, 79 (1978)); accord Made in the USA Found. v. United States, 242 F.3d 1300, 1310–11 (11th Cir. 2001) (explaining that even partial relief satisfies the redressability prong of Article III standing). Therefore, the Court finds that Plaintiffs satisfy the redressability requirement.

The only authority Election Defendants cite in their motion to dismiss regarding standing is the Eleventh Circuit's opinion in Jacobson v. Florida Secretary of State. [See Doc. 43-1 at 11] (citing 974 F.3d 1236 (11th Cir. 2020)). However, Election Defendants' attempt to argue that they are "in a similar position to [that of] the Florida Secretary of State" in Jacobson is misguided. [Id.] As another judge of this district succinctly summarized, in Jacobson, the Eleventh Circuit found that the plaintiffs lacked standing to sue the Florida Secretary of State "because she was not responsible for enforcing the challenged law" and therefore the suit could not redress

the plaintiffs' injury.  See Rose, 511 F. Supp. 3d at 1357  (citing Jacobson, 974 F.3d at 1241–42 (noting county officials independent of the secretary were responsible for placing candidates on the ballot in the prescribed order)).  Indeed, Jacobson supports that the redressability prong of the standing analysis exists as to Election Defendants because Plaintiffs have sued the entities responsible for "enforcing" the Map at issue.  See 974 F.3d at 1241–42.  Whether Election Defendants "played any role in creating, evaluating, accepting, rejecting, or otherwise exercising any control over the [Map] or the redistricting process" is of no consequence to that analysis, despite Election Defendants' unsupported argument to the contrary.  [Doc. 43-1 at 11].  Indeed, Election Defendants do not contest that they have a "legal obligation to conduct elections using the maps adopted by the State."  [Id. at 12].

Other recent caselaw from this district belies Election Defendants' arguments that Plaintiffs' alleged injuries are not traceable to them and that those injuries cannot be redressed by the entry of an order against them.  For example, in Rose, another judge of this district rejected an argument by the Georgia Secretary of State that the plaintiffs' alleged injury was not traceable to him in his official capacity or redressable by an order against him.  See 511 F. Supp. 3d at 1356.  In that ongoing case, the four (4) African American plaintiffs challenge "the state-wide, at-large method of electing members of the [Georgia Public Service] Commission" on the basis that it "inhibits black voters' ability to elect their preferred candidates and

dilutes black voting strength in violation of Section 2 of the Voting Rights Act." Id.

at 1344.  Accepting the plaintiffs' well-pleaded allegations as true for purposes of

addressing the Georgia Secretary of State's motion to dismiss for lack of standing,

the district court explained that

> [s]ince the Secretary is the person responsible for administering [the
> state-wide] elections [at issue], O.C.G.A. § 21-2-50(b), [p]laintiffs'
> injuries are traceable to him and injunctive relief directed against him
> concerning the administration of elections for the Commission
> consistent with Section 2 would redress the harm [p]laintiffs have
> allegedly suffered.  At the pleading stage, this is enough.

Id. at 1356.  In this case, it is undisputed that Election Defendants administer the

county-level elections at issue, rather than the Secretary of State, who administers

state-wide elections such as the one at issue in Rose.  See id.; see also Am. Compl.

¶¶ 147–55; [Doc. 43-1 at 3].  Thus, the reasoning of Rose supports a finding that

Plaintiffs in this action possess standing to sue Election Defendants.  See 511 F.

Supp. 3d at 1356.

Even distinguishable authority from this district illustrates why Plaintiffs have

standing to sue Election Defendants in the matter at bar.  Specifically, another judge

of this district considered a challenge to a plaintiff's standing in Scott v. Dekalb

County Board of Elections, a case that involved a defendant county board of

elections.  See Civil Action No. 1:02-CV-01851-ODE, 2005 WL 8155742, at *1

(N.D. Ga. Aug. 5, 2005), aff'd sub nom. Scott v. Taylor, 470 F.3d 1014 (11th Cir.

2006).  In Scott, the plaintiff was a former county commissioner who had already

lost her reelection.  See id.  The plaintiff in that case brought an equal protection claim based on the purported racial gerrymandering of county commission voting precincts.  Id. at *2.  In that case, the plaintiff alleged the defendant county board of elections was the entity charged by state law with conducting the elections for which the redrawn election map would be used.  Id. at *3–5.  The district court ultimately found that the plaintiff in Scott lacked standing on redressability grounds because the heart of her claimed injury was *retroactive*—that she lost her status as an incumbent county commissioner due to the redrawing of the voting districts—and noted that the plaintiff had no intention to run for that position in the foreseeable future.  Id. at *4 ("Surely the [b]oard of [e]lection's enforcement of [the redrawn] voting districts caused [p]laintiff harm in the November 2002 election by preventing [p]laintiff from running as the incumbent in District 3.  However, to the extent [p]laintiff was injured by that action, that injury is now moot.  This [c]ourt can grant [p]laintiff no relief that would remedy that harm, i.e., return her to her position as incumbent Commissioner of District 3.").  Importantly, however, the district court noted the Eleventh Circuit's instruction that "prospective relief enjoining the enforcement of the challenged voting districts is properly sought against [a] Board of Elections[.]"  Id. at *5 (citing Scott v. Taylor, 405 F.3d 1251, 1256 (11th Cir. 2005)).  Further, the court explained how the outcome of its standing analysis might have changed if the nature of the claim before it had been different:

> [i]f [p]laintiff were challenging the *substance* of Act No. 401 as unconstitutional, the Board of Elections would be better suited to defend the law.  In this case, however, there is no assertion that the districts are malapportioned, that minority voting strength was intentionally diluted, or that voters were assigned to districts primarily on account of their race.

Id.  Unlike the plaintiff in Scott, the Plaintiffs in this matter seek prospective relief against Election Defendants to enjoin the enforcement of the Map, which Plaintiffs also challenge as substantively unconstitutional.  Compare id. ("If [p]laintiff were challenging the substance of Act No. 401 as unconstitutional, the [county] Board of Elections would be better suited to defend the law."), with Am. Compl. ¶¶ 11, 183 (Plaintiffs challenging the constitutionality of the Map and HB 1028 and requesting the Court enjoin Election Defendants from enforcing it).  Within the framework of Scott, these factual distinctions demonstrate why Election Defendants are "suited to defend the law" (here, the Map) with "vigorous advocacy[.]"  See Scott, 2005 WL 8155742, at *5; [see also Doc. 43-1 at 16 & n.4].  Thus, the Court rejects Election Defendants' unsupported arguments to the contrary and finds that Scott supports that Plaintiffs' claimed injury is both traceable to Election Defendants and redressable by an order the Court might enter against the same.  See 2005 WL 8155742, at *5.

Therefore, taking Plaintiffs' allegations as true, the Court finds that Plaintiffs' pleadings satisfy the requirements to establish standing at this stage and denies Election Defendants' motion to dismiss on that basis.  Of course, Plaintiffs "must still adduce competent evidence of those elements in order to survive summary

judgment or a directed verdict at trial." Rose, 511 F. Supp. 3d at 1357 (citing Lujan, 504 U.S. at 561).

**B.    Failure to Join Indispensable Parties**

1.    Legal standard

Rule 12(b)(7) permits a party to move to dismiss a complaint for failure to join indispensable parties as required by Rule 19. See FED. R. CIV. P. 12(b)(7). As the Eleventh Circuit has instructed, a district court should engage in a two (2)-part analysis to determine whether a party is indispensable:

> First, the court must ascertain under the standards of Rule 19(a) whether the person in question is one who should be joined if feasible. If the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction) then the court must inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue. Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc., 669 F.2d 667, 669 (11th Cir. 1982).

> In making the first determination—i.e., whether the party in question "should be joined, pragmatic concerns, especially the effect on the parties and the litigation, control." Id. (quoting Smith v. State Farm Fire & Cas. Co., 633 F.2d 401, 405 (5th Cir. 1980)); see also In re Torcise, 116 F.3d 860, 865 (11th Cir. 1997) ("[F]indings of indispensability must be based on stated pragmatic considerations, especially the effect on parties and on litigation.").

Focus on the Fam., 344 F.3d at 1279–80 (cleaned up). As for the second part of the Rule 19(a) inquiry, it "focuses on possible prejudice either to the absent party, Rule 19(a)(2)(i), or the present litigants, Rule 19(a)(2)(ii)." Challenge Homes, 669 F.2d at 670.

2.   <u>Discussion</u>

Election Defendants argue that Plaintiffs have failed to join several indispensable parties pursuant to Rule 19: the District (which, as noted, already intervened in this case as a Defendant without opposition from Plaintiffs), the Georgia General Assembly, the State of Georgia, the Georgia Secretary of State, and the Georgia State Election Board.  [Doc. 43-1 at 15–16].  However, the Election Defendants offer no persuasive reasoning or relevant authority as to why any of these proposed parties should be joined, much less why they are indispensable pursuant to Rule 19.[3]  [<u>See</u> <u>id.</u>]  Indeed, "[i]n numerous Georgia cases like this one involving disputed 'local legislation,' plaintiffs have permissibly sued the relevant boards of elections and registrations and individuals representing those entities, and *not* the General Assembly."  <u>Tyson v. Town of Homer</u>, Civil Action No. 2:21-CV-00077-RWS, 2021 WL 8893039, at *3 (N.D. Ga. July 2, 2021) (emphasis in original) (citing <u>Adamson v. Clayton Cnty. Elections and Registration Bd.</u>, 876 F. Supp. 2d 1347 (N.D. Ga. 2012) and <u>Smith v. Cobb Cnty. Bd. of Elections and Registrations</u>, 314 F. Supp. 2d 1274, 1284 (N.D. Ga. 2002)).  In such cases, "[p]laintiffs need not have— and . . . could not have—sued the General Assembly itself."  <u>Id.</u>  As this district has reiterated,

---

[3] In light of the District's intervention in this matter, the Court declines to further discuss Election Defendants' arguments regarding whether the District is an indispensable party.  [Doc. 43-1 at 15–16].  The Court denies as moot that portion of Election Defendants' motion to dismiss.

> [a] person aggrieved by the application of a legal rule does not sue the rule *maker*—Congress, the President, the United States, a state, a state's legislature, the judge who announced the principle of common law.  He sues the person who acts to hurt him.

Scott, 2005 WL 8155742, at *3 (emphasis in original) (internal quotation marks omitted) (quoting Quinones v. City of Evanston, 58 F.3d 275, 277 (7th Cir. 1995)).

Additionally, the Eleventh Circuit holds that individual legislators "are entitled to absolute immunity" when sued in their official capacity "for prospective relief[.]" Taylor, 405 F.3d at 1255–56.

As relevant to Election Defendants' argument that the State of Georgia or the State Election Board must be joined:

> State agencies and arms of the State, such as the State Election Board, are . . . immune from suit in federal court, as to the extent that they are [subject to suit as] defendants, the action is really an action against the State of Georgia.  See Schopler v. Bliss, 903 F.2d 1373, 1379 (11th Cir. 1990) (holding that "to the extent that the [state] [b]oard [is a defendant], then, this is an action against the State[.]"), and Grizzle v. Kemp, [Civil Action] No. 4:10-CV-[0]0007-HLM, 2010 WL 11519159, at *7 (N.D. Ga. Mar. 15, 2010) ("The State Election Board, however, is a state agency."); see also P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 [] (1993) (holding that the state and its agencies retain their immunity against all suits in federal court).

> "Congress has not abrogated eleventh amendment immunity in [§] 1983 cases," and there is nothing in the record that shows that the State of Georgia has waived its immunity or otherwise consented to suit in federal court.  Cross v. Ala. State Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1502 (11th Cir. 1995).

<u>Fair Fight Action, Inc. v. Raffensperger</u>, 413 F. Supp. 3d 1251, 1277 (N.D. Ga. 2019).  The only case Election Defendants cite as to why the State or State Board of Elections should be joined, <u>Rose</u>, is inapposite.  [See Doc. 43-1 at 15 n.3] (citing <u>Rose</u>, 511 F. Supp. 3d at 1361).  <u>Rose</u> only discusses the abrogation of state sovereign immunity for VRA claims; it does not discuss § 1983 claims, like that at issue here.  <u>See</u> 511 F. Supp. 3d at 1361.  Similarly, the only case Election Defendants proffer as to why the Georgia Secretary of State should be sued in this action concerned the statewide general election, not elections specifically delegated to county-level election boards like the one at issue here.  [See Doc. 43-1 at 15 n.3] (citing <u>Fair Fight Action</u>, 413 F. Supp. 3d at 1284).  Thus, Election Defendants' arguments regarding the purported "indispensable" status of the State of Georgia, State Election Board, and Georgia Secretary of State are all unavailing.

Finally, Election Defendants contend they may be subject to "inconsistent obligations" if this Court "allow[s] this action to proceed without the . . . State of Georgia as [a] defendant[]" because "Election Defendants have a duty to run elections using the maps adopted by the State Legislature and signed into law by the Governor."  [Doc. 43-1 at 17].  However, in making this argument, Election Defendants "mistake[] the meaning of the term" "inconsistent obligations" in the Rule 19(a)(1)(B)(ii) context.  <u>See</u> <u>Winn-Dixie Stores, Inc. v. Dolgencorp, LLC</u>, 746 F.3d 1008, 1040 (11th Cir. 2014).  "'Inconsistent obligations' are not [] the same as

inconsistent adjudications or results.  Inconsistent obligations occur when a party is unable to comply with one court's order without breaching *another court's* order concerning the same incident."  Id. (emphasis added) (quoting Delgado v. Plaza Las Ams., Inc., 139 F.3d 1, 3 (1st Cir. 1998) (per curiam)).  Here, Election Defendants' argument does not concern a potential conflict between court orders; rather, it focuses on a potential conflict between an order this Court may eventually issue and Election Defendants' "duty to run elections using the maps adopted by the State Legislature and signed into law by the Governor."  [Doc. 43-1 at 17].  And the Court has already addressed the reasons why Election Defendants are "suited to defend the [claim]" in this case challenging the Map.  See Scott, 2005 WL 8155742, at *5.

The protestation by Election Defendants that they lack the authority to institute part of the relief Plaintiffs seek—the adoption of a constitutionally compliant redistricting plan that remedies the alleged racial gerrymandering of the Challenged Districts, even on an interim basis—does not impact the instant analysis. See Am. Compl. ¶ 183(c), (d); [see also Doc. 47 at 3].  If, at the appropriate procedural juncture, the Court determines such relief to be warranted, the Georgia General Assembly will be given "an adequate opportunity" to adopt a new redistricting map that comports with "federal constitutional requisites in a timely fashion."  Whitest v. Crisp Cnty. Sch. Dist., 601 F. Supp. 3d 1338, 1344 (M.D. Ga. 2022) (quoting Upham v. Seamon, 456 U.S. 37, 41 (1982) (per curiam)).

In short, nothing suggests that the alternative defendants enumerated by the Election Defendants are "one[s] who should be joined if feasible[.]"  See Focus on the Fam., 344 F.3d at 1279–80; see also FED. R. CIV. P. 19(a).  As such, the Court need not proceed to the second step of the Rule 19 analysis.  Accordingly, the Court denies the Election Defendants' motion to dismiss based on failure to join necessary parties.

**IV.    The District's Motion for Judgment on the Pleadings [Doc. 83]**

The Court next turns to the District's motion for judgment on the pleadings.  By that motion, the District repeats or recasts Election Defendants' arguments about the other entities they think Plaintiffs should have sued, including the State of Georgia, the Georgia General Assembly, or various individual legislators.[4]  [See Doc. 83 at 1–2, 11–24].  Because the Court already addressed these arguments, it declines to further discuss them here.  See supra part III(B)(2).  The only new argument the District makes is that it is not subject to liability pursuant to § 1983 and Monell v. Department of Social Services.  [See Doc. 83 at 11–15] (citing 436 U.S. 658 (1978)).  In response, Plaintiffs contend that "the District's reliance on Monell is completely off base" and that the Court should instead "apply the well-established framework from [Shaw v. Reno, 509 U.S. 630 (1993),] and its progeny"

---

[4] The District also makes passing mention of Governor Kemp, but does not appear to contend that Plaintiffs should have sued him for signing HB 1028 into law.  [See Doc. 83 at 20].

in its analysis of the District's motion.  [Doc. 93 at 16 n.3, 20 n.4].[5]  After setting

forth the relevant legal standard for a motion for judgment on the pleadings, the

Court addresses the Parties' arguments.

###    A.    Legal Standard

The legal standard for assessing a motion for judgment on the pleadings is the

same as the standard for a motion to dismiss under Rule 12(b)(6).  See Hawthorne

v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998); Roma Outdoor

Creations, Inc. v. City of Cumming, 558 F. Supp. 2d 1283, 1284 (N.D. Ga. 2008).

Thus, in evaluating a motion for judgment on the pleadings, a court analyzes whether

the complaint "contain[s] sufficient factual matter, accepted as true, 'to state a claim

to relief that is plausible on its face.'"  See Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also

Horsley v. Feldt, 304 F.3d 1125, 1131 n.2 (11th Cir. 2002) (explaining that "motions

for judgment on the pleadings are facial challenges to the legal sufficiency of [a

plaintiff's] complaint that 'present a purely legal question'" (first alteration adopted)

(quoting Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1367 (11th Cir. 1997))).

Put differently, when deciding a motion for judgment on the pleadings, a court looks

to see whether the plaintiff has pled "factual content that allows the court to draw

---

[5] The Court's citations to specific pages of Plaintiffs' response in opposition to the instant motion
refer to the blue page numbers at the top of each page generated by the Court's e-filing system.

the reasonable inference that the defendant is liable for the misconduct alleged." See Iqbal, 556 U.S. at 678.

"Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." Hawthorne, 140 F.3d at 1370 (citing FED. R. CIV. P. 12(c)). "In determining whether a party is entitled to judgment on the pleadings," a court "accept[s] as true all material facts alleged in the non-moving party's pleading[s] and . . . view[s] those facts in the light most favorable to the non-moving party." Perez, 774 F.3d at 1335.

**B.    Discussion**

Before turning to the merits of the District's motion for judgment on the pleadings, the Court addresses the threshold issue of the motion's timeliness. Plaintiffs assert that the District's motion is untimely pursuant to this district's Local Rule 7.1(A)(2), which requires that a motion for judgment on the pleadings be filed within thirty (30) days of the beginning of discovery unless the movant receives leave of court to file later.  [See Doc. 93 at 12–13] (citing LR 7.1(A)(2), NDGa. and Auto. Assurance Grp. v. Giddens, Civil Action No. 1:20-CV-03356-ELR, 2022 WL 18460629, at *3 (N.D. Ga. Sept. 20, 2022)).   The District responds that Rule 7.1(A)(2) "do[es] not speak to the circumstances in this case where discovery opened on January 5, 2023, before [it] was granted intervention on January 30, 2023."

[Doc. 98 at 2 n.1] (internal citation omitted).  Upon review and consideration, the Court agrees with the District and accepts its present motion as timely in light of the unusual timing of the District's intervention in this matter (which Plaintiffs did not oppose).  [See Docs. 52, 54, 60]; see also Ramion v. Brad Cole Constr. Co., 805 F. App'x 948, 950 (11th Cir. 2020) (noting a district court's discretion in applying and enforcing its local rules).

Turning to the merits of the instant motion for judgment on the pleadings, as noted, the gravamen of the argument the District advances is that it cannot be held liable for Plaintiffs' § 1983 claim because the allegations in the Amended Complaint are insufficient pursuant to Monell to pierce the municipal immunity that the District enjoys.  [See, e.g., id. at 11–12] (citing Monell, 436 U.S. at 694).  In two (2) footnotes in their response brief, Plaintiffs urge the Court to forego the analysis for municipal liability (including the Monell analysis) and instead only apply the pleading standard analysis for racial gerrymandering claims that the Supreme Court established in Shaw.  [Doc. 93 at 16 n.3, 20 n.4].

Plaintiffs are correct that a court's substantive analysis of a racial gerrymandering claim is governed by the Supreme Court's guidance in Shaw and its progeny, including Miller v. Johnson, 515 U.S. 900 (1995).  See 509 U.S. at 641–58 (analyzing a claim of unconstitutional racial gerrymandering against the United States Attorney General, Assistant Attorney General, and various North Carolina

state officials and agencies).  However, Plaintiffs' proposed approach side-steps the preliminary inquiry of whether Plaintiffs may hold the District, which is a municipality, liable pursuant to § 1983.

As relevant here, the Supreme Court held in Monell that municipalities can only be liable pursuant to § 1983 for "action[s taken] pursuant to official municipal policy of some nature [that] cause[] a constitutional tort."  See 436 U.S. at 691. Pursuant to Monell, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  Id. (all italics in original); accord City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." (emphasis in original)).

> The[] policies [that may subject a municipality to § 1983 liability] may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy."  [See Monell, 436 U.S. at 694].  A court's task is to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue."  Jett v. Dallas Indep[.] Sch[.] Dist., 491 U.S. 701, 737[] (1989).

McMillian v. Monroe Cnty., 520 U.S. 781, 784–85 (1997).  And though the Supreme Court has used the term "policy" in its cases explaining that the contours of § 1983 liability for municipalities, it has also noted that "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may

fairly subject a municipality to [§ 1983] liability on the theory that the relevant practice is so widespread as to have the force of law." Bd. of Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

Whether a policy or custom is sufficiently "official" to subject a defendant municipality to § 1983 liability is "dependent on an analysis of state law" because a court looks to state law to determine "whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." McMillian, 520 U.S. at 785 (citing Jett, 491 U.S. at 737). The analysis is also specific to the "particular issue" at hand in a given case; in determining whether a municipality can be liable pursuant to § 1983, a court does "not . . . make a characterization" regarding the defendant municipality's potential liability "in some categorical, 'all or nothing' manner" "that will hold true for every type of official action" that a municipal defendant is capable of taking. See id. Thus, the Court expressly limits the analysis herein to the "particular issue" at play. Id.

With these considerations in mind, for Plaintiffs' § 1983 claim to proceed against the District, Plaintiffs must allege facts showing that: "(1) [their] constitutional rights were violated; (2) that the [District] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." See Gurrera v. Palm Beach Cnty. Sheriff's Off., 657 F. App'x 886, 893 (11th Cir. 2016) (quoting McDowell v. Brown, 392 F.3d

1283, 1289 (11th Cir. 2004)); <u>Brown</u>, 520 U.S. at 403 ("[I]n <u>Monell</u> and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."); <u>Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (same).  In other words, to adequately state a claim against the District pursuant to § 1983, Plaintiffs must allege that a "policy or custom" of the District caused the purported injury to their rights pursuant to the Equal Protection Clause.  <u>Monell</u>, 436 U.S. at 694.

Here, Plaintiffs allege the following:

- That the white members of the Board have a "pattern and practice of subjecting the Black Board members and their constituents of color to racially disparate policies enacted along racial lines over the course of the last several years[,]" <u>see</u> Am. Compl. ¶ 2;

- That the Map "is a product of the Board's pattern and practice over the last several years to impose policies that disproportionately and negatively impact students of color and their families[,]" <u>id.</u> ¶ 10; and

- That "the white Board members have engaged in a pattern and practice of ignoring the concerns of Cobb County's Black and Latinx parents and students, shutting them out of critical Board decisions affecting their families[,]" including "issues related to the [Map]." <u>Id.</u> ¶ 69.

Conversely, Plaintiffs also allege that "[r]ather than cooperate with their Black counterparts on the Board and the members of Cobb County's legislative delegation, the Board's four white members voted on racial lines and without substantive debate to hire—at great expense to the [c]ounty—a consulting firm to draw a proposed

map" and that "[t]his process—both the hiring of a third party to draw the redistricting maps and the Board's decision to forego bids from multiple firms—*strayed from the Board's past practices*." Id. ¶ 3 (emphasis added).

Upon review and consideration, the Court finds that the above allegations are insufficient to establish a "longstanding and widespread practice" by the District of recommending a racially gerrymandered map for the Board of Education elections in Cobb County for at least three (3) reasons.  See Craig v. Floyd Cnty., 643 F.3d 1306, 1310 (11th Cir. 2011).  First, as set forth above, Plaintiffs acknowledge that the Map at issue was drawn in a way that contravenes the District's prior practices. See Am. Compl. ¶ 3.  Second, the Court finds that the only other allegations Plaintiffs proffer regarding the District's alleged policies and practices—particularly as they pertain to drawing and recommending the voting maps for the Cobb County Board of Education elections—lack sufficient detail related to the alleged constitutional violation to survive the District's instant motion.  See id. ¶¶ 2, 10, 69; see also Twombly, 550 U.S. at 555  (explaining that "labels and conclusions" and "formulaic recitation[s] of the elements of a cause of action" do not satisfy the plausibility pleading standard).  Third, Plaintiffs allege that the Map represents the "first redistricting plan to be enacted since the end of the VRA's preclearance requirement that applied for the last five redistricting cycles to states and local jurisdictions with a demonstrated record of racial discrimination in voting, including

Georgia and Cobb County."  Am. Compl. ¶ 51.  Plaintiffs do not allege that the Board or its Chairman have previously violated their Fourteenth Amendment Equal Protection rights by recommending a racially gerrymandered redistricting proposal to the General Assembly for final approval.  See generally Am. Compl.; see also O.C.G.A. § 28-1-14.1 (setting forth the process for county boards of education to submit a proposed "plan to revise . . . or create [voting] districts" to the Georgia General Assembly).

For each of these reasons, the Court finds that Plaintiffs fail to allege a "pattern of similar constitutional violations," as "is ordinarily necessary" to state a § 1983 claim against a municipality "because a single [alleged] violation is not so pervasive as to amount to a custom."[6]  Gurrera, 657 F. App'x at 893 (citing Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991)).  Accordingly, the Court grants the District's motion for judgment on the pleadings.

## V.   Conclusion

For the foregoing reasons, the Court **DENIES IN PART AND DENIES AS MOOT IN PART** Election Defendants' "Motion to Dismiss Plaintiffs' Amended Complaint."  [Doc. 43].  The Court **DENIES AS MOOT** that motion to the extent it argues the District is an indispensable party pursuant to Rule 19 and **DENIES** the

---

[6] In light of this outcome, the Court finds it unnecessary to address the District's other arguments pertaining to a "cat's paw" theory of liability and Brnovich v. Democratic National Committee, 141 S. Ct. 2321 (2021).

motion in all other respects.   The Court **GRANTS** the District's "Motion for Judgment on the Pleadings."   [Doc. 83].   Pursuant to the Court's most recent Amended Scheduling Order dated January 5, 2023, discovery in this case will close after September 5, 2023.  [See Doc. 57].

      **SO ORDERED**, this 18th day of July, 2023.

Eleanor L. Ross
United States District Judge
Northern District of Georgia