# EXHIBIT B

Report on School Board Districts in Cobb County, Georgia

Thomas L. Brunell, Ph.D

I am a Professor of Political Science at the University of Texas at Dallas. I received a Ph.D. in Political Science from the University of California, Irvine in 1997. Currently I serve as the program head for the Political Science program and I have previously served as Senior Associate Dean for the School of Economic, Political, and Policy Sciences here at UT Dallas. In 2020, I was appointed by the Director of the U.S. Census Bureau to serve a three-year term on the Census Scientific Advisory Committee. My teaching and research interests revolve around American elections. I study redistricting, representation, political parties and the U.S. Congress. I teach classes on Election Law, Redistricting and Racial politics, Campaigns and Elections, and Congress. I have published a book on redistricting and dozens of peer-reviewed articles in the top journals in our field on redistricting, the Voting Rights Act, elections, and representation. I am lead author on two textbooks for American politics: Introduction to American Government (TopHat 2021) and Introduction to State and Local Politics (TopHat 2021). Most recently, I have a book forthcoming with Oxford University Press entitled *How Polarization Begets Polarization: Ideological Extremism in the US Congress*. Over the past twenty years, I have testified in state and federal courts around the country in lawsuits involving: redistricting, the Voting Rights Act, early voting, signature matching on ballots, and election administration. There is a list of cases at the end of my CV.

I have been retained by counsel for the Cobb County School District in relation to the case of *Karen Finn, et al. v. Cobb County Board of Elections and Registration, et*

1

*al.*, United States District Court of the Northern District of Georgia, Civil Action No. 1:22-CV-2300. I was asked by counsel to evaluate the enacted school board map, along with several other maps to see whether the maps complied with traditional redistricting criteria. Counsel also asked me to review and opine on the usefulness of the expert report of Professor Oskooii. I am being compensated for my work on this case at a rate of $500 per hour. My compensation is not contingent on my opinions in the case or on the outcome of the case.

**Population Equality**

One of the main reasons to redistrict after each decennial census is to rebalance population totals among the various districts in a jurisdiction (state, county, etc.). The benchmark map, which is the map that was in effect through the 2020 census was not extremely out of balance in terms of the distribution of people across all seven districts. There were no districts that were either overpopulated or underpopulated by more than five percent in the benchmark map. This lack of need to move population around to achieve population equality does not mean that the institution in charge of redistricting is prohibited from doing more. Rather, it means minor tweaks may be necessary, but if the institution drawing the new maps has other goals in mind, they are free to redistrict as they like, as long as they are complying with federal and state law, adhering to standard redistricting principles, and any other requirements put upon the redistricting institution. The ideal population for districts in Cobb County per the 2020 census results is 100,740 people. The data for the benchmark map and the three news maps for population equality and compactness are below in Tables 1-4. All three of the new maps (Chair's map, Davis map, and Hutchins map) improve upon the benchmark map by reducing the size of deviations across the districts. Indeed, all three maps get to within 1

2

percent deviation from ideal for all their districts except for just one district in the Hutchins map (District 5 which is just over a -1 percent deviation). Thus, population equality across the districts was a concern and these three maps improve upon the benchmark districts.

**Compactness**

Compactness of districts is a common criterion used for redistricting. Electoral districts take on many different shapes. While it is possible for a partisan gerrymander to have nice compact looking districts, we more often see oddly shaped districts when a party is trying to extract as many seats as they can from a given distribution of votes across the state. While there are many metrics used to measure the compactness of districts, the two that are most commonly used, and which I find to be most helpful, are the Reock and the Polsby-Popper. These two tests measure the most common method partisan map-makers use to achieve their goals, which is drawing district lines that are deliberately designed to include and exclude the residences of specific partisan voters.

The Reock metric (Reock 1961) is calculated by drawing the smallest circumscribing circle around an electoral district and then taking the ratio of the area of the district to the area of the circle. The ratio will be between zero and one, with one being the most compact. This metric is generally useful and is particularly sensitive to districts that are elongated.

The Polsby-Popper metric (Polsby and Popper 1991) is calculated by creating a circle with the same circumference of the district and then taking the ratio of the area of the district and the area of the circle. Again, this ranges from zero to one, with scores closer to one being more compact. This metric is generally useful, is sensitive to when a

3

district is elongated, and is particularly sensitive to indentations and protrusions in a district's shape.

The three new maps examined in this report do not differ appreciably in terms of compactness. Nor do the new maps differ all that much in terms of compactness compared to the benchmark map. Thus, the is not any appreciable change in compactness between the old and new maps.

**Race**

I have put the relevant census data in Tables 5-8 below regarding race for the four maps relevant to this report. The three new maps differ slightly in terms of the distribution of race across the seven school board districts. The Chair's map is very similar to the benchmark map insofar as it keeps one majority African American district (District 3) and one coalition district (District 2) in which African-Americans and Hispanics combined constitute a numerical majority in the district.

Similarly, the Davis map keeps District 3 majority African American and keeps District 2 as a coalition district. The Hutchins map differs in that it keeps the majority-minority District 3 intact, though it does not keep District 2 as a coalition district.

**Conclusion for Traditional Redistricting Criteria**

The three new maps are all similar in terms of compactness and population deviation. There are minor differences in terms of how each of the maps deals with minority population. All are reasonable maps that comply with these traditional redistricting criteria, but the Chair's map has been enacted on a party line vote. Party line votes are not uncommon when it comes to voting for a new map. Most states have

4

entrusted the process of redistricting to partisan institutions which means the process of drawing the map and voting on the map are inherently political.

**Professor Oskooii's Report**

In this report Professor Oskooii examines Gingles prongs 2 and 3 (Thornburg v. Gingles, 478 U.S. 30 (1986)). First he uses extensive electoral data to demonstrate that voting continues to be polarized along racially lines in Cobb County. Blacks overwhelmingly support Democrats, and a majority of White voters favor Republican candidates for office at several different levels of government. I have no problem with Prof. Oskooii's racially polarized voting analysis or his conclusions that such voting is still prevalent in Cobb County.

Post 3 in the Cobb County School District was, in the benchmark, and continues to be in the newly drawn map, a performing Voting Rights Act district. Which is to say the state was and is compelled to draw this district because the Gingles criteria have been met. To then go return to the VRA-protected district and conclude that since minority voters can control the election outcomes, and, therefore, the district is no longer needed simply makes no sense. Of course Black voters control the district – it was designed to perform in this manner. VRA districts are not drawn purposefully in a round of redistricting and then dismantled in the next round of redistricting because they are doing exactly what they are intended to do. If the state was not compelled to draw such a district, one can imagine a map in which the Black voting population is strategically diluted among the five districts in such a way that African American voters no longer control any of the districts.

In conclusion, Prof. Oskooii's demonstrates the need for Cobb County to continue to draw a majority African American district – which the Chair's map, and the other two maps both do.

## Conclusion

All three maps that I was asked to examine perform similarly in terms of compactness, population equality, and the treatment of African American voters. Prof. Oskooii's report demonstrates the on-going need for a majority African American district in the Cobb County School District.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge. I reserve the right to amend or supplement my report if additional facts, testimony, or materials come to light.

_____   OCT. 14, 2023
Thomas Brunell                              Date

6

## Table 1. Benchmark Map – Population and Compactness

| District | Population | Deviation | % Deviation | Polsby Popper | Reock |
|---|---|---|---|---|---|
| 1 | 98,807 | -1934 | -1.9198 | 0.241253 | 0.46205 |
| 2 | 100,850 | 109 | 0.1082 | 0.421291 | 0.51092 |
| 3 | 103,539 | 2798 | 2.7774 | 0.316087 | 0.37194 |
| 4 | 99,050 | -1691 | -1.6786 | 0.199423 | 0.56249 |
| 5 | 97,168 | -3573 | -3.5467 | 0.118177 | 0.34175 |
| 6 | 104,884 | 4143 | 4.1125 | 0.183572 | 0.26164 |
| 7 | 100,879 | 138 | 0.137 | 0.16714 | 0.41319 |
| Average | 100,740 | | | 0.2353 | 0.4177 |

## Table 2. Chair's Map – Population and Compactness

| District | Population | Deviation | % Deviation | Polsby Popper | Reock |
|---|---|---|---|---|---|
| 1 | 100,133 | -608 | -0.6035 | 0.290366 | 0.38051 |
| 2 | 100,579 | -162 | -0.1608 | 0.186055 | 0.40045 |
| 3 | 101,274 | 533 | 0.5291 | 0.279223 | 0.35041 |
| 4 | 101,291 | 550 | 0.546 | 0.224522 | 0.32658 |
| 5 | 100,701 | -40 | -0.0397 | 0.180996 | 0.50191 |
| 6 | 101,214 | 473 | 0.4695 | 0.144985 | 0.39828 |
| 7 | 99,985 | -756 | -0.7504 | 0.153782 | 0.5335 |
| Average | 100,740 | | | 0.2086 | 0.4131 |

## Table 3. Davis Map – Population and Compactness

| District | Population | Deviation | % Deviation | Polsby Popper | Reock |
|---|---|---|---|---|---|
| 1 | 100,263 | -478 | -0.4745 | 0.284684 | 0.49378 |
| 2 | 100,708 | -33 | -0.0328 | 0.310788 | 0.49312 |
| 3 | 101,200 | 459 | 0.4556 | 0.311741 | 0.36661 |
| 4 | 101,210 | 469 | 0.4656 | 0.158906 | 0.41462 |
| 5 | 100,246 | -495 | -0.4914 | 0.12412 | 0.40697 |
| 6 | 100,652 | -89 | -0.0883 | 0.198458 | 0.3045 |
| 7 | 100,898 | 157 | 0.1558 | 0.138957 | 0.44766 |
| Average | 100,740 | | | 0.2182 | 0.4182 |

7

## Table 4. Hutchins Map – Population and Compactness

| District | Population | Deviation | % Deviation | Polsby Popper | Reock |
|---|---|---|---|---|---|
| 1 | 10,0787 | 46 | 0.0457 | 0.572622 | 0.66024 |
| 2 | 101,148 | 407 | 0.404 | 0.219527 | 0.54253 |
| 3 | 99,989 | -752 | -0.7465 | 0.131513 | 0.36082 |
| 4 | 100,786 | 45 | 0.0447 | 0.122034 | 0.3744 |
| 5 | 99,713 | -1028 | -1.0204 | 0.23613 | 0.42381 |
| 6 | 101,271 | 530 | 0.5261 | 0.059852 | 0.33492 |
| 7 | 101,483 | 742 | 0.7365 | 0.124289 | 0.43732 |
| Average | 100,740 | | | 0.2094 | 0.4477 |

## Table 5. Benchmark Map – Racial Breakdown

| District | Non-Hispanic White VAP % | Any Part Black VAP % | Hispanic VAP % |
|---|---|---|---|
| 1 | 62.6407% | 20.1329% | 9.747% |
| 2 | 42.4153% | 34.2947% | 16.597% |
| 3 | 23.9037% | 56.7790% | 16.938% |
| 4 | 59.9910% | 20.5097% | 10.068% |
| 5 | 69.4882% | 10.4616% | 7.465% |
| 6 | 54.0428% | 24.0366% | 7.875% |
| 7 | 50.7438% | 27.8022% | 16.477% |

## Table 6. Chair's Map – Racial Breakdown

| District | Non-Hispanic White VAP % | Any Part Black VAP % | Hispanic VAP % |
|---|---|---|---|
| 1 | 60.962 | 22.0901 | 9.812% |
| 2 | 35.5952 | 37.6053 | 21.409% |
| 3 | 24.315 | 56.2375 | 16.893% |
| 4 | 68.1857 | 12.6804 | 8.458% |
| 5 | 69.6654 | 09.3044 | 6.776% |
| 6 | 42.6655 | 33.7403 | 12.835% |
| 7 | 61.032 | 23.1432 | 8.832% |

8

## Table 7. Davis Map – Racial Breakdown

| District | Non-Hispanic White VAP % | Any Part Black VAP % | Hispanic VAP % |
|---|---|---|---|
| 1 | 60.567% | 21.480% | 10.538% |
| 2 | 38.872% | 35.263% | 19.879% |
| 3 | 23.867% | 56.936% | 16.854% |
| 4 | 62.661% | 18.175% | 9.405% |
| 5 | 69.852% | 9.602% | 7.016% |
| 6 | 49.923% | 28.797% | 8.063% |
| 7 | 56.270% | 24.801% | 13.598% |

## Table 8. Hutchins Map – Racial Breakdown

| District | Non-Hispanic White VAP % | Any Part Black VAP % | Hispanic VAP % |
|---|---|---|---|
| 1 | 63.112% | 19.869% | 9.678% |
| 2 | 47.225% | 33.411% | 11.172% |
| 3 | 24.711% | 53.853% | 18.337% |
| 4 | 62.065% | 19.372% | 9.350% |
| 5 | 72.912% | 7.840% | 6.149% |
| 6 | 44.509% | 25.545% | 17.531% |
| 7 | 47.943% | 34.975% | 12.605% |

# References

Brunell, Thomas, Robert Lowry, Banks Miller, and Thomas Gray. 2021. *An Introduction to American Government*. Toronto: TopHat.

Brunell, Thomas, Robert Lowry, Banks Miller, and Thomas Gray. 2021. *An Introduction to State and Local Government*. Toronto: TopHat.

Polsby, Daniel D.; Popper, Robert D. (1991). "The Third Criterion: Compactness as a procedural safeguard against partisan gerrymandering". *Yale Law & Policy Review*. 9 (2): 301–353.

Reock, Ernest (1961). "A Note: Measuring Compactness as a Requirement of Legislative Apportionment". *Midwest Journal of Political Science*. 5 (1): 70–74.