**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| KAREN FINN, DR. JILLIAN FORD, HYLAH DALY, JENNE DULCIO, GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., NEW GEORGIA PROJECT ACTION FUND, LEAGUE OF WOMEN VOTERS OF MARIETTA-COBB, AND GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., | Case No. 1:22-cv-2300-ELR |
| Plaintiffs | |
| -v- | |
| COBB COUNTY BOARD OF ELECTIONS AND REGISTRATION and JANINE EVELER, in her official capacity as Director of the Cobb County Board of Elections and Registration, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A**
**PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

BACKGROUND ................................................................. 3

   I.  The 2021-2022 Redistricting Process ............................................. 5

   II. The Enacted Plan ................................................................. 9

LEGAL STANDARDS ................................................................ 12

   I. Preliminary Injunction ............................................................ 12

   II. Racial Gerrymandering in Violation of the Equal Protection Clause of the

      Fourteenth Amendment ........................................................ 13

ARGUMENT................................................................................. 14

   I.   Plaintiffs Are Substantially Likely to Prevail on the Merits ........................ 14

   II.  Race Predominated in the Drawing of the Challenged Districts ................. 16

      A.  Direct Evidence of Map Drawers' Predominant Use of Race................ 18

      B.  Circumstantial Evidence of Map Drawers' Predominant Use of Race ..19

          i.   Demographics of the Districts and Areas Moved Are Best

             Explained by Race....................................................... 19

ii.   The Enacted Plan Subordinated Traditional Redistricting Principles to Race-Based Considerations ........................................................24

iii.   The Benchmark Plan Was Not Malapportioned and Fares Better on Traditional Redistricting Principles Than the Enacted Plan, Indicating VRA Compliance Was Pretext......................................26

iv.   Other Circumstantial Evidence Suggests the Enacted Plan Packed Black and Latinx Voters to Limit Their Growing Political Power .28

III.   The Enacted Plan's Use of Race Does Not Satisfy Strict Scrutiny ..............37

IV.   The Map Drawer's Post Hoc Partisanship Justification Is Entitled to No Weight and Is Not a Compelling State Interest ............................................44

V.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ....................47

VI.   The Balance of The Equities and the Public Interest Weigh in Favor of Granting Plaintiffs' Preliminary Injunction .................................................47

VII.        The *Purcell* Doctrine Does Not Preclude the Requested Relief .....48

CONCLUSION .................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ............................................................................ 15, 39

*Ala. Legislative Black Caucus v. Alabama*,
    575 U.S. 254 (2015) ......................................................................... 17, 24, 25

*Allen v. Milligan*,
    599 U.S. 1 (2023) ........................................................................................ 17

*Bethune-Hill v. Va. State Bd. of Elections*,
    580 U.S. 178 (2017) .............................................................................. *passim*

*Caster v. Merrill*,
    No. 2:21-CV-1536-AMM, 2022 WL 264819 (N.D. Ala. Jan. 24,
    2022), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1, 143 S. Ct.
    1487, (2023) ............................................................................................... 39

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    408 F.3d 1349 (11th Cir. 2005) ................................................................. 48

*Clark v. Putnam Cnty.*,
    293 F.3d 1261 (11th Cir. 2002) ................................................................. 46

*Cooper v. Harris*,
    581 U.S. 285 (2017) .............................................................................. *passim*

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ................................................................. 49

*Dillard v. Baldwin Cnty. Comm'rs*,
    225 F.3d 1271 (11th Cir. 2000) ................................................................. 15

*In re Georgia Senate Bill 202*,
    No. 1:21-CV-01259, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ................ 50

*In re Georgia Senate Bill 202*,
No. 1:21-CV-01259, 2023 WL 5334617 (N.D. Ga. Aug. 18, 2023) ........... 50, 52

*Gonzalez v. Governor of Ga.*,
978 F.3d 1266 (11th Cir. 2020) .......................................................................... 13

*Grace, Inc. v. City of Miami*,
No. 23-12472, 2023 WL 5286232 (11th Cir. Aug. 4, 2023) ............................ 52

*Harris v. McCrory*,
159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017) ................................................................. 14, 28, 46

*Jacksonville Branch of NAACP v. City of Jacksonville*,
2022 WL 16754389 (11th Cir. Nov. 7, 2022) ................................ 29, 37, 48, 50

*Jacksonville Branch of NAACP v. City of Jacksonville*,
635 F. Supp. 3d 1229 (M.D. Fla. 2022), appeal dismissed, No. 22-13544-HH, 2023 WL 2966338 (11th Cir. Jan. 12, 2023) ............................... 29

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) ......................................................................... 13

*League of Women Voters of Florida, Inc. v. Florida Secretary of State*,
32 F.4th 1363 (11th Cir. 2022) ..................................................... 29, 49, 50, 51

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ............................................................................ 48

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ..................................................................... 49, 50, 52

*Miller v. Johnson*,
515 U.S. 900 (1995) .............................................................................. *passim*

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .................................................................................. *passim*

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020) ...................................................................................... 49

*Rose v. Raffensperger*,
143 S. Ct. 58 (2022)........................................................................52

*Rubin v. Young*,
373 F. Supp. 3d 1347 (N.D. Ga. 2019)..........................................13

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010).......................................................48

*Shaw v. Hunt*,
517 U.S. 899 (1996).........................................................................38

*Shaw v. Reno*,
509 U.S. 630 (1993)...................................................................20, 47

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000).......................................................48

*Thornburg v. Gingles*,
478 U.S. 30 (1986)....................................................................*passim*

*United States v. Hays*,
515 U.S. 737 (1995).........................................................................15

*Wis. Legislature v. Wis. Elections Comm'n*,
595 U.S. 398 (2022).........................................................................40

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
979 F.3d 1282 (11th Cir. 2020).......................................................39

## Statutes

Fourteenth Amendment's Equal Protection Clause .....................................3, 13, 16

O.C.G.A. § 28-1-14.1(b)(1) .....................................................................8

Voting Rights Act .....................................................................*passim*

## INTRODUCTION

The Enacted Plan[1] for the Cobb County School Board's (the "School Board")
seven districts manipulates the population of Cobb County predominantly on the
basis of race. This was essentially admitted by those individuals key to the creation
of the Enacted Plan, who testified that they used specific racial targets for the
supposed reason of complying with the Voting Rights Act (the "VRA"), but also
approved a map that subordinated the very principles identified by the School Board
Chair as priorities for the redistricting process. Indeed, it is undisputed that the map
drawer moved more than 250,000 people—more than 35% of the County's total
population—into new districts, despite that reapportionment could have been
accomplished by moving fewer than 9,000 people. The Enacted Plan essentially
passes Black and Latinx residents southward from district to district and passes white
residents northward—packing Black and Latinx voters into three purported
"minority opportunity" districts that were already electing the candidates of choice
of Black and Latinx voters in southern Cobb and bleaching the remaining four
districts in northern Cobb. Under this drawing, the southern districts with significant
populations of color—Districts 2, 3, and 6 (the "Challenged Districts")—are largely
drawn to include additional Black and Latinx population, and the northern districts—

---

[1] The Enacted Plan refers to the redistricting plan enacted pursuant to House Bill
1028 and signed into law as Act 561 effective March 2, 2022.

Districts 1, 4, 5, and most substantially District 7—with majority white populations are largely drawn to include additional white population, thus "amplifying divisions" between the white population and the population of color. *Cooper v. Harris*, 581 U.S. 285, 300 (2017).

This race-based districting can stand only if there exists "good reason[]" to believe that the VRA would require it. *Id.* at 293. Here, there is simply no evidence in the record to support the assertion that VRA compliance explained—let alone, justified—the racially predominant drawing of the Enacted Plan. Specifically, there is no evidence that the map drawer who constructed the Enacted Plan, or any decision-maker who influenced the Enacted Plan, conducted any analysis under *Thornburg v. Gingles* to determine which districts might require the protection of the VRA. *Id.* Nor did they undertake the simple step of undertaking a functional analysis of the electoral behavior within the three purported VRA districts to determine the proportion of Black and Latinx voters that would allow those voters to usually elect their preferred candidates. Had they undertaken such analyses, they would have easily found that voters of color in those districts had been electing their candidates of choice, and there was thus no reason under the VRA to pack those districts with more voters of color. For this reason alone, Plaintiffs are likely to succeed on the merits of their claim to justify the issuance of a preliminary injunction.

2

But there is more. The evidence is overwhelming that voters of color had been on the cusp of electing a fourth preferred candidate to the seven-member School Board and that the Enacted Plan was created to prevent that possibility—under the pretext of VRA compliance. The map drawer, at the direction of white School Board members, created a map that packed voters of color into three southern districts, eliminating the opportunity for voters of color to elect their preferred candidate in a fourth post. This was done via a secretive process that excluded Black School Board members from meaningful participation in redistricting, against a historical backdrop of racial animosity in the County, and pursuant to an abnormal state legislative process—all of which further support the conclusion that the Enacted Plan was enacted with race as its predominant motivation.

The Enacted Plan is an unlawful racial gerrymander in violation of the Fourteenth Amendment's Equal Protection Clause. Plaintiffs seek preliminary relief enjoining use of the Enacted Plan to ensure its harms are not irreparably perpetuated in the 2024 elections.

## BACKGROUND

The racial diversification of Cobb County accelerated substantially between the 2010 and 2020 Censuses. The Cobb County School District's (the "District" or "CCSD") total population grew from 631,138 to 705,177 persons during this time—an increase of 74,039 people or 11.73% of the population—and was fueled primarily

3

by Black and Latinx population growth. Ex. 1, Fairfax Rep. ¶¶ 29-30. During this time, the white population of the District declined by 8.8 percentage points—from 57.52% to 48.72%—such that it no longer comprises a majority of the District. *Id.* at ¶ 31, Table 1. Every census place[2] *decreased* in white population percentage from 2010 to 2020. *Id.* at ¶ 93. Meanwhile, the Black population increased by 3.2 percentage points (from 25.69% to 28.89% of the population) and the Latinx population increased by approximately 2.49 percentage points (from 11.51% to 14% of the population). *Id.* at ¶ 30, Table 1. These shifts in the County's demographics were common knowledge among School Board members and District leadership. *See, e.g.*, Ex. 4, Banks Tr. 49:11-49:16 ("the white population has gone down a lot"); Ex. 5, CCSD 30(b)(6) (Floresta) Tr. 59:11-17 ("the census data . . . has certainly changed in this county between 2012 and 2022"); Ex. 8, Scamihorn Tr. 124:20-125:12 ("the county is becoming very diverse").

The demographic changes were also reflected in election results. Before the 2018 election, the seven-member School Board was made up of six white members and one Black member. Ex. 22, Davis Decl. ¶ 4. The 2018 elections added two Black members, Dr. Jaha Howard and Charisse Davis, both preferred candidates of Black and Latinx voters. *Id.* For the first time ever, the School Board had three sitting Black

---

[2] A census place is a geographically defined concentration of population recognized by the U.S. Census Bureau.

members, representing Districts 2, 3, and 6. *Id.* The trend continued with the 2020 elections, when Leroy "Tre" Hutchins, who is also Black, was elected to replace another Black Board member in District 3. *Id.* In 2020, Lindsey Terrebonne, the preferred candidate of voters of color in District 7, came within approximately three points of defeating the preferred candidate of white voters, incumbent Brad Wheeler. *Id.* ¶ 26.

Reduced to a razor-thin 4-3 majority after the 2018 elections, the white School Board members—David Banks, Brad Wheeler, David Chastain, and Randy Scamihorn ("white Board members")—altered Board practices to diminish the power and voice of the Black and Latinx-preferred Board members—Charisse Davis, Leroy "Tre" Hutchins, and Jaha Howard ("Black Board members"), and by extension, their Black and Latinx constituents. *Id.* ¶¶ 8-25; Ex. 5, CCSD 30(b)(6) (Floresta) Tr. 141:1-2, 142:1-7; Ex. 7, Howard Tr. 49:7-51:3, 114:16-116:13, 117:20-121:18. This campaign culminated in a redistricting process in which race was the driving force behind the creation of a map designed to stop Black and Latinx voters from electing the controlling member of the School Board.

## I.    The 2021-2022 Redistricting Process

The 2021-2022 redistricting process began in secret unbeknownst to Black Board members as early as "late winter" or "early spring of 2021" when then-Board Chair Scamihorn (the "Board Chair") made a request to District staff to

5

"research . . . legal experts in redistricting." Ex. 5, CCSD 30(b)(6) (Floresta) Tr. 14:25-15:6. In May 2021, the Board Chair and District employees John Floresta and Andy Steinhauser met with former State Representative Earl Ehrhart and attorneys Jonathan Crumly of Taylor English Decisions LLC and Bryan Tyson of the law firm Taylor English Duma LLP ("Taylor English"). Ex. 10, Tyson Tr. 15:5-9, 18:6-9; Ex. 16, Pls. Ex. 22; Ex. 9, Steinhauser Tr. 48:14-18, 51:1-18. During this meeting, the Board Chair discussed his principles for a map with Tyson. *See* Ex. 11, Pls. Ex. 5, "Randy Scamihorn's Principles for Map"; Ex. 8, Scamihorn Tr. 78:17-79:2.

Despite this meeting two months earlier, it was not until July 2021 that the Board Chair first brought the issue of redistricting to the full School Board—without mentioning Taylor English.[3] *See* Ex. 22, Davis Decl. ¶ 27 (noting only a general overview of redistricting was discussed). At the very next Board meeting on August 19, 2021, the Board voted whether to retain Taylor English's redistricting services.[4] Ex. 22, Davis Decl. ¶¶ 28-32. This was the first time that the Black Board members were made aware of Taylor English. *See* Ex. 7, Howard Tr. 63:6-67:1, 128:8-129:23;

---

[3] Cobb County School Board Work Session (July 15, 2021), at 3:01:00-3:15:40, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 34, Cobb County School Board Work Session (July 15, 2021) Tr. 2-7 (unofficial transcript).
[4] Cobb County School Board Meeting (August 19, 2021), at 1:11:20-1:23:08, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 35, Cobb County School Board Meeting (August 19, 2021) Tr. 10 (unofficial transcript).

Ex. 22, Davis Decl. ¶¶ 28-32. Over the objections of the Black Board members, the white Board members voted to approve Taylor English's contract.[5] *See* Ex. 7, Howard Tr. 41:14-43:9; Ex. 22, Davis Decl. ¶ 31.

Between August and December 2021, Tyson consulted with School Board members and their proxies to draw new School Board district plans but did the actual drawing of the plans himself. Ex. 10, Tyson Tr. 66:24-67:5. As the "technical hands" for designing the maps, Tyson would "carry[] out the policy of what the elected official want[ed] to do." *Id.* at 43:13-17; 44:16-18. To do so, Tyson met or spoke with each School Board member individually at least once during this time period—except for the Board Chair. *Id.* at 41:5-20; Ex. 8, Scamihorn Tr. 97:16-18. Instead, the Board Chair authorized Steinhauser to speak with Tyson as his go-between on redistricting, noting a preference to keep "his hands off" of the maps. Ex. 10, Tyson Tr. 53:14-54:9; Ex. 9, Steinhauser Tr. 34:7; 45:10-15; 55:25-56:2. It was during these conversations with Steinhauser that Tyson received policy preferences for the Board Chair's Map. Ex. 10, Tyson Tr. 104:21-106:7; *see* Ex. 11, Pls. Ex. 5, "Randy Scamihorn's Principles for Map"; Ex. 13, Pls. Ex. 7, "Protocols for Map."

On December 6, 2021, Tyson transmitted three maps, created for Hutchins,

---

[5] Cobb County School Board Meeting (August 19, 2021), at 1:11:20-1:23:08, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 35, Cobb County School Board Meeting (August 19, 2021) Tr. 10 (unofficial transcript).

Davis, and Board Chair Scamihorn respectively, to the School Board for collective consideration. Ex. 18, Pls. Ex. 75; Ex. 14, Pls. Ex. 8. However, the School Board did not release the maps to the public until 8:00 p.m. on December 8, 2021—the evening before the December 9, 2021 School Board meeting.[6] The School Board approved the Board Chair's map at the December 9 meeting, with the vote once again splitting along racial lines.

After that meeting, the Board Chair e-mailed Georgia State Representative Ginny Ehrhart, a white member of the General Assembly, requesting that she sponsor the Board Chair's map as legislation.[7] Ex. 15, Pls. Ex. 17; Ex. 20, Pls. Ex. 99; Ex. 8, Scamihorn Tr. 168:10-24. The map introduced to the General Assembly, House Bill 1028 ("HB 1028"), included only minor tweaks from the Board Chair's map to remedy technical discrepancies.[8] Ex. 19, Pls. Ex. 81; Ex. 10, Tyson Tr.

---

[6] Cobb County School Board Work Session (Dec. 9, 2021), at 2:41:40–2:41:55, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 36, Cobb County School Board Work Session (Dec. 9, 2021) Tr. 39-40 (unofficial transcript).

[7] Georgia law requires any plan to revise districts for existing county-level offices to either be drawn or submitted and certified by the Legislative and Congressional Reapportionment Office of the General Assembly. O.C.G.A. § 28-1-14.1(b)(1). As a result, the map approved by the School Board's white majority in December 2021 was transmitted to the Georgia General Assembly for final legislative action and enactment.

[8] *See* Georgia House, Committee on Governmental Affairs (Feb. 9, 2022), at 0:38:25–0:42:46, https://vimeo.com/showcase/8988922?video=675573182; *see also* Ex. 37, Georgia House, Committee on Governmental Affairs (Feb. 9, 2022) Tr. 3-4 (unofficial transcript).

151:21-152:21.

To ensure the map's passage, Rep. Ehrhart guided HB 1028 through an unusual legislative path, first sidestepping the customary approvals of Cobb County legislators—the majority of whom are Black or Black-preferred candidates—and then avoiding assignment to the usual committees for county-level redistricting legislation. *See infra* Section II.B.iv. With limited opportunities for public comment, the House adopted HB 1028 on February 14, 2022, the Senate did the same on February 24, 2022, and Governor Kemp signed HB 1028 into law as Act 561 effective March 2, 2022.

## II.    The Enacted Plan

The District is laid out roughly in a circle around the city of Marietta, which sits at the center of the county but falls outside the District. Under the Benchmark Plan, Districts 2, 3, and 6—the districts represented by Black Board members at the time of the redistricting—skewed southeastward, including the south-central and southeast portions of the county, as well as portions of District 6 due east of Marietta. Ex. 1, Fairfax Rep., App. C, at 79. Correspondingly, the white members' districts— Districts 1, 4, 5, and 7—skewed northwestward, with District 7 also encompassing portions of the county west and southwest of Marietta. *Id.* Through the 2021-2022 redistricting process, the Benchmark Plan was rotated clockwise, shifting Districts 2, 3, and 6 entirely within the southern half of the county and closer to Atlanta and

9

safeguarding Districts 1, 4, 5, and 7 in the northern half of the county further from

Atlanta. *Id.* at 88.





*See id.* at 79, 88.

The resulting Enacted Plan packs Black and Latinx voters into the three southern districts (giving them Black and Latinx populations of 63.4%, 77.2%, and 49.97%, respectively) and bleaches the population of the northern districts (giving them white populations of 58.22%, 65.56%, 67.24%, and 58.17%, respectively). All the northern districts, except for District 1, added a greater number of white people to the district than Black or Latinx people. *Id.* at Table 7. And all of the southern districts, except for District 3, added a greater number of Black and Latinx people to the district than white people. *Id.*

| District | Black % | Added | Removed | Population | White | Black | Latinx |
|---|---|---|---|---|---|---|---|
| 1 | <25% | 33,485 | 32,227 | 1,258 | -535 | 1,862 | 92 |
| 2 | >35% | 35,816 | 35,610 | 206 | -7,254 | 3,310 | 5,594 |
| 3 | >35% | 12,821 | 15,541 | -2,720 | -42 | -2,333 | -510 |
| 4 | <25% | 38,767 | 36,346 | 2,421 | 9,814 | -7,646 | -1,485 |
| 5 | <25% | 47,040 | 43,027 | 4,013 | 2,952 | -970 | -552 |
| 6 | >35% | 42,718 | 47,040 | -4,322 | -15,160 | 9,919 | 6,012 |
| 7 | <25% | 43,823 | 44,679 | -856 | 10,225 | -4,142 | -9,151 |

Table 7 – Changes in Demographics of School Board Districts for the Benchmark and Enacted Plans for Cobb, GA

*See id.*

This packing ensured that all of the northern districts maintained a white majority, but it was especially critical to shoring up District 7's white population, which went from 47.55% under the Benchmark Map to 58.17% under the Enacted Plan. *Id.* at Tables 4, 5.

| Racial Demographics of Benchmark Plan and Enacted Plan | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| District | Benchmark Pop. | Enacted Pop. | Benchmark White % | Enacted White % | Benchmark Black % | Enacted Black % | Benchmark Latinx % | Enacted Latinx % |
| 1 | 98,807 | 100,065 | 59.50% | 58.22% | 21.97% | 23.55% | 11.08% | 11.04% |
| 2 | 100,833 | 101,039 | 38.98% | 31.73% | 35.36% | 38.56% | 19.35% | 24.84% |
| 3 | 103,515 | 100,795 | 20.35% | 20.85% | 58.11% | 57.36% | 19.81% | 19.84% |
| 4 | 98,870 | 101,291 | 57.24% | 65.56% | 21.64% | 13.57% | 11.33% | 9.59% |
| 5 | 96,688 | 100,701 | 66.97% | 67.24% | 10.91% | 9.52% | 8.43% | 7.54% |
| 6 | 105,564 | 101,242 | 52.19% | 39.44% | 24.21% | 35.05% | 8.62% | 14.92% |
| 7 | 100,900 | 100,044 | 47.55% | 58.17% | 28.42% | 24.52% | 19.13% | 10.15% |

*See id.* at Tables 4, 5.

## LEGAL STANDARDS

### I. Preliminary Injunction

To obtain a preliminary injunction, a plaintiff must show: (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if relief is not granted; (3) the threatened injury outweighs any harm the requested relief would inflict on the non-moving party; and (4) entry of relief would serve the public interest. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006). The Eleventh Circuit has recognized that a substantial likelihood of success on the merits is "generally the most important." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (cleaned up). Moreover, "[t]he third and fourth factors merge when, as here, the government is the opposing party." *Gonzalez*, 978 F.3d at 1271 (cleaned up). At the preliminary injunction stage, courts "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the

12

character and objectives of the injunctive proceeding.'" *Rubin v. Young*, 373 F. Supp. 3d 1347, 1351 (N.D. Ga. 2019) (cleaned up).

## II. Racial Gerrymandering in Violation of the Equal Protection Clause of the Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment prohibits racial gerrymandering, or the "separat[ing its] citizens into different voting districts on the basis of race," without sufficient justification. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017). Racial gerrymandering claims involve "a two-step analysis." *Cooper*, 581 U.S. at 291.

First, a plaintiff must prove that "race was the predominant factor motivating the . . . decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). To meet this burden, Plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). While any redistricting analysis begins with the presumption that legislators acted in "good faith," that presumption yields when there is a sufficient showing of race-based districting. *Miller*, 515 U.S. at 915; *see also Harris v. McCrory*, 159 F. Supp. 3d 600, 611 (M.D.N.C. 2016) ("This presumption must yield . . . when the evidence shows that citizens have been assigned to legislative districts primarily based on their race."), *aff'd sub nom.*

*Cooper*, 581 U.S. 285.

Second, if a court finds racial predominance, the design of the district must withstand strict scrutiny and the State must prove "that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end" in order to be constitutional. *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill,* 580 U.S. at 193). Courts have assumed that VRA compliance is a compelling interest and is narrowly tailored to that end if the State can prove it "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* (quoting *Ala. Legislative Black Caucus v. Alabama,* 575 U.S. 254, 278 (2015) ("*ALBC*")). Such a strong basis in evidence requires the State to carefully evaluate whether a plaintiff could establish the *Gingles* preconditions—including effective white bloc-voting—in a new district created without those measures. *Id.* at 304. Where courts "have accepted a State's 'good reasons' for using race in drawing district lines," "the State made a strong showing of a pre-enactment analysis with justifiable conclusions," that is, an "actual 'legislative inquiry' that would establish the need for its manipulation of the racial makeup of the district." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

## ARGUMENT

### I.   Plaintiffs Are Substantially Likely to Prevail on the Merits

As a threshold matter, Plaintiffs can adequately demonstrate standing. *United States v. Hay*s, 515 U.S. 737 (1995), "set forth a bright-line standing rule for . . .

cases alleging illegal racial gerrymandering with respect to voting districts: if the plaintiff lives in the racially gerrymandered district, she has standing." *Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1279 (11th Cir. 2000). Individual Plaintiffs have standing because they reside in the Challenged Districts. Ex. 25, Daly Decl.; Ex. 26, Dulcio Decl.; Ex. 27, Finn Decl.; Ex. 28, Ford Decl. Organizational Plaintiffs have standing because they have members who live in the Challenged Districts and minority voting rights are germane to the organizations' purposes. Ex. 29, GALEO Latino Community Fund of Georgia, Inc. ("GALEO") Decl.; Ex. 30, Georgia Coalition for the People's Agenda, Inc. ("GCPA") Decl.; Ex. 31, League of Women Voters of Marietta-Cobb ("LWVMC") Decl.; Ex. 32, New Georgia Project Action Fund ("NGPAF") Decl.

Plaintiffs are likely to prevail on their claim that the Enacted Plan violates the Equal Protection Clause based on both the ample "'direct evidence' of legislative intent," and the "circumstantial evidence of [the Challenged Districts'] shape[s] and demographics" that race predominated in the creation of Districts 2, 3, and 6. *Cooper*, 581 U.S. at 291. Simply put, the pretextual invocation of the VRA without a corresponding strong basis in evidence, as well as the plethora of circumstantial evidence and the pretextual nature of the race-neutral explanations of the Enacted Plan, would each be sufficient on their own to demonstrate the merit of Plaintiffs' claims. But taken together, they provide overwhelming evidence of the strength of

Plaintiffs' arguments and establish a clear likelihood of success on the merits.

First, those who directed the drawing of the map and who drew the map essentially concede that race predominated in the Challenged Districts. Their stated reason—compliance with the VRA—is certainly a compelling state interest. But because there is simply no evidence in the record to support the assertion that the map drawer had "good cause" to believe that VRA compliance was actually required to draw the Challenged Districts as Tyson did in the Enacted Plan, the key decision-makers cannot provide a compelling state interest in the Enacted Plan's configuration here. And there is no other compelling state interest, claimed or otherwise, sufficient to justify this race-based map. This direct evidence alone would be enough to support a likelihood of success on the merits of Plaintiffs' claim.

Second, the overwhelming circumstantial evidence also supports that the Enacted Plan, by the hands of the map drawer and at the direction of white School Board members, packed voters of color into the Challenged Districts.

## II.    Race Predominated in the Drawing of the Challenged Districts

Race predominates in a plan's configuration when a mapmaker purposefully establishes a racial target and that target is prioritized above all else, producing a "direct and significant impact" on a map's configuration. *Cooper*, 581 U.S. at 299. This is so even if the racial target is chosen in order to comply with the VRA—so long as there is evidence that that target was the single, immovable factor. *ALBC*,

16

575 U.S. at 267 (finding racial predominance where map drawers "prioritiz[ed] mechanical racial targets above all other districting criteria").[9]

Here, the express statements of the map drawers that a racial target was their overriding consideration, coupled with the strong circumstantial evidence of deviation from traditional districting principles and the equally strong evidence that invocation of VRA compliance was a pretext to hide the enactment of a plan designed to prevent Black and Latinx voters from electing a fourth candidate of their choice to the seven-member Board, support the conclusion that the Enacted Plan was a racial gerrymander. And, although true compliance with the VRA would have justified a race-based redistricting as a compelling state interest, the failure of the map drawer to have undertaken the required *Gingles* analysis or, indeed, any functional analysis of the districts, is conclusive evidence that the map drawer lacked the required "strong basis" that the Enacted Plan was narrowly tailored to comply with the VRA.

---

[9] Plaintiffs emphasize that drawing a district to comply with the VRA does not in and of itself trigger strict scrutiny. Indeed, Section 2 "demands consideration of race." *Allen v. Milligan*, 599 U.S. 1, 30. "At the same time, however, race may not be 'the predominant factor in drawing district lines unless [there is] a compelling reason.'" *Id.* (citing *Cooper*, 581 U.S. at 291). Here, it is the direct and circumstantial evidence that all other factors were subordinated to the acknowledged racial target that triggers strict scrutiny.

## A. Direct Evidence of Map Drawers' Predominant Use of Race

Tyson repeatedly stated that he drew the Enacted Plan first and foremost by establishing racial targets and drawing district lines that met those targets. Ex. 10, Tyson Tr. 106:4-7, 37:14-15, 37:18-20. Standing alone, setting a racial target for the purpose of complying with the VRA may not pose a constitutional issue. But here, the racial target was "the criterion that . . . could not be compromised," such that "race-neutral considerations came into play only after the race-based decision had been made." *Bethune-Hill*, 580 U.S. at 189 (cleaned up). Tyson explained to the Board that the VRA *required* him to draw majority-minority districts that needed to meet a racial target of "at least 50% of a single race."[10] Tyson "was not coy in expressing that goal." *Cooper*, 581 U.S. at 299. According to Tyson:

> [T]he best way to avoid liability is to draw a single race district if there's racially polarized voting. As we've discussed, there is polarized voting in Georgia. . . . But given that, statistically, there would be an indication of racially polarized voting, the best plan for a jurisdiction to avoid liability under Section two [of the VRA] is to draw a majority black district, if you can draw one, which we could in Cobb County.

Ex. 10, Tyson Tr. 98:11-21. Tyson confirmed that the single-race, majority-minority district he drew to meet the target of "50 percent plus one of African-American voters" was District 3. *Id.* at 98:24-99:3, 102:14-16; *see also* Ex. 33, CCSD

---

[10] Cobb County School Board Work Session (Dec. 9, 2021), at 3:18:50–3:19:10, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 36, Cobb County School Board Work Session (Dec. 9, 2021) Tr. 53 (unofficial transcript).

Response to ROG 17 (that District 3 was drawn to comply with the VRA). But he also noted that the other two "majority nonwhite districts" he drew—Districts 2 and 6—also "could be viewed as Voting Rights Act compliant districts." Ex. 10, Tyson Tr. 95:7-11. To draw all three districts, Tyson admitted to using "racial information" and "racial data." *Id.* at 35:12-15; 37:5-23.

## B. Circumstantial Evidence of Map Drawers' Predominant Use of Race

The overwhelming circumstantial evidence also points to VRA compliance as an unsupported pretext for packing Black and Latinx into the Challenged Districts and denying their equal opportunity to participate in the political process in the other districts. That evidence, when coupled with the direct evidence above, makes clear that the Enacted Plan is "unexplainable on grounds other than race." *Shaw v. Reno,* 509 U.S. 630, 643 (1993) (quotation marks omitted); *see also Miller*, 515 U.S. at 905, 913.

### i. <u>Demographics of the Districts and Areas Moved Are Best Explained by Race</u>

As Mr. Fairfax attests, the transformation from the Benchmark Plan to the Enacted Plan—and the resulting changes to the seven districts' geography and demographics—is best explained by race predominating. Ex. 1, Fairfax Rep. at ¶ 113. The Enacted Plan's configuration was achieved by adding and removing substantial population to each district according to racial makeup, resulting in both

packed white districts and packed districts of color. Through a clockwise rotation of the map, every northern district added areas with more white people than Black and Latinx people and every southern district, save for District 3, removed areas with more white people than Black and Latinx people. *Id.* at ¶ 50, 52. In effect, the map passes Black and Latinx voters southward from District 7 to Districts 3, 2, and 6 and passes white voters northward from District 6 to Districts 5, 4, 1, and 7. *Id.* at Figures 1, 2. All told, this rotation moved over 250,000 people—more than 35% of the county's total population—into new districts. *Id.* at ¶ 14(b).

**Southern Districts:** In the southern half of the county, Tyson implemented his "50 percent floor" strategy to Districts 2, 3, and 6. District 3, which Tyson identified as the "at least 50% of a single race" district, was the key. Tyson carefully maintained the demographic breakdown of Benchmark District 3 in the Enacted District 3: moving slightly from a 20.35% white population to 20.85%, a 58.11% Black population to 57.36%, and a 19.81% Latinx population to 18.84%. *Id.* at Tables 4, 5, ¶ 100. But the lack of change in the demographic makeup of District 3 belies the fact that Tyson reshaped District 3 significantly—with a new claw-shape reaching toward the center of the county—moving 12,000 people into the district and more than 15,000 people out of it. Of those 15,000 people moved out of District 3 and into District 2, the majority (11,096) were Black and Latinx. Ex. 1, Fairfax Rep. at ¶¶ 62, 102. District 2 also took on Black and Latinx population from District

6, which in turn allowed District 6 to take on Black and Latinx population from District 5. *Id.* at ¶ 112. District 3, with its pretextual VRA justification, thus served as the conduit for the packing of the entire southern region.

The manipulation of the boundaries of District 3 allowed Districts 2 and 6—which Tyson later referred to as "Voting Rights Act compliant districts"—to be rotated further southward to pick up the spillover from District 3 and fully contain the Black and Latinx population in the south of the county. Ex. 10, Tyson Tr. 94:21-95:17. Both Districts 2 and 6 saw a sizable increase in Black and Latinx population and a decrease in white population as a result. Ex. 1, Fairfax Rep. at Tables 4, 5. In the case of District 2, this marked a significant packing of the post, decreasing the white population from 38.98% to 31.73%, increasing the Black population from 35.36% to 38.56%, and increasing the Latinx population from 19.35% to 24.84%. *Id.* at Tables 4, 5. To accomplish this packing, Tyson added areas to the northern and northwestern edges of District 2 with fewer white residents *and* removed areas on the northeastern and eastern edges of District 2 with more white residents. *Id.* at Figures 1, 2. For District 6, Tyson's drawing was more precise—moving it a hair's breadth away from the majority-minority line, from 52.19% white to 39.44%, 24.21% Black to 35.05%, and 8.62% Latinx to 14.92% (together, the Black and Latinx population now equals 49.97%). *Id.* at Tables 4, 5. To accomplish this packing, Tyson added areas to the western edges of the district with significant white

21

and Black population, but he maintained the packed district by removing a massive amount of white population from the northeast corner of the district. *Id.* at Figures 1, 2.

**Northern Districts:** Tyson's packing of the southern districts served to bleach the white-controlled districts in the north. Foremost, these shifts shored up the white population in District 7, where the Black and Latinx population was on the cusp of reaching a majority in 2020. *Id.* at Table 4. District 7 was shifted northeast, moving the voters of color in the southern portion of Benchmark District 7 out of the district entirely and ensuring that any areas added to the post included more white people than Black or Latinx people. *Id.* at Figure 1. District 7 ultimately incorporated more than 10,000 new white people and excluded removed 4,142 Black people and 9,151 Latinx people. *Id.* at Table 7. These manipulations increased the white population by more than ten percentage points, transforming District 7 from a 47.55% White, 28.42% Black, and 19.13% Latinx district into a 58.17% White, 24.52% Black, and 10.15% Latinx district. *Id.* at Tables 4, 5. These adjustments guaranteed that Enacted District 7 would be firmly controlled by white voters in future election cycles. *Id.* at Figure 1, ¶ 14(d).

District 1—already comfortably controlled by white voters—followed from the reshaping of District 7. Continuing the clockwise shift, District 1 was reconfigured to capture the northwest corner of the county, with a thick arm jutting

eastward. This allowed Kennesaw, a city with some one of the highest rates of growth in Black and Latinx population growth in the last decade, to be split between Districts 1 and 7, ensuring the political power of the city's population of color would be diluted between the two districts. *Id.* at ¶¶ 60-61. Here, too, the specific areas added to District 1—in the southwest and northeast corners of the district—included far more white people than Black or Latinx people, allowing the District to maintain a solid white majority population of 58.22%. *Id.* at Figure 1, Table 5.

Meanwhile, District 4 was rotated east and District 5 was rotated southeast, and both were carefully calibrated to pick up as little population of color as possible. The areas added to Districts 4 and 5 included eight times more white people than Black or Latinx people. *Id.* at Figure 1. District 4 incorporated 9,814 white people, and removed 7,646 Black people and 1,485 Latinx people, while District 5 incorporated 2,952 white people and removed 970 Black people and 552 Latinx people. *Id.* at Table 7. These districts thus became more solidly white, with District 4 moving from 57.24% white to 65.56%, and District 5 moving from 66.97% white to 67.24%. *Id.* at Tables 4, 5.

Ultimately, the map was carefully tailored to facilitate the packing of minority voters: the three so-called VRA-compliant districts (Districts 2, 3, and 6) and four white-controlled districts (Districts 1, 4, 5, and 7) were made possible by packing the white population in the North and the Black and Latinx population in the South.

23

### ii. **The Enacted Plan Subordinated Traditional Redistricting Principles to Race-Based Considerations**

The Enacted Plan subordinates and arbitrarily applies traditional redistricting principles, including those initially identified by the Board Chair as his priorities for the redistricting process. *See Miller*, 515 U.S. at 916 (these principles include "compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests"); *ALBC*, 575 U.S. at 272; *see* Ex. 12, Pls. Ex. 6. Although "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition" for demonstrating racial predominance, the "conflict or inconsistency may be persuasive circumstantial evidence tending to show racial predomination." *Bethune-Hill*, 580 U.S. at 190.

Here, the Enacted Plan conflicts with and arbitrarily applies the traditional redistricting principles—including those identified by the Board Chair—to "respect [] political subdivisions" and "communities defined by actual shared interests." *ALBC*, 575 U.S. at 272. The Enacted Plan splits two key municipalities, Smyrna and Kennesaw, without explanation. Ex. 1, Fairfax Rep. at ¶ 60. Doing so also divides each city's precinct boundaries, inconsistent with the Board Chair's "Principles" to "follow existing precinct boundaries" and "keep communities of interest together as much as possible." Ex. 11, Pls. Ex. 5. The Enacted Plan further conflicts with the

24

principle to maintain communities of interest through the arbitrary reshuffling of high school pairings, for example, by placing Pebblebrook High School and South Cobb High School into separate districts. As Hutchins initially raised at the December 2021 School Board meeting, the Board Chair's map did not in fact "keep[] communities of interest together as much as possible," since it "cut[] one community right in half," even though the schools are only "1.7 miles from" each other.[11] *See also* Ex. 22, Davis Decl. ¶¶ 38, 48.

Relatedly, none of the policymakers who discussed the Board Chair's map or high school pairings with Tyson could explain the Enacted Plan's high school pairings. *E.g.*, Ex. 8, Scamihorn Tr. 94:9-95:14; Ex. 6, Chastain Tr. 105:10-22. In fact, both the Board Chair and Chastain could identify no commonalities that would require the Enacted Plan's specific high school pairings. Ex. 8, Scamihorn Tr. 94:9-95:14; Ex. 6, Chastain Tr. 105:10-22. Banks not only testified that he could not explain the Enacted Plan's high school pairings, but also that he *disagreed* with them. Ex. 4, Banks Tr. 219:8-221:9. These circumstances strongly suggest that the pairings were arbitrary and ad-hoc, supplied only as a pretext for the packing of the

---

[11] Cobb County School Board Work Session (Dec. 9, 2021), at 3:13:09-3:13:45, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 36, Cobb County School Board Work Session (Dec. 9, 2021) Tr. 45 (unofficial transcript).

Challenged Districts.[12] *See Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189-90 (2017) ("The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not.").

### iii.   The Benchmark Plan Was Not Malapportioned and Fares Better on Traditional Redistricting Principles Than the Enacted Plan, Indicating VRA Compliance Was Pretext

At the outset, the evidence suggests that the decision to redistrict was a foregone conclusion. S*ee* Ex. 10, Tyson Tr. 24:25-25:18, 26:3-5 (noting Tyson advised the Board Chair that the existing School Board map ("Benchmark Plan") was "generally defensible in court"); Ex. 1, Fairfax Rep. ¶¶ 14(b), 76 (discussing a legally acceptable population deviation of just 8.81%).

Even assuming *arguendo,* that the School Board could be justified in choosing to reapportion the districts to obtain lower population deviation, the Enacted Plan

---

[12] Although Tyson suggested the instructions to split Kennesaw into Districts 1 and 7 and pair certain high schools came from Steinhauser, acting on the Board Chair's behalf, Steinhauser did not recall giving any specific instructions to Tyson in constructing the Board Chair's map. Ex. 10, Tyson Tr. 145:16-146:18; Ex. 9, Steinhauser Tr. 81:22-83:13. Neither the Board Chair nor Chastain, the only other Board member who reviewed a draft of the Board Chair's map, could explain these decisions. Ex. 8, Scamihorn Tr. 164:22-24, 165:5-11, 165:12-166:3; Ex. 6, Chastain Tr. 120:7-121:14, 119:10-120:5. Together, this inconsistency suggests these redistricting principles were *post hoc* justifications for packing the Challenged Districts with Black and Latinx voters.

does far more than that, strongly supporting the conclusion that VRA compliance was the mere pretext for packing in the Enacted Plan, not rather than malapportionment. If ideal apportionment population equality was the goal, it would have been attainable by moving a mere 4,000 people into District 5, moving about 4,800 people out of District 6, and making a handful of other minor changes to the other districts. Ex. 1, Fairfax Rep. ¶ 14(b).[13] Instead, the Enacted Plan moves more than 250,000 people, or more than 35% of the county's total population. *Id.* This required the reconstruction of each district, retaining just 53.29% of the population of Benchmark District 5, 56.2% of District 7, and 57.81% of District 6. *Id.* at ¶ 77, Appendix E.

Moreover, the Benchmark Plan does an overall *better* job than the Enacted Plan of adhering to both traditional redistricting principles and the Board Chair's principles. On the precinct boundaries criterion, the Benchmark Plan splits 23 voting tabulation districts ("VTDs"),[14] while the Enacted Plan splits 30 VTDs. *Id.* at ¶ 81. On compactness, the Benchmark Plan is significantly more compact under a variety of different measures. *Id.* at ¶¶ 86, 87. And on incumbent pairing, the Benchmark

---

[13] At the Court's discretion, Plaintiffs are prepared to provide the Court with illustrative maps that reach ideal apportionment while otherwise hewing to least-change principles, as Mr. Fairfax outlines in his report.

[14] VTDs reflect voting precincts in the District as they existed at the time of the census.

Plan did not pair any incumbents, whereas the Enacted Plan paired Board members Howard and DavisHm into the same district. *Id.* at ¶ 83. The Enacted Plan performs better on only *one* of the Board Chair's criteria—following identifiable boundaries (*e.g.*, major roads)—which fell near the bottom of the Board Chair's list of priorities. *Id.* at ¶ 82. This further supports the conclusion that traditional redistricting criteria were considered "solely insofar as they did not interfere with this 50-percent-plus-one-person minimum floor" Tyson set out for District 3. *Harris v. McCrory*, 159 F. Supp. 3d 600, 615 (M.D.N.C. 2016), *aff'd sub nom.*, *Cooper*, 137 S. Ct. 1455 (2017) (finding that race can be found to predominate even when other factors also play a role in districting decisions when race is the criterion that cannot be compromised).

### iv. Other Circumstantial Evidence Suggests the Enacted Plan Packed Black and Latinx Voters to Limit Their Growing Political Power

The linchpin of a racial gerrymandering analysis is proof that race predominates the creation of a map without a narrowly tailored, compelling interest. In conducting a review of the evidence in support of those elements, the Eleventh Circuit has at times looked to *Arlington Heights*—typically used in the intentional discrimination context—for help in determining whether and why race drove line-

drawing decisions.[15] *See Jacksonville NAACP*, 2022 WL 16754389 at *3; *Jacksonville NAACP*, 635 F. Supp. 3d at 1244. Though consideration of the *Arlington Heights* factors is not necessary in racial gerrymandering claims, here, the evidence under several *Arlington Heights* factors is useful in understanding how race drove the creation of the Enacted Plan.

*First*, the impact of packing Black and Latinx voters into the Challenged Districts and the foreseeability and knowledge of that impact (Factors 1, 6, and 7) was obvious to every person associated with the creation of the Enacted Plan. By separating Black and Latinx voters in the southern three districts from the white voters in the northern four districts, the Enacted Plan diminishes the opportunity of voters of color to elect a candidate of choice in a fourth district. The Board members witnessed the demographic changes in Cobb County firsthand and received regular, detailed updates on these demographic changes through their work on the Board. *See, e.g.*, Ex. 4, Banks Tr. 71:7-71:12 (Cobb County demographic studies presented

---

[15] The Eleventh Circuit has summarized the non-exhaustive *Arlington Heights* factors as follows: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives. *See League of Women Voters of Fla., Inc. v. Florida Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022).

to Board annually). One white, four-term member of the School Board even provided his fellow Board members and various District employees with regular "ethnicity studies," in which he reviewed changes in the racial and ethnic demographics of the student population in the County's high schools, with the understanding that such changes might alter the School Board's work. *See id.* at 34:18-37:20 (testifying that he has prepared and distributed "ethnicity studies" for at least "five or six years"), 53:21-54:5 ("the ethnicity and the population . . . in a particular school, does affect the education"), 77:17-77:22 (testifying that Board "should have been aware" of demographic data in undertaking policymaking); Ex. 22, Davis Decl. ¶ 24 (noting that Banks "frequently commented on the growth of the population of color in the County" and "sent his 'studies' every couple of months"). The School Board was also aware that these changes were threatening the white Board members' 4-3 majority. Ex. 22, Davis Decl. ¶¶ 26, 51.

*Second*, HB 1028's departures from the normal legislative process (*Arlington Heights* Factors 3 and 4) demonstrate the efforts key decision-makers took to preserve the white majority in power by targeting the voting rights of Black and Latinx voters. For example, HB 1028 was originally assigned to the House Intragovernmental Coordination Committee, as county-level redistricting plans that

traditionally undergo a Local Bill process would proceed.[16] Ex. 24, Wilkerson Decl. ¶¶ 15-17; Ex. 21, Allen Decl. ¶¶ 3-4, 12-14; Ex. 23, Shannon Decl. ¶¶ 3-8; Ex. 17, Pls. Ex. 33. But the bill was withdrawn and reassigned to the House Governmental Affairs Committee a week later as a General Bill, which has different requirements than a Local Bill.[17] This was unusual not only because it deviated from historical practice, but also because, in that same legislative session, all but four of Georgia's counties that redistricted followed the usual Local Bill process. Cobb County did not. Ex. 23, Shannon Decl. ¶ 7; Ex. 21, Allen Decl. ¶ 18. Nor did Rep. Ehrhart speak with State Representative Erick Allen, then-Cobb County Delegation[18] Chair, or a majority of the Cobb County delegation before introducing HB 1028, as would have been customary for a Local Bill. Ex. 24, Wilkerson Decl. ¶¶ 17-18, 22; Ex. 21, Allen Decl. ¶¶ 8-10,13, 21.[19]

Then on February 9, 2022, when Rep. Ehrhart presented HB 1028 to the Governmental Affairs Committee, Rep. Wilkerson—a Black representative of Cobb

---

[16] Local legislation is "legislation which affects a specified political subdivision of the state as opposed to affecting the state in general."

[17] Georgia General Assembly, *HB 1028: Cobb County; Board of Education; change description of districts*, at https://www.legis.ga.gov/legislation/61369.

[18] A county delegation is comprised of all Georgia State Assembly elected officials who represent that county in part or in whole.

[19] Georgia House, Committee on Governmental Affairs (Feb. 9, 2022), at 0:55:43.0-0:56:06.1, https://vimeo.com/showcase/8988922?video=675573182; *see also* Georgia House, Committee on Governmental Affairs (Feb. 9, 2022), Tr. 9 (unofficial transcript).

County—raised race and representation issues in his opposition to HB 1028. Governmental Affairs Chairwoman Darlene Taylor—a white woman—took the extraordinary step of turning off Wilkerson's microphone in the middle of his comments. Ex. 24, Wilkerson Decl. ¶ 20. Taylor went so far as to call upon the Capitol Police to remove Wilkerson from the hearing. *Id.*

*Third*, the secretive process which excluded Black members of the School Board is best understood against a historical background of racial animosity on the School Board and of Black and Latinx constituents in Cobb County (*Arlington Heights* Factors 2, 5). Soon after Howard and Davis were elected in 2018, the white Board members instituted practices to limit Black Board members' influence. In 2019, the white majority on the Board abruptly ended the longstanding practice of allotting Board meeting time for open discussion after Howard and Davis used that time to discuss topics that impacted their Black and Latinx constituents. Ex. 22, Davis Decl. ¶¶ 9-10 (stating that white Board members frequently used the Board member comment period to discuss various non-education issues, including law enforcement officers killed in the line of duty in other states, but they ended the comment period after the Black Board members began discussing issues like ICE raids and gun violence); Ex. 7, Howard Tr. 114:16-116:13, 117:20-121:18 (testifying that he was "shocked" that a common practice was ended without prior discussion).

In November 2020—following the summer of racial justice demonstrations—

the School Board again voted along racial lines to increase the number of Board members required to place an item on a meeting agenda from three to four. Ex. 22, Davis Decl. ¶¶ 11-12. This change—supported by only the four white members— was made to prevent Black Board members from addressing issues of race and inequity in Cobb County schools to the School Board. *See, e.g.*, Ex. 5, CCSD 30(b)(6) (Floresta) Tr. 141:1-142:7 (testifying that policy change occurred to prevent "agenda items and conversation that was [sic] not relevant to schools," including "some of the political topics that our minority members had a habit of bringing"); Ex. 7, Howard Tr. 117:20-121:18 (testifying that the policy change occurred to avoid topics that made the majority of the board "uncomfortable" such as "things that were related to race and anything about race"); Ex. 22, Davis Decl. ¶¶ 11-12 (stating that the change prevented Black Board members from getting anything on the agenda, especially issues of race or racial equity). Once again, Black Board members were left in the dark about this change until it was suddenly presented for a vote. Ex. 22, Davis Decl. ¶¶ 17-18 (describing that she was unprepared for the Board to vote on this change because the agenda item said only "Policy BC – Board Meetings (For Potential Action) – Mr. Scamihorn").

White Board members capitalized on the suppression of their Black colleagues' influence to enact a host of policies to counter the interests of constituents of color. This included: voting along racial lines on a resolution

33

prohibiting the use of "critical race theory";[20] disbanding a committee formed to consider changing the name of Wheeler High School—named after a Confederate soldier—despite thousands of students and community members petitioning the School Board to do so and approximately 74% of the Wheeler student body being students of color;[21] ignoring concerns of parents of color to adopt COVID-19 safety protocols in the face of skyrocketing COVID-19 case in Cobb County schools and instead blaming "illegal aliens" for Cobb County's high COVID-19 positivity rates and referring to the disease as "the China virus;"[22] and ignoring the pleas of parents and students of color to address incidents of overt racism in Cobb County schools. *See* Ex. 22, Davis Decl. ¶¶ 8-25; Ex. 7, Howard Tr. 52:22-56:6, 119:12-124:22.

Within this context, it was no surprise when the Board Chair kept his search for a legal expert to redraw district lines a secret from Black Board members. Ex. 7,

---

[20] Cassidy Alexander, Cobb School Board Member Questions District's Response to Antisemitism, Atlanta J. & Const. (Feb. 18, 2022), https://www.ajc.com/education/cobb-county-school-board-member-questions-district-response-to-antisemitism/26PULAOJ4NCTJM24Q4GYVZ2NTY/.

[21] Wendy Parker, Wheeler Student Leaders Seek 'Dialogue' on School Name Change, East Cobb News (Oct. 28, 2020), https://eastcobbnews.com/wheeler-student-leaders-seek-dialogue-on-school-name-change/.

[22] Rebecca Gaunt, Cobb School Board Chairman Under Fire for COVID Response, Cobb Cnty. Courier (Sept. 7, 2021), https://cobbcountycourier.com/2021/09/cobb-school-board-chairman-under-fire-for-covid-response/; Cobb County Parents Concerned After School Board Vice-Chair Shares COVID-19 Misinformation, FOX 5 Atlanta (Oct. 11, 2021), https://www.fox5atlanta.com/news/cobb-county-school-board-vice-chair-accused-of-disseminating-debunked-information-on-covid-19-vaccine.

Howard Tr. 41:14-43:9, 63:6-67:1, 128:8-129:23; Ex. 22, Davis Decl. ¶¶ 27-32. The efforts to conceal redistricting decisions from Black Board members is even more apparent when comparing who had access to the Board Chair's map and who did not: Black Board members did not know of or see the Board Chair's map until Tyson transmitted it to the full School Board on December 6, 2021, for consideration at the December 9, 2021 map-approval meeting, Ex. 22, Davis Decl. ¶ 40 (stating that the first time she saw the Board Chair's map was when Tyson sent it to the full School Board on December 6, 2021), but at least one other white Board member—Chastain—was given an early version to review, Ex. 6, Chastain Tr. 86:7-14. That the Board Chair engaged Steinhauser so he could be "hands off" and disclaim knowledge about redistricting to his Black colleagues shows the lengths white Board members went to limit the political power of Black Board members and the voters of color they represented. Ex. 9, Steinhauser Tr. 34:7; 45:10-15; 55:25-56:2.

These actions also make it especially difficult to believe the white majority on the School Board would actually prioritize the careful and precise work it takes to comply with the Voting Rights Act and ensure minority electoral opportunity. According to the Board Chair, VRA compliance topped his "Principles for Map," Ex. 11, Pls. Ex. 5; Ex. 8, Scamihorn Tr. 71:20-72:8, 77:8-18, and again claimed VRA

compliance as a priority during the July 15, 2021[23] and December 9, 2021[24] Board

meetings; Tyson repeated the refrain of "VRA compliance" during the map drawing

process;[25] and Rep. Ehrhart sang the same tune[26] before the Governmental Affairs

Committee.[27] But this expressed desire to satisfy the VRA was counter-factual based

on the contemporaneous actions of the white Board members, and was also

completely pretextual, as discussed, *infra* Section III.

    Altogether, this circumstantial evidence viewed through an *Arlington Heights*

---

[23] *See* Cobb County School Board Work Session (July 15, 2021), at 3:05:00-3:05:30, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 34, Cobb County School Board Work Session (July 15, 2021) Tr. 2 (unofficial transcript).

[24] *See* Cobb County School Board Work Session (Dec. 9, 2021), at 2:59:20-2:44:07, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 36, Cobb County School Board Work Session (Dec. 9, 2021) Tr. 40 (unofficial transcript).

[25] S*ee, e.g.*, Cobb County School Board Work Session (Dec. 9, 2021), at 3:18:50-3:00:40, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 36, Cobb County School Board Work Session (Dec. 9, 2021) Tr. 53 (unofficial transcript).

[26] *See Jacksonville Branch of NAACP v. City of Jacksonville*, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022) (noting that while the court has "shown skepticism about whether the statements of a single bill sponsor can be imputed to the rest of a legislative body," the district court was justified in weighing the comments of a single "key" councilmember who had "offered numerous direct quotes that suggested race was a primary motivating factor for that councilmember").

[27] Georgia House, House Subcommittee on Governmental Affairs Redistricting and Elections (Feb. 07, 2022), at 0:26:44:00–0:26:56:00, 0:29:42:00–29:54:00, https://www.youtube.com/watch?v=XNjm5wf7UHI (testifying that the "first and foremost" concern in drawing the Enacted Plan was legal compliance, including with the VRA, that the resulting map "potentially creates three minority opportunity voting districts," and clarifying that "legal compliance" with Section 2 of the VRA "was" the number one consideration in the drawing" of the HB 1028 map).

lens compounds the probability that the Enacted Plan discriminates against Black and Latinx voters.

## III.   The Enacted Plan's Use of Race Does Not Satisfy Strict Scrutiny

Having shown that Plaintiffs have a probability of success of demonstrating that race predominated the creation of the Enacted Plan, the merits issue turns to whether Defendant will be able to satisfy strict scrutiny, the "most rigorous and exacting standard of constitutional review." *Miller*, 515 U.S. at 920. To do so, the redistricting at issue must be "narrowly tailored to achieve a compelling interest." *Id.* at 920, 922. While VRA compliance is one such compelling interest, merely invoking the VRA to justify race-based redistricting is not enough. To meet the narrow tailoring requirement, the map drawer—here, Tyson—must show that he had "'a strong basis in evidence' for concluding that the statute required [his] action." *Cooper*, 581 U.S. at 292 (quoting *ALBC*, 575 U.S. at 278). Such a "strong basis in evidence" exists only when the map drawer has determined that the *Gingles* preconditions are met. "If a State has good reason to think that all the *Gingles* preconditions are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Id.* at 302. This means that the map drawer must analyze whether: (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group is "politically cohesive," and (3) the "majority votes

sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51.

Additionally, drawing a district for the purpose of VRA compliance requires "remedy[ing] the anticipated violation or achiev[ing] compliance with the VRA" in order to be narrowly tailored. *Shaw v. Hunt*, 517 U.S. 899, 916 (1996). A common way of doing so is to undertake a "functional analysis of the electoral behavior within the particular . . . election district" to determine the proportion of minority voters needed in a district to allow those voters to usually elect their preferred candidates. *Bethune-Hill*, 580 U.S. at 194. Once a violation has been established, the protected group need not necessarily form a majority of the population in a Section 2 remedial district, as long as the protected group "otherwise ha[s] an opportunity to elect a representative of their choice" in the remedial district. *Caster v. Merrill*, No. 2:21-CV-1536-AMM, 2022 WL 264819, at *83 (N.D. Ala. Jan. 24, 2022), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023); *see also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1299 (11th Cir. 2020) (affirming district court's conclusion that "[t]he remedial plan should give[ ] African American voters a realistic opportunity to elect candidates of their choice").

Here, Tyson did neither a *Gingles* analysis nor a functional analysis to support the map he drew under the pretext of VRA compliance. Indeed, the three posts that he touted as VRA-compliant "minority opportunity districts"—Districts 2, 3,

and 6—were districts where voters of color had already been achieving electoral success. There is absolutely nothing in the record resembling the necessary "strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott*, 138 S. Ct. at 2335. Because courts will not "approve a racial gerrymander whose necessity is supported by no evidence," the Election Defendants should be enjoined from enforcing the map. *Cooper*, 137 S. Ct. at 1472.

Specifically, after generally noting that "there is" racially polarized voting in Georgia as a whole and that there are "a lot of non-white individuals in Cobb County," Tyson provided no district-specific analysis in presenting his map to the Board.[28] *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 404 (2022) (noting the improper reliance on "generalizations to reach the conclusion that the preconditions were satisfied"). When asked if he ever determined "whether or not minority voters in Cobb County were blocked from electing their candidates of choice anywhere in the school board map," Tyson answered, "I did not." Ex. 10, Tyson Tr. 100:7-10. "Strict scrutiny requires much more" than this sort of "uncritical" assumption free of "other evidence or analysis." *Wis. Legislature*, 142 S. Ct. at 1249.

---

[28] Cobb County School Board Work Session (Dec. 9, 2021) at 3:00:00-3:00:32, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 36, Cobb County School Board Work Session (Dec. 9, 2021) (unofficial transcript).

Had Tyson conducted a true *Gingles* analysis, he would have found there was no "good reason" to believe that any of these districts required the VRA protections he purportedly sought to provide. *Cooper*, 581 U.S. at 302. True, racially polarized voting exists in Cobb County: Black voters in Cobb County vote cohesively such that a large majority of Black voters favor the same candidates, white voters in Cobb County vote cohesively such that a large majority of White voters favor the same candidates, and the candidates favored by Black voters and white voters are different. Ex. 2, Oskooii Rep. ¶ 16(a)-(d). But the second and third *Gingles* preconditions require more than proof of minority and white bloc voting. They require proof that the degree of polarization is such that the white majority voters "usually . . . defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. No such proof exists in Districts 2, 3, or 6. The preferred candidates of Black voters have won elections in all three Benchmark districts in recent years by comfortable margins. Ex. 2, Oskooii Rep. ¶¶ 50-54. The average margin of victory for Black-preferred candidates in District 2 is 27.1 percentage points, in District 3 is 52 percentage points, and in District 6 is 5.1 percentage points. *Id.* In District 3, most notably, Black voters have elected their candidates of choice by an average margin of victory of greater than 50 percentage points, with sizable support from white crossover voters in many elections. *Id.* at ¶¶ 15(e)-(h), 50-54. In other words, there is simply no evidence of the third *Gingles* precondition in any of these districts.

40

"[U]nless each of the three *Gingles* prerequisites is established, 'there neither has been a wrong nor can [there] be a remedy.'" *Cooper*, 581 U.S. at 306 (quoting *Growe v. Emison*, 113 S. Ct. 1075, 1084 (1993)). This is because the VRA does not apply when minority voters have no problem electing representatives of their choice, no matter how cohesive white voters may be. Because Districts 2, 3, and 6 were already electing Black members to the School Board (even as Districts 2 and 6 were majority white), there was no evidence of a VRA violation in any of these districts. Tyson thus cannot justify his assertion that the VRA compelled the creation of the Enacted Plan, especially his increase of Black and Latinx population in Districts 2 and 6. *See Cooper*, 581 U.S. at 299-316 (rejecting jurisdiction's defense that VRA compliance required increasing Black population in districts already electing Black candidates). Absent any indication, let alone a strong basis in evidence, that Black and Latinx voters needed the protections of the VRA to elect a candidate of choice in any of these districts, there was no justification for the racial manipulation resulting in the packing of these districts.

Further, Tyson failed to conduct a functional analysis or any other sort of analysis of the electoral behavior within any of the districts to determine the proportion of Black and Latinx voters that would be needed in a remedial district. Ex. 10, Tyson Tr. 100:2-100:10. Instead, Tyson set a racial standard—based on his assertion that "what you must do with Voting Rights Act districts is create districts

41

that are at least 50% of a single race where that can be created"—and drew the three Challenged Districts on this basis. Tyson admitted to doing so in District 3, which he drew to include a 57.36% Black population.[29] Ex. 1, Fairfax Rep. at Table 5. Tyson and the legislative sponsor also repeatedly touted that Districts 2 and 6 were drawn as "minority opportunity voting districts," which he drew to include a 63.4% and a 49.97% Black and Latinx population, respectively. Ex. 10, Tyson Tr. 95:7-11; Ex. 1, Fairfax Rep. at Table 5. Regarding these districts, Tyson said: "Two [districts], I believe, are majority nonwhite districts . . . I believe any of those could be viewed as Voting Rights Act compliant districts."[30] Ex. 10, Tyson Tr. 95:5-11.

Had Tyson conducted any analysis, he would have learned that voters of color were electing candidates of choice in all three districts with comfortable margins. As Plaintiffs' expert demonstrates, based on historical election data, Black-preferred candidates would enjoy an average margin of victory of a stunning 50.3 percentage points in Enacted District 3 with the levels of population chosen by Tyson. Ex. 2, Oskooii Rep. ¶ 54. Thus, Black voters in District 3 would have been able to elect candidates of choice with a Black voting population substantially below the 50%

---

[29] Cobb County School Board Work Session (Dec. 9, 2021), at 3:19:01-3:19:08, https://www.cobbk12.org/page/8993/watch-meetings-online; *see also* Ex. 36, Cobb County School Board Work Session (Dec. 9, 2021) Tr. 51 (unofficial transcript).

[30] Georgia House, House Subcommittee on Governmental Affairs Redistricting and Elections (Feb. 07, 2022), at 0:26:44:00–0:26:56:00, https://www.youtube.com/watch?v=XNjm5wf7UHI.

threshold Tyson set. Had Tyson conducted this analysis as to Districts 2 and 6, he would have discovered that Districts 2 and 6 were also already comfortably performing for Black voters, as evidenced by the fact that both districts had elected Black candidates to the Board already. Ex. 22, Davis Decl. ¶ 4. The addition of more voters of color was thus not necessary to comply with the VRA. Ex. 2, Oskooii Rep. ¶ 52 (noting that the average margin of victory for Black-preferred candidates was 27.1 percentage points in Benchmark District 2 and 5.1 percentage points in Benchmark District 6). And providing Black and Latinx voters with continued electoral opportunities certainly did not require packing District 2's population to be 63.4% Black (compared to the 54.71% of the Benchmark) and Latinx and District 6's Black and Latinx population to be 49.97% (compared to the 32.83% of the Benchmark). Nor did it require the Enacted Plan's manipulation of voters in and out of Districts 2 and 6. *See* Ex. 1, Fairfax Rep. ¶¶ 57, 63, 67, 70, 74, 102-105.

In short, Tyson used the VRA as a pretext to pack Black and Latinx voters into District 3, 2, and 6. There is no support for the proposition that any of Districts 2, 3, or 6—let alone all of them—necessitated the level of voters of color set by Tyson in order to comply with the VRA. Far from facilitating minority opportunity in these districts, the Enacted Plan simply packs an unnecessarily large proportion of voters of color into south Cobb to limit their influence elsewhere in the county.

43

Such arbitrary racial quotas are textbook racial gerrymandering that cannot satisfy strict scrutiny.

## IV.    The Map Drawer's Post Hoc Partisanship Justification Is Entitled to No Weight and Is Not a Compelling State Interest

There is no meaningful evidence to suggest partisanship, rather than race, predominated in the map-drawing process. The leaders of the redistricting process—including the Board Chair, his proxy Steinhauser, and map drawer Tyson—never once mentioned partisan advantage as a priority in the redistricting process in either documents or statements contemporaneous with the process. Partisan advantage was never included in the Board Chair's "Principles for Map" or other versions of that document, such as the "Protocols for Map" that were drafted and distributed during the map-drawing process. Ex. 11, Pls. Ex. 5; Ex. 13, Pls. Ex. 7. And, as noted above, the Board Chair made clear that all principles he considered were included on this list. Ex. 8, Scamihorn Tr. 78:11-16. Nor did any Board Member discuss partisan advantage in public meetings where redistricting was discussed, including the July 15, August 19, and December 9, 2021 Board meetings.[31]

Indeed, in describing his decision to hire Taylor English to draw the map, the

---

[31] *See generally* Ex. 34, Cobb County School Board Work Session (July 15, 2021) (unofficial transcript); Ex. 35, Cobb County, Board of Education Meeting (August 19, 2021) (unofficial transcript); Ex. 36, Cobb County Board of Education Work Session (Dec. 9, 2021) (unofficial transcript).

Board Chair cited the firm's "bipartisan work" and that they had "clients across . . . the political spectrum." Ex. 8, Scamihorn Tr. 68:23-69:6. When asked whether partisan advantage was a priority in the redistricting process, the Board Chair stated it "wasn't a primary goal." *Id.* at 69:11-14. Steinhauser similarly reported that the Board Chair did not include partisanship in his communicated priorities. The first time that partisan considerations were even hinted at as a priority was in the course of this litigation, when Tyson testified that partisanship "was a very important consideration," but not an "overriding" one. Ex. 10, Tyson Tr. 112:14-17; 113:18-23. Tyson's assertion can thus only be understood as a *post hoc* suggestion that partisanship could justify his own line-drawing decisions—despite nothing in the record to suggest this was a factor for the Board, let alone a significant consideration. This testimony rings particularly hollow in light of Tyson's statements that he acted as the "technical hands for the elected officials'" policy goals. *Id.* at 43:13-18, 44:7-20. This sort of retroactive explanation is entitled to no weight in redistricting cases. *See Harris v. McCrory*, 159 F. Supp. 3d 600, 614-15 (M.D.N.C. 2016) ("Apparently seeing the writing on the wall, the defendants make the passing argument that the legislature configured [the district] . . . for partisan advantage."), *aff'd sub nom. Cooper*, 137 S. Ct. at 1455.

More importantly, *even if* partisan advantage was Defendants' primary aim— and all parties simply "understood partisanship was important to the map drawing

process," as Tyson suggests, Ex. 10, Tyson Tr. 117:8-14, that does not change the overwhelming evidence that race was the predominant criterion used to further that goal. *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002) (the "fact that other considerations may have played a role in the County's redistricting does not mean that race did not predominate"). *See supra* Section I.A. The use of race "remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 581 U.S. at 308 n.7. For example, if legislators "use race as their predominant districting criterion with the end goal of advancing their partisan interests—perhaps thinking that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander . . . their action still triggers strict scrutiny." *Id.*

When race is shown to be the predominant tool for sorting voters, that districting presumptively violates the Equal Protection Clause. *Shaw I*, 509 U.S. at 653. Strict scrutiny is triggered and the burden shifts to defendants to show a compelling interest and narrow tailoring. *Cooper*, 581 U.S. at 292. And partisan advantage is not such a compelling interest. Sorting voters on the basis of race is impermissible "regardless of the[] ultimate objective in taking that step," even if the map drawer "use[d] race . . . with the end goal of advancing their partisan interests." *Id.* at 308 n.7. As such, Tyson's *post hoc* partisanship justification is irrelevant to the merits of this case and cannot overcome the overwhelming evidence of racial targets

46

and gerrymandering.

### V.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

"Racial classifications with respect to voting carry particular dangers," *Shaw I*, 509 U.S. at 647, and Plaintiffs will suffer imminent, irreparable harm if elections are held under the Enacted Plan. Plaintiffs seek timely relief of an irreparable injury that is "neither remote nor speculative, but actual and imminent" due to the upcoming 2024 elections. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

The harm of voting in districts that are unconstitutionally racially gerrymandered cannot be redressed once an election has occurred. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("The injury to these voters is real and completely irreparable if nothing is done to enjoin this law."). When impaired, this injury "cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (citation omitted).

### VI.   The Balance of The Equities and the Public Interest Weigh in Favor of Granting Plaintiffs' Preliminary Injunction

The irreparable harm Plaintiffs face outweighs any burden an injunction might create for the County, and an injunction is in the public interest. Plaintiffs' interest in protecting their equal opportunity to access the political process outweighs any

countervailing interest in maintaining an unconstitutional, discriminatory map. *City of Jacksonville*, 2022 WL 16754389, at *5 ("[T]he public has no interest in enforcing unconstitutional redistricting plans."); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[C]autious protection of the Plaintiffs' franchise-related rights is without question in the public interest."). In fact, allowing elections to proceed under unconstitutional lines "would be harmful to the public's perception of the election's legitimacy." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

## VII.    The *Purcell* Doctrine Does Not Preclude the Requested Relief

Originating from *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the *Purcell* doctrine stands for the proposition that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). This is because "[l]ate judicial tinkering with election laws can lead to disruption" of elections "close at hand." *Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Kavanaugh J., concurring). If a district court issues an injunction too close to an election, it risks the appellate court staying that injunction. *See League of Women Voters of Fla. v. Lee*, 32 F.4th 1363, 1371 (11th Cir. 2022). But the concerns laid out by *Purcell* are satisfied here, where the next School Board election is at least seven months away and with more than enough time to avoid a "late, judicially-imposed chang[e] to [] election laws and

48

procedures." *Merrill*, 142 S. Ct. at 881 (Kavanaugh J., concurring). Even if *Purcell* were applicable and Plaintiffs were to prevail on their Motion, an appellate stay of the Court's injunctive order would not be warranted because Plaintiffs have sufficiently demonstrated the "(i) underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.* (cleaned up).

Plaintiffs bring this motion to ensure that relief can be implemented in time for the next School Board election while still satisfying *Purcell* considerations. That election—the May 21, 2024 primary election—is presently seven months away and nowhere "close at hand." *Id.* (quoting *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring)). Though the Supreme Court and Eleventh Circuit have stayed injunctions pertaining to elections four months or less away, *see Merrill*, 142 S. Ct. at 879; *League of Women Voters of Fla., Inc.*, 32 F.4th at 1369, the Eleventh Circuit has declined to stay an injunction related to an election five months away because "[a]pplying *Purcell* to [that] case would extend the 'eve of an election' farther than [the court had] before," *City of Jacksonville*, 2022 WL 16754389, at *2. *See also In re Georgia Senate Bill 202*, No. 1:21-CV-01259, 2023 WL 5334582, at *14 (N.D. Ga. Aug. 18, 2023) & No. 1:21-CV-01229, 2023 WL 5334617, at *14 (N.D. Ga.

Aug. 18, 2023) (enjoining voting restrictions where next affected elections over six months away). Plaintiffs therefore respectfully request that the Court grant Plaintiffs' motion for a preliminary injunction by December 15, 2023 to avoid any "late-breaking injunction" that could generate election administration hardship or voter confusion. Plaintiffs have also contemplated this schedule with the Election Defendants, and negotiated in good faith to adhere to a schedule that would both avoid unnecessary confusion and allow Plaintiffs the opportunity to vote in constitutionally configured districts in the 2024 election. *See* Doc. No. 180 at 4 (consent motion to revise scheduling order requesting that an interim remedial period begin December 18, 2023 should Plaintiffs prevail on their preliminary injunction motion).

Even if this Court determined the timing of this Motion and Plaintiffs' request for an order by December 15, 2023 "fit[]" within the timing of "*Purcell*'s outer bounds," an injunctive order pursuant to this Motion would not be subject to an appellate stay. *League of Women Voters of Fla., Inc.*, 32 F.4th at 1371. *First*, Plaintiffs have marshaled overwhelming evidence to show the underlying merits clearly weigh in their favor. *Second*, Plaintiffs have demonstrated they will suffer irreparable harm absent injunctive relief: the May 21, 2024 election is imminent and Plaintiffs' harms cannot be redressed once the election has occurred. *Third*, and related, Plaintiffs did not unreasonably delay in filing this case or the instant Motion.

Plaintiffs filed their complaint just months after the Enacted Plan became effective on March 2, 2022. Because the Enacted Plan became effective less than three months before the next School Board election on May 24, 2022, any relief Plaintiffs sought ahead of that election would have already been barred by *Purcell*. Now, Plaintiffs seek preliminary injunctive relief less than two months after discovery has closed and seven months before the next School Board election. If *Purcell* bars relief here, Plaintiffs would be placed in an impossible position related to timing, because no claim could be made before harm was imminent. Had Plaintiffs filed their Motion earlier, "their prospective harms would not have been imminent, but had they filed any later, their relief" would again be "barred by *Purcell*." *In re Georgia Senate Bill 202*, 2023 WL 5334617, at *12 (N.D. Ga. Aug. 18, 2023) (slip copy).

*Fourth*, any injunctive relief at this stage would be "feasible before the election without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881 (Kavanaugh J., concurring). The Supreme Court has vacated an appellate court's stay that was based on *Purcell* where the defendants had conceded that a district court's decision would not have election administration implications. *See Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022). Here, Defendants agreed that, "should the Court issue an order preliminarily enjoining the current School Board map by December 15, 2023, Election Defendants will have sufficient time to fully administer the May 21, 2024 state and county primary election, including . . . all

51

public education and notice actions in the usual course of an election" in order to mitigate confusion. Doc. No. 180 at 3; Ex. 3, Stipulated Settlement Agreement. Election Defendants' and Plaintiffs' jointly proposed schedule, Doc No. 180, also anticipates that any interim remedial plan would be implemented at least four months before the next School Board election. *Cf. Grace, Inc. v. City of Miami*, No. 23-12472, 2023 WL 5286232, at \*1, 5 (11th Cir. Aug. 4, 2023) (staying a remedial plan adopted less than three months before election). Therefore, Plaintiffs' request for a preliminary injunction by December 15, 2023 is also made in consideration of a timely interim remedial process and adoption of an interim remedial map that would be feasible for election administration without significant cost, hardship, or confusion.[32]

For these reasons, *Purcell* does not bar Plaintiffs' requested relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant

---

[32] Consistent with the Consent Motion to Revise Scheduling Order (Doc. 180 at 2-3) and Stipulated Settlement Agreement (Ex. 3), should Plaintiffs prevail on this motion, Plaintiffs request that the Court give the legislature the first opportunity to draw a new map. If the Georgia General Assembly fails to draw an interim remedial map or if the map drawn by the General Assembly fails to meet the Court's approval, Plaintiffs agree to the Court's supervision of the implementation of an interim remedial map and request that the Court consider input from the Parties regarding any such interim remedial map. Plaintiffs are prepared to provide briefing on a proposed interim remedial process, including several illustrative "least-change" maps described in Section II.B.iii, *supra*, at the Court's discretion.

their motion for a preliminary injunction enjoining Election Defendants from conducting any future elections using the Cobb County School Board map enacted in House Bill 1028 in the 2022 Legislative Session. Plaintiffs further respectfully request that the Court grant Plaintiffs' motion by December 15, 2023 so that an interim remedial map be adopted by January 22, 2024, well in advance of the 2024 elections to avoid hardship to Cobb County's election administration and to mitigate voter confusion.

Respectfully submitted this 23rd day of October, 2023,

*/s/ Pichaya Poy Winichakul*
Bradley E.  Heard (Ga. Bar No.  342209)
Pichaya Poy Winichakul (Ga. Bar No.  246858)
Michael Tafelski (Ga. Bar No.  507007)
Sabrina S. Khan*
Courtney O'Donnell (Ga. Bar No. 164720)
SOUTHERN POVERTY LAW CENTER
150 E.  Ponce de Leon Ave., Suite 340
Decatur, Georgia 30030
(404) 521-6700
bradley.heard@splcenter.org
poy.winichakul@splcenter.org
michael.tafelski@splcenter.org
sabrina.khan@splcenter.org
courtney.odonnell@splcenter.org

Caitlin May (Ga. Bar No. 602081)
Cory Isaacson (Ga. Bar No. 983797)
Rahul Garabadu (Ga.  Bar No.  553777)
ACLU FOUNDATION OF GEORGIA, INC.
P.O.  Box 570738
Atlanta, Georgia 30357
(678) 310-3699
cmay@acluga.org
cisaacson@acluga.org
rgarabadu@acluga.org

Jeff Loperfido*
Christopher Shenton*
SOUTHERN COALITION FOR SOCIAL
JUSTICE
1415 West Highway 54, Suite 101
Durham, NC 27707
(919) 323-3380
jeffloperfido@scsj.org
chrisshenton@scsj.org

Jon Greenbaum*
Ezra D.  Rosenberg*
Julie M.  Houk*
Sofia Fernandez Gold*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
sfgold@lawyerscommittee.org

Douglas I.  Koff*
Thomas L.  Mott*
Jacqueline Maero Blaskowski*
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000
Douglas.Koff@srz.com
Thomas.Mott@srz.com
Jacqueline.Maeroblaskowski@srz.com

*Admitted Pro Hac Vice

Counsel for Plaintiffs Karen Finn, Dr. Jillian
Ford, Hylah Daly, Jenne Dulcio, GALEO Latino
Community Development Fund, Inc., New Georgia
Project Action Fund, League of Women Voters of
Marietta-Cobb, and Georgia Coalition For The
People's Agenda, Inc.

/s/ Caren E.  Short

Caren E.  Short (Ga Bar No.  990443)
LEAGUE OF WOMEN VOTERS

OF THE UNITED STATES
1233 20th Street NW, Suite 500
Washington, DC 20036
202-921-2219
cshort@lwv.org

*Counsel for Plaintiff League of Women Voters
Marietta-Cobb*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the foregoing using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted this 23rd day of October, 2023.

/s/ Pichaya Poy Winichakul
Pichaya Poy Winichakul (Ga. Bar No. 246858)
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30030
(404) 521-6700
poy.winichakul@splcenter.org

*Counsel for Plaintiffs Karen Finn, Dr. Jillian Ford, Hylah Daly, Jenne Dulcio, GALEO Latino Community Development Fund, Inc., New Georgia Project Action Fund, League of Women Voters of Marietta-Cobb, and Georgia Coalition For The People's Agenda, Inc.*