# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KAREN FINN, *et al.*,

     Plaintiffs,

-v-

COBB COUNTY BOARD OF
ELECTIONS AND REGISTRATION, *et al.*

     Defendant.

Case No. 1:22-cv-2300-ELR

---

## AMICUS CURIAE COBB COUNTY SCHOOL DISTRICT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

**Philip W. Savrin**
**Georgia Bar No. 627836**
**Johnathan D. Crumly**
**Georgia Bar No. 199466**
**William H. Buechner, Jr.**
**Georgia Bar No. 086392**
**Scott Eric Anderson**
**Georgia Bar No. 105077**
**P. Michael Freed**
**Georgia Bar No. 061128**
**FREEMAN MATHIS & GARY, LLP**
**100 Galleria Parkway, Suite 1600**
**Atlanta, GA 30339**
**T: 770.818.0000**
**F: 833.330.3669**

**Counsel for Amicus Curiae Cobb County School District**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................... iii

I.    FACTS ............................................................................................. 2

II.   ARGUMENT AND CITATION OF AUTHORITY ...................................... 6

     A.    Plaintiffs' Motion Should Be Summarily Denied Because It Is Untimely ....................................................................... 6

     B.    Plaintiffs Have Failed To Show A Likelihood of Success On The Merits ...................................................................... 8

          1.    Plaintiffs Have Failed To Establish That Race Predominated The General Assembly's Enactment Of House Bill 1028 ....................................................... 9

          2.    Plaintiffs Have Failed To Establish That Race Rather Than Partisan Considerations Predominated Tyson's Construction Of Districts 2 and 6 ............................... 13

               a.    Tyson Testified And Banks Confirmed That Retaining A Republican Majority Was A Very Important Factor In Drawing The Map, Including Districts 2 and 6.......................... 14

               b.    Plaintiffs Have Failed To Demonstrate Tyson Drew Districts 2 And 6 Because Of Race Rather Than Partisan Considerations ........................ 15

               c.    Plaintiffs Have Failed To Demonstrate That Tyson Subordinated Traditional Redistricting Principles, Much Less That He Did So Because Of Race ................................................................ 17

               d.    The Arlington Heights Factors Do Not Point To Race As The Predominant Factor .................................... 19

          3.    Plaintiffs Have Failed To Establish That District 3 Was The Product Of Unlawful Racial Gerrymandering.......... 21

a.   Tyson Would Have Drawn A Majority Black District Even In The Absence Of The Need To Comply With § 2 of the VRA.........................................21

b.   District 3 Satisfies Strict Scrutiny Because Tyson Had Good Reason To Believe That Retaining A Majority Black District Was Necessary To Comply With The VRA...........................22

III.   CONCLUSION.............................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ............................................................. 13, 27

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015) ..................25

*Allen v. Milligan*, 143 S. Ct. 1487 (2023)...................................................................1

*Alpha Phi Alpha Inc. v. Raffensperger*, 2023 WL 7037537
(N.D. Ga. Oct. 26, 2023)....................................................................................1

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018)..............................................................6

*Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 786 (2017) ..... 10, 25, 26

*Black Voters Matter Fund v. Raffensperger*, 508 F.
Supp.3d 1283 (N.D. Ga. 2020) ...........................................................................7

*Bush v. Vera*, 517 U.S. 952 (1996) ................................................................. 15, 25

*Clark v. Putnam Cnty.,* 293 F.3d 1261 (11th Cir. 2002) ........................................18

*Cooper v. Harris*, 581 U.S. 285 (2017) ......................................................... *passim*

*DeJulio v. Georgia*, 290 F.3d 1291 (11th Cir. 2002) ....................................... 13, 14

*Easley v. Cromartie* 532 U.S. 234 (2001).........................................................15, 17

*Georgia Senate Bill 202*, 2023 WL 5334617 (N.D. Ga. Aug. 18, 2023) .................8

*Gonzalez v. Governor of Ga.*, 978 F.3d 1266 (11th Cir. 2020)................................6

*Hunt v. Cromartie*, 526 U.S. 541 (1999) .................................................................16

*Hunter v. Underwood*, 471 U.S. 222 (1985)............................................................23

*Jacksonville Branch of NAACP v. City of Jacksonville*, 2022 WL
16754389 (11th Cir. Nov. 7, 2022)......................................................................12

*Miller v. Johnson*, 515 U.S. 900 (1995).......................................................... 9, 13, 25

*Pals Group, Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299
(S.D. Fla. Feb. 9, 2017)............................................................................7

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ..................................15

*Shaw v. Hunt*, 517 U.S. 899 (1996) ................................................ 25, 28

*Shaw v. Reno*, 509 U.S. 630 (1993) ........................................ 10, 24, 25

*Software Tissue Regeneration Technologies, LLC v. Kostopoulos*,
2022 WL 19976189 (N.D. Ga. 2022) ...................................................7

*Vill of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252 (1977) .... 21, 23

*Wisconsin Legislature v. Wisconsin Election Commission*,
142 S. Ct. 1245 (2022)........................................................... 9, 24, 27

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016).........................7

**Constitutional Provisions**

Ga. Const., Art. IX, § 2, ¶ I (c)(2)..........................................................11

This case and Plaintiffs' Motion reflects their continuing efforts to manipulate the judicial system to advance their partisan and electoral goals. The organizational Plaintiffs and their ideological allies have argued in other redistricting cases that there are *not enough* majority black legislative or Congressional districts. S*ee*, *e.g.*, *Alpha Phi Alpha Inc. v. Raffensperger*, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023); *Allen v. Milligan*, 143 S. Ct. 1487 (2023).  But in *this* case, Plaintiffs argue that *one* majority black district among seven districts for the Cobb County School District's governing board is *too many*.

Leaving that aside, Plaintiffs' Motion is meritless. Their *16-month delay* in filing this Motion alone requires that it be denied.  Plaintiffs also have failed to demonstrate a substantial likelihood of success in showing that the General Assembly enacted the challenged map because of race and in fact devote very little of their 55-page brief to that issue.  Instead, Plaintiffs mostly focus on the motives of the Republican members of the District's governing board and its map-drawer. Furthermore, Plaintiffs have failed to cite *any* authority for their apparent proposition that a lawful and properly functioning *existing* majority black district must be *dismantled* in order to avoid a racial gerrymandering claim. Moreover, the same (or substantially the same) majority black district would have been drawn in the absence of the need to comply with the Voting Rights Act. Lastly, Plaintiffs largely ignore the lawful partisan motives that were a very important factor in drawing the redistricting map,

including the other two districts they challenge. For these and additional reasons set forth below, Plaintiffs' Motion should be denied.

## I.    FACTS

In May 2021, Board Chairman Randy Scamihorn and two District employees, John Floresta and Andy Steinhauser, met with attorney Bryan Tyson with the law firm of Taylor English Duma, LLP ("Taylor English") and two individuals with affiliate Taylor English Decisions to discuss the possibility of the District retaining Taylor English to draw a redistricting map for the District. (Tyson Dep., pp. 13:4-14:17, 15:5-16:3) (Ex. 1, attached).[1] Tyson, a long-time resident of Cobb County, has been a redistricting and election law attorney for more than 20 years and has more than 20 years of experience drawing redistricting plans in Georgia and other states, including the 2005 Georgia congressional redistricting.[2]

During the meeting, Tyson discussed the fact that a population deviation of plus or minus five percent (for a total deviation of 10%) between districts was generally defensible as a safe harbor in court, but that most jurisdictions and the State Legislative and Congressional Redistricting Office ("LCRO") prefer a population deviation of plus or minus one percent. (Ex. 1., pp. 25:19-26:11).  According to the

---

[1] Relevant excerpts and accompanying exhibits for each deposition cited herein are attached hereto as exhibits.

[2] *Id*., pp. 10:20-11:13, 35:3-6, 157:18-158:5; Tyson Decl., ¶¶ 2-3) (Ex. 2, attached).

2020 census, the population deviation among the Board districts was plus or minus 7.66%.  (Morgan Report, ¶¶ 36-40, attached as Ex. 3).

At the conclusion of the meeting, there was no understanding whether the District would hire Tyson. (Ex. 1, pp. 28:6-29:2). None of the other Board members (Republican or Democrat) were aware of the possibility of retaining Taylor English until Chairman Scamihorn proposed the hire during the August 19, 2021 Board work session.[3] During the Board meeting that evening, the Board voted to retain Tyson and Taylor English by a 4-3 vote, with the four Republican Board members voting in favor, and the three Democrat Board members voting against.[4]

The District's general counsel, Nina Gupta, contacted Tyson on August 24, 2021 to inform him of the Board's desire to retain him to handle the redistricting for the Board. (Ex. 7, attached). On August 27, Gupta sent Tyson an email summarizing the essential terms for his retention. (*Id.*). These terms included (1) the production of "a fair, nondiscriminatory and legal defensible redistricting map" for the Board; and (2) that "[a]ll Board members must have equal access to the TED attorneys involved and equal opportunity to provide meaningful input into the map, with that input

---

[3] Doc. 194-37, pp. 3-12; Davis Decl., ¶¶ 28-32; Chastain Dep., pp. 58:2-9, 59:16-60:7 (Ex. 4, attached); Wheeler Dep., pp. 62:18-63:8, 64:20-65:12 (Ex. 5, attached); Banks Dep., pp. 140:8-142:9 (Ex. 6, attached).
[4] Ex. 4, pp. 60:18-61:3, 64:6-22; Ex. 6, pp. 152:5-154:23.

meaningfully considered." (*Id*). Tyson agreed to these and other material terms, and he signed the formal retention letter on October 12, 2021.[5]

All Board members indeed had equal access and input. Per Dr. Howard, a Democrat Board member, "we all had opportunity to meet with . . . [Tyson] . . . and give our opinions and draw maps and potential maps together with him".[6] In fact, Tyson talked and/or met with all Board members, and each of the Democrat Board members drew their own maps.[7] Tyson also spoke and met with Steinhauser frequently and understood that Steinhauser was authorized to speak on behalf of Chairman Scamihorn. (Ex. 1, pp. 53:9-54:25, 56:7-9). Steinhauser instructed Tyson that retaining a Republican majority on the Board needed to be a very important goal for the redistricting map he was preparing for Chairman Scamihorn (referred to as the Chair's Map), and Tyson did so.[8] Tyson did so primarily by rotating the districts clockwise around the City of Marietta, which favored Republicans.[9] On December 4, 2021, Board member David Banks sent an email to Tyson stating that he would vote in favor of the Chair's map because it "support[ed] the current *political*

---

[5] Ex., attached; Ex. 1, pp. 30:13-31:2.
[6] Howard Dep., 43:13 – 25, 77:7-79:17, 82:24-84:3, 86:24-88:5, 150:13-25 (Ex. 9, attached); Doc. 194-35, at pp. 8, 10).
[7] Ex. 1, pp. 39:10-41:20, 113:23; Doc. 194-35, at p. 8.
[8] Ex. 1, pp. 73:19-24, 112:10-17, 113:1-23, 115:19-24; 117:11-23; 146:11-16).
[9] Ex. 2, ¶¶ 7-8; Steinhauser Dep., pp. 128:5-129:6 (Ex. 10, attached); Ex. 4, p. 82:12-15; Ex. 6, pp. 201-202:2, 241:25-242:8).

*majority*" and "will have the potential to maintain the current *political ratio*." (Ex. 11) (emphasis added).

The Chair's Map, Hutchins' map and Davis' map were all unveiled to the entire Board for the first time at the same time on December 6, 2021.[10] In a strategic political *and legal* maneuver, on the evening of December 8, 2021, Davis and Hutchins contacted Chairman Scamihorn and requested that their proposed redistricting maps be withdrawn from consideration. (Doc. 194-35, p. 13).

During the Board's 12/9/21 meeting, Hutchins and Davis did in fact withdraw their proposed redistricting maps from consideration. (, 194-38, p. 39, at 2:36.28.1). Tyson then made a presentation regarding (primarily) the Chair's Map and answered questions by all Board members. (*Id.*, pp. 42-51). After further debate and discussion, Davis made a motion to submit the existing map to the state LCRO, which was defeated 4-3 in a party-line vote. (*Id.*, p. 53, at 3:19:45.8).  Chairman Scamihorn made a motion to submit the Chair's map to the state LCRO, which was approved 4-3 in another party-line vote. (*Id.*, pp. 53-54).

Tyson submitted the Chair's map to Gina Wright, the director of the state Reapportionment Office, in early January 2022 for its technical review. (194-21). After Wright made minor technical corrections, the Chair's Map was drafted into

---

[10] Doc. 194-35, pp. 21-22, response to Int. No. 11; Ex. 1., at depo. Ex. 76; Ex. 1, pp. 128:18-130:11.

the form of a bill, House Bill 1028. (Ex. 1, pp. 153:1-155:5). The Georgia House approved House Bill 1028 on February 14, 2022, and the Georgia Senate approved it on February 28, 2022. (Doc. 194-1, p. 15).  Governor Kemp signed HB 1028 into law on March 2, 2022. (*Id*.).

## II.    ARGUMENT AND CITATION OF AUTHORITY

To obtain a preliminary injunction, the moving party must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm unless the injunction is granted; (3) the threatened injury outweighs the harm the injunction would cause to the non-moving party; and (4) injunction would not be adverse to the public interest. *See*, *e.g.*, *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270-71 (11th Cir. 2020) (citing cases). The Eleventh Circuit has recognized that a substantial likelihood of success on the merits is "generally the most important." *Id*. at 1271 n.12 (citing cases).  As amicus, the District will focus on the first two prongs.

## A.    Plaintiffs' Motion Should Be Summarily Denied Because It Is Untimely

Any party seeking a preliminary injunction must demonstrate that they exercised "reasonable diligence" in pursuing this remedy, including in election cases.  *See*, *e.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018); *Black Voters Matter Fund v. Raffensperger*, 508 F. Supp.3d 1283, 1301 (N.D. Ga. 2020) (citing cases).  The Eleventh Circuit and other district courts inside and outside the Eleventh Circuit have rejected requests for preliminary injunctions involving <u>far</u> shorter delays than

those present in this case.  *See*, *e.g.*, *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (five-month delay); *Softwave Tissue Regeneration Technologies, LLC v. Kostopoulos*, 2022 WL 19976189, at *12 (N.D. Ga. 2022) (delay of two to four months) (citing cases) (Jones, J.); *Pals Group, Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (unexplained delays of a few months) (surveying cases).

Plaintiffs have demonstrated the *antithesis* of reasonable diligence in filing the instant Motion more than **19 months** after Governor Kemp signed HB 1028 into law on March 2, 2022 and more than **16 months** after Plaintiffs filed this lawsuit on June 9, 2022.  Plaintiffs have not cited *any* case that has granted a preliminary injunction after such a lengthy delay.  Plaintiffs claimed that they just discovered in late August 2023 that a motion for preliminary injunction would be necessary to ensure a ruling in time for the 2024 election cycle. (Doc. 156-2, pp. 2-3 n.2). However, the primary elections for the last *five* election cycles have been in May, just as it will be for the 2024 election cycle. (Exs. 12-13, attached).[11]

Plaintiffs cite *In re Georgia Senate Bill 202*, 2023 WL 5334617, at *12 (N.D. Ga. Aug. 18, 2023) for the proposition that a motion for preliminary injunction may be filed too early to show imminent harm. (Doc. 194-1, p. 57). However, the plaintiffs

---

[11] The 2020 cycle, the primary was originally scheduled for May 19, 2020 but was moved to June 9, 2020 because of COVID-19. (Ex. 13).

in that case previously had filed motions for preliminary injunction that were denied. Id. at *2, 6. They re-filed their motions in April 2023, nearly one year before the primary elections for the 2024 election cycle, which the court held was appropriate. *Id*. at *12. Thus, under *In re Senate Bill 202*, filing a motion for preliminary injunction nearly one year before an election is sufficiently imminent. Yet Plaintiffs did not file the instant Motion until six months later.

**B.   Plaintiffs Have Failed To Show A Likelihood of Success On The Merits**

A plaintiff asserting a racial gerrymandering claim must show that "race was the predominant factor motivating the ***legislature's*** decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *see also Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245, 1248 (2022) (*per curiam*). The Supreme Court has articulated the plaintiff's burden as follows:

> The plaintiff's burden is to show, either through circumstantial evidence *of a district's shape or size* or more direct evidence going to **legislative purpose**, that race was the predominant factor *motivating* the ***legislature's***[12] decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the ***legislature*** subordinated traditional, race-neutral districting principles, including, but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

---

[12] Plaintiffs replace "legislature" with "mapmaker" or "map drawer." (*See*, *e.g.*, Doc. 194-1, pp. 22, 37).

*Miller*, 515 U.S. at 916 (emphasis added). The plaintiff must show that "race for its own sake, and not other districting principles, was the ***legislature's*** dominant and controlling rationale." *Id.* at 913 (emphasis added).

Courts must exercise "extraordinary caution in adjudicating claims that a [State] has drawn district lines on the basis of race." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 786, 797 (2017) (*quoting Miller*, 515 U.S. at 916). This is because "[r]edistricting legislatures will, for example, almost always be aware of racial demographics, but it does *not* follow that race predominates in the redistricting process." *Miller*, 515 U.S. at 916 (citing *Shaw v. Reno*, 509 U.S. 630, 646 (1993)(emphasis added).

### 1.    Plaintiffs Have Failed To Establish That Race Predominated The General Assembly's Enactment Of House Bill 1028

Plaintiffs' Motion focuses almost exclusively on the alleged motives of the *Board* and its map-drawer, Tyson. However, it is the motives of the Legislature, not the Board or Tyson, that matter because it was the Legislature, not the Board, that adopted the redistricting map. Indeed, Georgia's constitution confirms that *only* the General Assembly has the authority to enact new district voting maps in preempting "[a]ction affecting the composition, form, procedure for election or appointment, compensation, and expenses and allowances in the nature of compensation of the county governing authority." Ga. Const., Art. IX, § 2, ¶ I (c)(2).

Recognizing that the District merely recommended the redistricting map, Plaintiffs' Motion essentially asserts a "cat's paw" theory in a futile attempt to attribute the Board's alleged racial motives or that of Tyson to the Legislature. "A 'cat's paw' is a 'dupe' who is 'used by another to accomplish his purposes.' A plaintiff in a *'cat's paw'* case typically seeks to hold the plaintiff's employer liable for 'the animus of a supervisor who was not charged with making the ultimate [adverse] employment decision.'" *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (internal citations omitted).

In *Brnovich,* the Supreme Court expressly rejected the application of the *"cat's paw"* theory in the legislative context, stating:

> The "cat's paw" theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is ***insulting*** to suggest that they are mere dupes or tools.

*Brnovich*, 141 S. Ct. at 2350 (emphasis added).

Just as legislators who adopt a bill are not the agents of a bill's sponsor,[13] they

---

[13]   Plaintiffs contend that Rep. Ehrhart, the sponsor of HB 1028, was motivated predominantly by race merely because she stated that compliance with the federal and Georgia constitution, as well as the VRA were top considerations. (Doc. 194-1, p. 42 n.27).  However, it goes without saying that a redistricting map that does not prioritize compliance with the U.S. Constitution, the Georgia Constitution, and the VRA will not be a valid map.  This statement hardly reflects that race was Rep. Ehrhart's predominant motive. Likewise, her observation that HB 1028 "potentially

are also not agents of a local board that recommended a bill to them.[14] Thus, Plaintiffs' suggestion that the Legislature could be used as the local school board's *"cat's paw"* in attempting to argue that HB 1028 was enacted predominantly because of race is, "insulting" to Georgia's democratic process.[15]

Moreover, the Supreme Court repeatedly has emphasized that legislatures are presumed to act in good faith. *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018); *Miller*, 515 U.S. at 915. Thus, "[i]n assessing the sufficiency of a challenge to a districting plan," a court "must be sensitive to the complex interplay of forces that enter a

---

creates three minority opportunity voting districts" (*id.*) is equally innocuous and does not suggest a racial motive. She explained that such districts were those that allowed "a minority member to win an election." (Doc. 37, ¶ 132). Rep. Ehrhart was simply explaining plausible political outcomes for HB 1028 and noted that these districts were currently represented by minority members. (*Id.*). Indeed, Rep. Ehrhart testified that HB 1028 was *not* drawn because of race. (194-39p. 9 at 0:55.20.0-35.5).

[14] Contrary to Plaintiffs' suggestion (Doc. 194-1, p. 42 n. 26), *Jacksonville Branch of NAACP v. City of Jacksonville*, 2022 WL 16754389 (11th Cir. Nov. 7, 2022), the district court found a predominant racial motive based on direct quotes from *multiple* councilmembers, the "sprawling" district geometries and a multitude of other evidence. *Id.* at *3. In any event, attributing the motives of one "key" member to the other 18 members of a city council may be one thing; attributing the purported motives of one Georgia House member to the 179 other members is quite another.

[15] Plaintiffs cannot sidestep *Brnovich*'s prohibition against employing a "cat's paw" based on *Cooper v. Harris*, 581 U.S. 285 (2017). In *Cooper*, the Supreme Court found the district court's factual finding that the district map was based predominantly on racial considerations was not clearly erroneous based on evidence that two state legislators told their colleagues in the legislature that they needed to create a "majority-minority" district to comply with the Voting Rights Act, and that a consultant to the legislature testified that he was instructed by the two legislators to draw two districts with voting age populations that were majority black. *Id.* at 299-301.

legislature's redistricting calculus." *Brnovich*, 138 S. Ct. at 2324.

In a feeble attempt to rebut the presumption of good faith by the Legislature and prove that it adopted HB 1028 predominantly because of race, Plaintiffs complain that the Legislature did not defer to the local delegation (which has a one-member Democratic majority in the Georgia House and likely would have favored a map that enhanced their electoral prospects to gain a majority of the Board). (Doc. 194-1, pp. 36-37). However, the Eleventh Circuit has recognized that Georgia law ***does not*** "codify or require the discretionary deference to local courtesy when either the House or the Senate addresses legislation." *DeJulio v. Georgia*, 290 F.3d 1291, 1296 (11th Cir. 2002). Rather, "members of the General Assembly can contest local legislation of which they disapprove by removing it from the consent calendar and requiring the whole body to vote upon it." *Id.*

That is what happened here. In a purely *political* dispute, Democrat members of the Cobb Delegation opposed HB 1028 and proposed a different redistricting map (Doc. 194-23, p. 4, ¶¶ 5-6), and Republican members of the Cobb Delegation and other House Republicans supported HB 1028. Because HB 1028 was contested, it went through a different committee process as a contested general bill, which was not a deviation in the legislative process.[16] *See DeJulio*, 290 F.3d at 1296.

---

[16] Ehrhart Dep., pp. 35:10-24 (Ex. 14, attached); 194-39, p. 7, at 50:46.6; *Id.*, p. 12, at 1:04:18.4; *Id.*, p. 13, at 107:40.0.

Moreover, Plaintiffs' assertion that the Republican sponsor, Rep. Ginny Ehrhart, did not confer with Democrat members of the Cobb Delegation before introducing HB 1028 (Doc. 194-1, p. 37), hardly establishes a racial motive. Plaintiffs' assertion that a Republican committee chairwoman (Darlene Walker) turned off the microphone of a Democrat House member (David Wilkerson) while he was speaking in opposition to HB 1028 and had Capital Police called (*id.*, p. 38) is disingenuous[17] and in any event likewise fails to establish a racial motive.

### 2. Plaintiffs Have Failed To Establish That Race Rather Than Partisan Considerations Predominated Tyson's Construction Of Districts 2 and 6

Partisan gerrymandering does not violate the Fourteenth Amendment, and a claim of partisan gerrymandering is nonjusticiable. *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). When the government raises partisan motivations as a defense, the court faces a "formidable task." *Cooper,* 581 U.S. at 308. For example, the Supreme Court has acknowledged that "political and racial reasons are capable of yielding similar oddities in a district's boundaries" because "racial identification is highly

---

[17] Rep. Walker was more than entitled to take the necessary steps to regain control of the committee hearing after Rep. Wilkerson's disorderly conduct and abusive comments, including telling Rep. Walker that he was "just *disgusted* at this chamber, *disgusted*" and then daring to tell a presiding committee chairwoman, "*No*, I'm *not* gonna listen to you because I'm tired of you talking[.]" (194-39, p. 14, at 1:10:29.1, 1:11:15.2) (emphasis added).

correlated with political affiliation." *Id*. (quoting *Easley v. Cromartie* 532 U.S. 234, 243 (2001) ("*Cromartie II*")).

Thus, "[c]aution is especially appropriate … where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Cromartie II*, 532 U.S. at 242. *See also Bush v. Vera*, 517 U.S. 952, 968 (1996) ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify") (plurality opinion). Thus, a court "must make 'a sensitive inquiry' into all 'circumstantial and direct evidence of intent' to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines." *Cooper*, 581 U.S. at 308 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)).

> **a.   Tyson Testified And Banks Confirmed That Retaining A Republican Majority Was A Very Important Factor In Drawing The Map, Including Districts 2 and 6**

Following the direction of Steinhauser, who Tyson understood to be speaking for Chairman Scamihorn, Tyson drew the Chair's Map with the very important goal of retaining a Republican majority on the Board.[18] Tyson did so primarily by rotating the districts clockwise around the City of Marietta, which favored Republicans.[19]

---

[18] *See* note 8, *supra*.

[19] *See* note 9, *supra*.

Tyson consulted with political data reflecting precinct-level results from the general statewide elections in 2018 and 2020, as well as various county elections in 2018 for 2020, including for chair of the county commission and district attorney.[20] Tyson used this political data to measure how the Republican Board members would likely perform in an election under various configurations of the map.[21] Tyson reviewed the precinct-level political data with Steinhauser during the map-drawing process in order to ensure that the redistricting boundaries would increase the chances of retaining a Republican majority on the Board. (Ex. 2, ¶¶ 5-6, & Ex. A thereto).

> **b.     Plaintiffs Have Failed To Demonstrate Tyson Drew Districts 2 And 6 Because Of Race Rather Than Partisan Considerations**

In a futile attempt to diminish this evidence that the partisan goal of ensuring a Republican majority on the Board was a very important part of the map-drawing process, Plaintiffs attempt to characterize Tyson's deposition testimony as a "*post hoc*" claim of a partisan goal.  However, Plaintiffs' wishful thinking is eviscerated by Banks' email to Tyson on December 4, 2021, which confirmed that the goal of the Chair's Map as being to ensure a Republican majority on the Board. (Exhibit

---

[20] Ex. 1, p. 35:3-6, 10-22, 37:20-22, 38:12-22, 80:19 – 81:15; Ex. 1 atDep., Ex. 15; Ex. 2, ¶¶ 5-6 & Ex. A thereto).
[21] Ex. 1, p. 81:10-15; Ex. 1 at Dep., Ex. 15).

11).[22] Plaintiffs' "post hac" claim is further eviscerated by Tyson's *contemporaneous* notes at the time reflecting conversations with Steinhauser focusing on potential election outcomes and other political considerations.[23] Tyson's partisan motives thus were no more "post hoc" than in *Cromartie II*, where the Supreme Court held that the predominant motives of the North Carolina legislature were partisan and not racial. *Cromartie II*, 532 U.S. at 242-254.

Undeterred, Plaintiffs simply declare without any support that there is "overwhelming evidence" that race was the predominant criterion used to further a partisan goal. (Doc. 194-1, p. 52). Plaintiffs' experts do not even mention Tyson's stated partisan motives, much less attempt to explain how their data shows that Tyson's construction of Districts 2 and 6 can only be explained because of race rather than politics.[24] The case law cited by Plaintiffs (Doc. 194-1, pp. 51-52) likewise involves facts not present in this case. *Cooper*, 581 U.S. at 314-17 (race was predominant motive because, among other reasons, legislative leaders initially stated the district was drawn in order to comply with § 5 of the VRA, which was confirmed in a preclearance submission to the Department of Justice, and because a far higher percentage of black Democrats were moved into district than white

---

[22] Plaintiffs point out that partisan interests were not listed among the redistricting criteria provided to Tyson. However, as Tyson explained, elected officials typically prefer not to state partisan goals publicly. (Ex. 1, p. 115:19-25).

[23] Ex. 1at Ex. 15; Ex. 1, pp. 75:4 – 76:6, 80:24 – 81:15).

[24] Doc. 194-1, pp. 25-29; Doc. 194-3, 194-4.

Democrats); *Clark v. Putnam Cnty.,* 293 F.3d 1261, 1268, 270-78 (11th Cir. 2002) (two majority-black districts had at least 60% black voters, who comprised only 34% of county voters, 90% of the county's black voters were drawn into two districts, and the county invoked need to comply with § 5 of the VRA).

Finally, Plaintiffs point to Tyson's deposition that Districts 2 and 6 "could be viewed as Voting Rights Act compliant districts." (Doc. 194-1, p. 25). However, Tyson did not draw Districts 2 or 6 based on their racial composition or in order to the comply with Section 2 of the VRA. (Ex. 2, ¶ 10). Tyson's testimony simply reflects his understanding that some may view those districts as related to compliance with Section 2 because those districts would elect Democrats, who are currently the candidates of choice of Black and Latino voters in Cobb County. (*Id.*).[25]

### c. Plaintiffs Have Failed To Demonstrate That Tyson Subordinated Traditional Redistricting Principles, Much Less That He Did So Because Of Race

Contrary to Plaintiffs' contentions (Doc. 194-1, p. 33), the existing map and the Chair's Map received the *same* compactness score (.42) by one measure (Morgan

---

[25] Plaintiff's assertion that Tyson admitted to using "racial information" and "racial" data to draw Districts 2 and 6 (Doc. 194-1, p. 25) is disingenuous and misleading. Plaintiffs conveniently omit the portions of Tyson's testimony stating that he also reviewing extensive political data that he had loaded onto the Maptitude platform. (Ex. 1, pp. 35:15-22). Tyson also testified that he did not rely on racial data, but considered and used a wide range of information, including racial data, political data, incumbent data, precinct data, prior plan data – "a variety of different pieces of the puzzle." (*Id.*, p. 37:9-23).

Report, ¶ 72; by another measure, the existing map's compactness score was (.03) higher than the Chair's Map (*id*., ¶ 82), which is hardly "significant."  Both maps are reasonably compact. (*Id*., ¶ 81). Plaintiffs point out that the Chair's Map split 30 precinct lines (voting tabulation districts or "VTDs"), whereas the existing map only split 23 such VTDs. (Doc. 194-1, p. 33). However, this was due almost entirely to the Chair's criteria instructing Tyson to use major roads as precinct boundaries when possible.  (Ex. 3, ¶¶ 96-103; 194-14, 194-15).

Plaintiffs complain that the Chair's Map disregarded incumbent protection as a traditional redistricting principle because it drew Howard and Davis into the same district. (Doc. 194-1, pp. 33-34). However, as Plaintiffs are well aware, Tyson was informed early that Howard was not going to run for re-election.[26] Plaintiffs next complain that the Chair's Map split the cities of Kennesaw and Smyrna into different districts. (Doc. 194-1, p. 24). Plaintiffs' complaints about Kennesaw are inapposite because it does not lie within any of the three districts Plaintiffs challenge. Also, it is not constitutionally required to keep all cities within the same district, and the Chair's Map kept many cities and communities of interest together in the same district as much as possible.[27]

---

[26] Ex. 1, at Ex. 14 (10/21/21 email) ("Tre is only Democratic member that is here to stay"); Ex. 1, pp. 68:19 – 69:17).

[27] Ex. 1 at  Ex. 16, ¶ 5; Ex. 3, ¶¶ 138-39.

Finally, Plaintiffs complain about the re-shuffling of high school pairings in the Chair's Map. (Doc. 194-1, pp. 31-32). However, this was the result of rotating the districts clockwise to increase the chances of retaining a Republican majority on the Board.[28] The Chair's criteria required that each Board member have two high schools and that six specific high schools be paired together because they shared common issues.[29] Which Board members were given which high schools was a contentious subject during the redistricting process. (*See*, *e.g.*, Ex. 1 at Exs. 14, 15). Yet the Chair's Map did keep each high school's attendance zones largely within the same district. (Ex. 1 atEx. 16, ¶ 6). Regardless, the fact that Banks may have disagreed with the high schools he received but yet approved the Chair's Map because he believed it would preserve a Republican majority (Ex. 11) shows that this political goal was a higher priority than the high school pairings.

### d.   The *Arlington Heights* Factors Do Not Point To Race As The Predominant Factor

Finally, Plaintiffs contend that the *Arlington Heights* factors show circumstantial evidence that race was the predominant motive for drawing Districts 2 and 6. (Doc. 294-1, pp. 34-43).[30] The bulk of Plaintiffs' contentions consist of political

---

[28] *See* note 9, *supra*.

[29] 194-14, 194-15; Scamihorn Dep., pp. 92:11-93:10, 21-25, attached as Ex. 19; Ex. 4, p. 105:15-22.

[30] Plaintiffs' argument that the Legislature deviated from the normal legislative process to enact HB 1028 (Doc. 194-1, at pp. 30-32) is refuted in Section B(1), *supra*.

19

disagreements completely outside the redistricting process.[31] (*Id*.).  Plaintiffs have failed to cite *any* case finding race to be the predominant motive for a redistricting plan based on facts or circumstances *completely unrelated* to the redistricting process itself (or a previous redistricting process).  In any event, Plaintiffs' assertions of disparate impact (Doc. 194-1, p. 29) not only ignore the fact that any foreseeable impact was partisan, not racial, but also is not alone determinative in the absence of a stark pattern of racial intent (which is not present here), and the Court must look to other evidence. *Arlington Heights*, 429 U.S. at 266.[32]  Plaintiffs' allegations of a "secretive process" are likewise meritless.[33]

---

[31] In any event, Plaintiffs' assertions that the resolution of these hot button political issues were based on race are meritless. The Board adopted the policy decision to end the open discussion period at the end of a work session and to change the required vote to get items on the agenda to streamline Board meetings and to limit topics to those that were "relevant to the business of the School District" and not political issues.(Floresta Dep., pp. 138:10-15, 139:17-145:14 (Ex. 15, attached)); Ex. 6., pp. 44:19-46:23). The Board banned Critical Race Theory because it was not part of the curriculum approved by the Georgia Department of Education and was undefined. (Ex. 15, pp. 197:14-198:8; Ex. 4, pp. 121:17-123:18; Ex. 5, pp. 113:215; Ex. 16, attached). No Board member ever made a motion to rename Wheeler High School, and this was never requested to be an agenda item. (Ex. 4, pp. 122:23-123:7; Ex. 5, p. 113:6-20).  The Board had open discussions about COVID 19 protocols; however, the safety protocols to deal with COVID was an operational decision made by the Superintendent, not the Board. (Ex. 5, pp. 113:6-20-114:20).

Banks distributed "ethnic studies" to fellow Board members and others (Doc. 194-1, p. 36) for non-discriminatory reasons (Ex. 6, pp. 36:16-37:17, 37:21-39:11) and were not discussed with other Board members. (Ex. 19, pp. 124:20-22, 127:1-24; Ex. 4, pp. 95:8-97:14; Ex. 5, pp. 83:20-86:7).

[33] *See* pp. 3-4 & footnotes 7-8, *supra*.

3.    **Plaintiffs Have Failed To Establish That District 3 Was The Product Of Unlawful Racial Gerrymandering**

a.    **Tyson Would Have Drawn A Majority Black District Even In The Absence Of The Need To Comply With § 2 of the VRA**

The "central purpose" of the Fourteenth Amendment is to "prevent the States from purposefully discriminating between individuals because on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Thus, racial gerrymandering is simply a particular form of intentional race discrimination. *See*, *e.g., Id.* at 649; *Miller*, 515 U.S. at 913. A racial gerrymandering claim, like any other intentional race discrimination claim, may be defeated by showing that the same decision would have been made without the racial motive. *See*, *e.g.*, *Vill of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 271 n. 21 (1977); *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Here, Tyson would have made the same decision to maintain the same or substantially the same majority Black district in South/Southwest Cobb County even if he had not concluded that it was necessary to do so in order to comply with § 2 of the VRA. (Ex. 2, ¶ 11). Tyson would have done so (1) in order to achieve the partisan goal of ensuring a Republican majority on the Board and also in order to apply traditional redistricting criteria and to carry out Chairman Scamihorn's other redistricting criteria; and (2) because drawing a majority-black district in this area was almost inevitable due to the heavy density of Black voters in this area of the

21

County.[34] Retaining a majority-black district in South/Southwest Cobb County for reasons unrelated to § 2 VRA compliance would be lawful. *Shaw*, 509 U.S. at 647.

> **b.    District 3 Satisfies Strict Scrutiny Because Tyson Had Good Reason To Believe That Retaining A Majority Black District Was Necessary To Comply With The VRA**

The Supreme Court repeatedly has assumed (without expressly holding) that compliance with the VRA constitutes a compelling state interest that might permit consideration of race in the redistricting process, and then considered whether the government's actions were narrowly tailored to advance that compelling interest under strict scrutiny. *See*, *e.g.*, *Wisconsin Legislature v. Wisconsin Election Commission*, 142 S. Ct. 1245, 1248 (2022) (per curium); *Cooper*, 581 U.S. at 292; *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct.788, 801 (2017); *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) (*Shaw II*); *Miller*, 515 U.S. at 921.

In this context, the narrow tailoring requirement "insists only that the legislature have a 'strong basis in evidence' in support of the (race-based) choice that it has made." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015); *Cooper*, 581 U.S. at 292-93; *Shaw*, 509 U.S. at 656; *Shaw II*, 517 U.S. at 910; *Bush v. Vera*, 517 U.S. 952, 997 (1996) (plurality opinion).  This standard

> [d]oes not demand that a State's actions actually be necessary to achieve a compelling state interest in order to be constitutionally valid … And legislators "may have a strong basis in evidence to use racial classifications in order to comply with a statute when they have *good*

---

[34] *Id*.; Ex. 1, pp. 93:25–94:8, 94:21-95:4; Ex. 3, ¶¶ 105-106.

*reasons* to believe such use is required, even if a court does not find
that the actions were necessary for statutory compliance."

*Alabama Legislative Black Caucus*, 575 U.S. at 278. (citation omitted) (emphasis in
original). *Accord Bethune-Hill*, 137 S. Ct. at 801. This standard gives local
governments "'breathing room' to adopt reasonable compliance measures that may
prove, in perfect hindsight, not to have been needed." *Cooper*, 581 U.S. at 293.
Thus, "[i]f a State has **good reason** to think that all the '*Gingles* preconditions'[35] are
met, then so too it has good reason to believe that § 2 requires drawing a majority-
minority district." *Cooper,* 581 U.S. at 302 (emphasis added).

Plaintiffs contend that the third *Gingles* factor is not satisfied because Black-
preferred candidates have won in District 3 by margins of approximately 50% for
the last several selections. (*Id*., pp. 40-43).[36] However, the District 3 candidate ran
*unopposed* in the 2020 election cycle. (Ex. 17, attached). More importantly,
Plaintiffs conveniently ignore the fact that Tyson did not *create* a new majority black
district; he *retained* the majority Black District 3 that had existed since at least

---

[35] In order to make a threshold showing of voter dilution under § 2 of the VRA, a
plaintiff must show (1) a "minority group must be able to demonstrate that it is
sufficiently large and geographically compact to constitute a majority in a single-
member district"; (2) the minority group must be "politically cohesive"; and (3) a
district's white majority must "vote[] sufficiently as a bloc to enable it – in the
absence of special circumstances, such as the minority candidate running unopposed
– usually to defeat the minority's preferred candidate." *Thornburgh v. Gingles*, 478
U.S. 30, 50-51 (1986) citation omitted).
[36]  Plaintiffs' strict scrutiny arguments as to Districts 2 and 6 are irrelevant because
race was not the predominant motive. (Section B.2 *infra*).

2012.[37] In fact, Tyson retained 87.36% of pre-existing District 3. (Ex. 3, ¶ 87). Moreover, Tyson *reduced* the percentage of Black voters in District 3 from 56.78% to 56.24% and the percentage of Hispanic voters in District 3 from 16.94% to 16.89%. (*Id*., ¶¶ 39, 48). Furthermore, the competing maps proposed by Hutchins and Davis all proposed a District 3 that is also majority Black. (*Id*., ¶¶ 48, 52, 56).

Plaintiffs have failed to cite *any* authority for the proposition that an *existing* majority Black district that is functioning as designed must be dismantled if a "functional analysis" is not conducted. (Brunnell Report, p. 5, attached as Ex. 18). Indeed, Plaintiffs have failed to cite *any* case holding that a jurisdiction may dismantle an *existing* and functioning majority Black district without violating § 2 of the VRA if candidates preferred by Black voters in that district win by a certain percentage for a certain period of time. The Supreme Court racial gerrymandering cases that have rejected a VRA § 2 compliance defense have done so where the government sought to *add* a majority-minority district and was unable to show that it had good reason to believe that one was necessary under the VRA. *See*, *e.g.*, *Wisconsin Legislature*, 142 S. Ct. at 1249 (state sought to add seventh majority-minority district); *Abbott*, 138 S. Ct. at 2332-35 (state sought to add majority Latino districts); *Cooper*, 581 U.S. at 301-304 (state sought to create majority Black district

---

[37] Morgan Report, ¶ 39, Tyson Dep., p. 88:17-18).

24

even though district was already functioning as coalition district); *Shaw II*, 517 U.S. at 914-18 (state sought to add majority Black congressional district).

Accordingly, Tyson had good reason to believe that, in the absence of controlling case law holding that the existing and functioning majority Black district in District 3 could be dismantled without violating § 2 of the VRA, the District would face a significant threat of § 2 VRA liability if it dismantled the majority Black district in District 3. (Ex. 1, p. 95:12-17). Even if subsequent case law develops holding that an existing majority-minority district may be dismantled without violating § 2 of the VRA under certain circumstances, this would not alter the fact that that Tyson had good reason to believe that the District was required under § 2 of the VRA to retain the existing majority Black district in District 3.

## III.   CONCLUSION

For all the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction should be denied.

Respectfully submitted this 6th day of November, 2023.

*/s/ Philip W. Savrin*
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com
Jonathan D. Crumly
Georgia Bar No. 199466
Jonathan.crumly@fmglaw.com
William H. Buechner, Jr.
Georgia Bar No. 086392
bbuechner@fmglaw.com

25

Scott Eric Anderson
Georgia Bar No. 105077
scott.anderson@fmglaw.com
P. Michael Freed
Georgia Bar No. 061128
michael.freed@fmglaw.com

*Attorneys for Amicus Cobb County School District*

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(833) 330-3669 (facsimile)

## <u>LOCAL RULE 7.1 CERTIFICATION</u>

The undersigned does hereby certify that the foregoing has been prepared with

New Times Roman 14-point font in compliance with Local Rule 5.1.

*/s/ Philip W. Savrin*
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com

27

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically submitted the foregoing to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants.

*/s/ Philip W. Savrin*
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(833) 330-3669 (facsimile)

28